# DEPOSITION OF JOHN MAUGHAN
# TAKEN ON DECEMBER 18, 2019

**Certified Copy Transcript**

# In The Matter Of:

Marie Hughes et al vs. Venetian Hills Apartments, LLC et al

30(b)(6) Deposition of Venetian Hills Apartment, LLC (John Maughan)

December 18, 2019



**AccuTran, Inc.**

*---certified court reporters---*

707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
Phone: 770-426-9705
Fax: 770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 3 of 114

IN THE STATE COURT OF DEKALB COUNTY

STATE OF GEORGIA

MARIE HUGHES, as Authorized      )
Administrator for the Estate of  )
GEORGE HUGHES,                   )
                                 )
     Plaintiff,                  )      CIVIL ACTION FILE
                                 )
     vs.                         )      NO. 19A73694
                                 )
VENETIAN HILLS APARTMENTS, LLC   )
and JOHN MAUGHAN,                )
                                 )
     Defendants.                 )

                    - - -

        Videotaped 30(b)(6)Deposition of VENETIAN
     HILLS APARTMENTS, LLC, taken on behalf of the
     Plaintiff, pursuant to notice and with agreement
     of counsel, in accordance with the Georgia Civil
     Practice Act, before Sharon H. Ross, Registered
     Professional Reporter, at 3020 Big Creek Court,
     Alpharetta, Georgia, on the 18th day of December,
     2019, commencing at 1:08 p.m.

                    _____

AccuTran, Inc.
770-426-9705

```
 1    APPEARANCES OF COUNSEL:

 2         ON BEHALF OF THE PLAINTIFF:

 3              BRANDON S. SMITH, ESQUIRE

                Shiver Hamilton, LLC

 4              3490 Piedmont Road, Suite 640

                Atlanta, Georgia 30305

 5              (404) 593-0020

 6

 7         ON BEHALF OF THE DEFENDANT:

 8              BRYAN GRANTHAM, ESQUIRE

                Hawkins, Parnell & Young, LLP

 9              303 Peachtree Street NE

                Suite 4000

10              Atlanta, Georgia 30308

                bgrantham@hpylaw.com

11              (404) 614-7400

12

13

14         Also present:

15              Videographer, Duke Corey

16                        - - -

17              (Whereupon, disclosure as required by the

18         Georgia Board of Court Reporting was made by the

19         court reporter, a written copy of which is

20         attached hereto.)

21

22

23

24

25
```

```
 1
 2                        TABLE OF CONTENTS
 3                                                     PAGE
 4     Examination by Mr. Smith                          4
 5
 6     PLAINTIFF'S
        EXHIBIT:              DESCRIPTION            PAGE
 7
 8     Exhibit No. 1    Notice of Taking Deposition      6
 9     Exhibit No. 2    Furnished Efficiency Agreement  49
10     Exhibit No. 3    APD Spreadsheet                 60
11     Exhibit No. 4    Fax, Feb. 26, 2015              67
12     Exhibit No. 5    Map of Crimes in Vicinity       67
13     Exhibit No. 6    Map of Crimes in Vicinity       69
14     Exhibit No. 7    Inspection Checklist            91
15
16     Reporter's Note: Exhibits retained by Mr. Smith, Esq.
17
18
19
20
21
22
23
24
25
```

```
 1              THE VIDEOGRAPHER:  We are now on the
 2        record.
 3              MR. SMITH:  This is the deposition of
 4        Venetian Hills 30(b)(6) designee taken pursuant
 5        to notice and agreement of counsel for purposes
 6        of discovery, all other purposes allowed under
 7        the Rules of Civil Practice Act.  All
 8        objections, except to those going to the form of
 9        the question and responsiveness of the answer,
10        will be reserved until the time of trial or
11        further use of this transcript.  Is that
12        agreeable?
13              MR. GRANTHAM:  That's agreeable.  And we're
14        going to read and sign the deposition.
15              MR. SMITH:  If you would, please swear the
16        witness.
17                        JOHN MAUGHAN,
18      having been first duly sworn, was examined and
19      testified as follows:
20                        EXAMINATION
21      BY MR. SMITH:
22        Q    Would you please state your full name?
23        A    John Maughan.
24        Q    I represent the estate and family of George
25      Hughes, an individual who died at Venetian Hills
```

1    apartment complex on March 15, 2017.  You have

2    given a deposition already, Mr. Maughan, in this

3    case as a discovery deposition.  You now represent

4    Venetian Hills as the corporate designee to testify

5    to the topics that we've noticed.  Do you

6    understand that?

7        A    Yes.

8        Q    And if I say "you" or "Venetian Hills"

9    today, I mean Venetian Hills.  Okay?

10       A    Okay.

11       Q    And I may do that and, just if you would

12   have some understanding, I would appreciate it.

13   But you do understand that your testimony is

14   binding on the company itself.  Do you understand

15   that?

16       A    Yes.

17       Q    If you don't understand any of my questions

18   today or if you need a break, please request

19   clarity on the question or request to take a break.

20   That will be no problem.  We ask that you would not

21   guess today when you're providing testimony.  You

22   may hear some objections from your lawyer as to

23   form, but you're still obligated to answer unless,

24   of course, he advises you not to answer.  Does all

25   that make sense?

```
 1        A     Yes.

 2              (Plaintiff's Exhibit 1 was marked for

 3         identification.)

 4        Q.    (By Mr. Smith)  I'm handing you what's marked

 5        Plaintiff's Exhibit 1, and that is the deposition

 6        notice for today.  Have you seen that document?

 7        A     Yes.

 8        Q     And have you had ample time to review it

 9        and its contents?

10        A     Yes.

11        Q     And are you prepared to testify as to each

12        of these topics that have been noticed?

13        A     Yes.

14        Q     What did you do in preparation for today's

15        deposition as corporate designee?

16        A     I pulled out two pieces of paper which were

17        recently given to you, just given to you.  Well,

18        recently given to you.

19        Q     I understand.  And aside from these two

20        pieces of paper that you gave to us today, any

21        other preparations made?

22        A     I discussed it with my attorney.

23        Q     We've got --

24        A     Or -- I discussed it, yeah.

25        Q     I'm sorry.  I didn't mean to cut you off.
```

AccuTran, Inc.
770-426-9705

 1          Just discussed it with your lawyer?

 2          A    Yeah.

 3          Q    I don't need to know the substance of

 4     those, but you met with your lawyer in anticipation

 5     of today?

 6          A    Yes.

 7          Q    When did you all meet?

 8          A    Yesterday.

 9          Q    How long did you meet for?

10          A    An hour, maybe a little longer.

11          Q    Did you review any specific documents aside

12     from this notice?

13          A    Yes.

14          Q    What documents were those?

15          A    The ones I gave you.

16          Q    So the two documents that were produced

17     today.  Any other documents aside from those?

18          A    No.

19          Q    We'll mark these as --

20          A    Well, I looked at a couple others.

21          Q    What other documents did you look at?

22          A    I looked -- you've got one from Art

23     Robinson there.  I looked -- I saw -- I looked

24     through the file and I saw where we had had that

25     same attorney draw up the lease.



AccuTran, Inc.
770-426-9705

8

1      **Q**     Attorney Russell Mays here?

2      **A**     Yes.  Do you know him or of him?

3      **Q**     I do not, no.  But Russell Mays was the

4    lawyer that you had testified in your deposition

5    several months back that helped you with the lease

6    documents when you were separating Building I5; is

7    that right?

8      **A**     That's correct.

9      **Q**     And so this document is further reflective

10   of the work that you did on I5; is that right?

11     **A**     That document there, yes.

12     **Q**     And we'll get to that.  But aside from this

13   document, and then the other one I think was an

14   interchange between you and an officer in the area,

15   no other documents that you looked at in

16   preparation for today?

17     **A**     Correct.

18     **Q**     And I have asked a lot of these questions

19   in your factual deposition; I'm not going to

20   necessarily go back into some of those details, but

21   I do want to know:  Since your deposition, aside

22   from your lawyer, have you communicated with anyone

23   about this case?

24     **A**     No.  Well, let me think about that.  I

25   don't believe so, no.

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 11 of 114

```
 1        Q     And did you --
 2        A     I may or may not have spoken to my regular
 3    attorney about it.  I can't remember.
 4        Q     Who is your regular attorney?
 5        A     Brad McClung.
 6        Q     And did Mr. McClung, is he representing you
 7    in this case?
 8        A     He gives me advice on everything.
 9        Q     I understand.  And I, again, don't want to
10    delve into that.
11        A     I don't understand the legal term represent
12    me, so I just want to be careful that I don't
13    misunderstand anything.
14        Q     And I appreciate that.  Aside from
15    Mr. McClung, have you spoken about this case since
16    your -- or your lawyer -- have you spoken about
17    this case since your deposition several months ago?
18        A     I don't believe so.
19        Q     You haven't met with any investigators?
20        A     No.
21        Q     No assistant district attorney, anything
22    like that; correct?
23        A     Correct.
24        Q     Since your prior deposition, discovery
25    deposition, have you done any additional research
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 12 of 114

```
 1        outside of the two documents that you've given me

 2        here today?

 3             A    No.  That's it.

 4             Q    Have you ever given a 30(b)(6) deposition?

 5        In other words, have you ever been the corporate

 6        designee to testify on behalf of Venetian Hills?

 7             A    No.  Well, I don't know.  I mean, that's a

 8        technicality that I wouldn't know.

 9             Q    It's possible -- I know there have been

10        prior actions --

11             A    I've never had a duplicate -- what are we

12        in here now?  I've never had to testify twice.

13             Q    I see.

14             A    As two different persons.

15             Q    Do you know if you've ever been designated

16        by Venetian Hills to testify on Venetian Hill's

17        behalf as the corporate representative such that

18        your testimony binds Venetian Hills?

19             A    I have no idea.  As I told you, I have

20        never had more than one, so I don't know whether --

21        which side I was on.

22             Q    I understand.

23             A    Not which side.  Whether I was testifying

24        as John Maughan or as Venetian Hills.

25             Q    Okay.
```



AccuTran, Inc.
770-426-9705

```
 1        A     Because it's never occurred before.

 2        Q     You've had just the one prior deposition?

 3        A     I'm sorry?

 4        Q     You've had just one prior deposition, is

 5   what you're saying?

 6        A     In this case?

 7        Q     No.  Just in your life.

 8        A     Oh, yeah.  It's only been one in any

 9   particular case.

10        Q     Okay.  Just try to listen to my question.

11   Have you testified more than once before I took

12   your deposition this summer?

13        A     I'm sorry?

14        Q     Okay.  So have you given deposition

15   testimony prior to your deposition testimony that

16   you gave in this case this summer?

17        A     On this case?

18        Q     Have you ever testified in your life in any

19   case?

20        A     Yes.

21        Q     Okay.  How many times have you testified in

22   your life on any case?

23        A     I have no idea.

24        Q     Can you estimate?

25        A     Half a dozen, I guess.  I don't know.
```



1      **Q**    Half a dozen times?

2      A    I wouldn't want to estimate.

3      **Q**    And I just want to make sure we're

4      perfectly clear.  In any of those times, you don't

5      know whether or not you were the corporate

6      representative for Venetian Hills?

7      A    No, I do not.  I only testified once.

8      **Q**    In those prior six times where you gave a

9      deposition, about, more or less --

10     A    Yeah.

11     **Q**    -- were those in reference to actions

12     against Venetian Hills?

13     A    I guess so.

14     **Q**    And nobody wants you to guess, but have

15     you -- can you think of anything else, outside of

16     testimony that you've given on --

17     A    I cannot think of any but, you know, I

18     could have given testimony where we were doing

19     something to somebody.  I have no idea.

20     **Q**    I understand.

21     A    I've been there 40 years.  Okay.

22     **Q**    Totally get that, yeah, loud and clear.

23     And I understand you've had many, many eviction

24     matters in the past.  I get that.

25     A    Eviction?

1     **Q**     Yes, sir.

2     A     Yes.

3     **Q**     Where you would be bringing the action.

4     I'm asking when somebody else has brought the

5     action against you or Venetian Hills, around six

6     times you've testified; fair?

7     A     That's my guess, but it's a way-out guess.

8     Okay.  Forty years, you know.  You're asking me to

9     count something in 40 years.  So, you know, I don't

10    want to take six as being anywhere near literate --

11    accurate.

12    **Q**     Okay.  Well, we may come back to that.

13          Did you at any time provide testimony in

14    the -- in any of the prior shooting cases that have

15    happened at Venetian Hills?

16    A     Did I provide testimony?

17    **Q**     Yes, sir.  Sworn testimony, like a

18    deposition that we're in today.

19    A     Yes.

20    **Q**     You did?

21    A     Yes.  I believe so.  I'm quite sure.

22    **Q**     So I want to talk to you about the fire

23    that occurred at Venetian Hills.  Do you remember

24    what day/date that it occurred?

25    A     No, but you have it in the information.



AccuTran, Inc.
770-426-9705

 1     **Q**    That fire that resulted in the death of

 2     George Hughes, which is what brings us here today,

 3     is what I want to ask you about.  Okay?

 4     **A**    Yeah.  I understand.

 5     **Q**    And Venetian Hills, is it your position

 6     that Venetian Hills could have done nothing to

 7     prevent the death of George Hughes?

 8     **A**    I don't believe so.

 9     **Q**    You don't believe that Venetian Hills could

10     have done anything to prevent his death?

11     **A**    I don't think so.

12     **Q**    If Venetian Hills' tenants wholeheartedly

13     disagreed with that, would that impact Venetian

14     Hills' belief as to what could have been done?

15     **A**    I have no idea.

16     **Q**    You don't know if it would impact your

17     belief?

18     **A**    No.

19     **Q**    If Venetian Hills' tenants disagreed with

20     your opinion that nothing could have been done to

21     prevent Mr. Hughes' death, would that be important

22     information to Venetian Hills?

23     **A**    I have no idea.

24     **Q**    If they, tenants of Venetian Hills,

25     believed that -- they believe that something like

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 17 of 114

1    this could be prevented in the future, would that

2    be important information of Venetian Hills?

3        A    Perhaps.

4        Q    What information would you need to believe

5    that Venetian Hills could have done an ounce of

6    anything to prevent George Hughes' death?

7        A    I can't conjecture on that.

8        Q    Has Venetian Hills ever followed up with

9    any tenant regarding how the events giving rise to

10   Mr. Hughes' death --

11       A    I'm sorry.  You're going to have to repeat

12   that one.  I missed the first part.

13       Q    All right.  Has Venetian Hills ever

14   followed up with any tenant regarding how the

15   events giving rise to Mr. Hughes' death could have

16   been prevented?

17       A    I'm sorry.  It's not my hearing; I don't

18   understand that question.  Repeat it, please.

19       Q    Allow me to rephrase.  Could Venetian

20   Hills, or, has Venetian Hills talked to any

21   resident about what happened in this case?

22       A    I don't believe so.

23       Q    And so would it be a fair statement that

24   Venetian Hills has not reached out to or followed

25   up with or contacted any Venetian Hills resident to

1    inquire what Venetian Hills could do to prevent

2    something in the future from happening like what

3    happened to Mr. Hughes?

4        A    That's a very here/here, there/there

5    question.  It's -- I cannot answer that

6    effectively.

7        Q    Let me try to rephrase again.  And I'm not

8    trying to here/here, there/there anything.  I'm

9    just trying to simply ask:  Is it a fair statement

10   that you have not inquired of any Venetian Hills

11   resident what Venetian Hills could do to prevent

12   something like this from ever happening again?

13       A    I don't believe I've spoken to any resident

14   on that.

15       Q    Did Venetian Hills have any type of

16   community or tenant meetings following this fire to

17   address any concerns by Venetian Hills tenants?

18       A    No.

19       Q    Did Venetian Hills have any tenant meetings

20   or community meetings before this fire to address

21   any concerns Venetian Hills tenants had with

22   respect to fires or safety?

23       A    No.

24       Q    Venetian Hills -- does Venetian Hills know

25   of any witnesses to the event leading up to the

```
 1      fire of March 15, 2017?

 2          A    Any what?  I'm sorry.  Any witness?  What?

 3          Q    Do you know of any witnesses to the fire?

 4          A    Do I know of any witnesses to the fire?

 5          Q    Yes, sir.

 6          A    What you submitted.

 7          Q    I'm asking:  As you sit there right now, do

 8      you know of any witnesses to the fire?

 9          A    As the fire was going on or --

10          Q    Sure.  Let me rephrase.  Do you know any

11      witnesses that were on Venetian Hills premises that

12      were there before the fire started that witnessed

13      the events that gave rise to the fire itself?

14          A    That would give rise to the -- did I have

15      any advance warning; is that what you're asking?

16          Q    No, sir, it's not.  I'm asking:  Do you

17      know of any witness that witnessed the fire

18      breaking out in building I, Unit 5, on March 15,

19      2017?

20          A    Breaking out?

21          Q    Starting, igniting, commencing.

22          A    Oh, oh.  Only what the police have come up

23      with; so, no, I have none.

24          Q    So outside of anything that's -- you rely

25      on the police reports for any witnesses that are
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 20 of 114

```
 1       listed there; correct?

 2           A     We gave the police all the information that

 3       we had.  You know, I was -- I'm not the manager of

 4       the property, so, and I had no communications with

 5       people.  The nature of what I understand you're

 6       asking the question.

 7           Q     You didn't communicate with any witnesses

 8       to the fire?

 9           A     Witnesses to the fire?  I don't understand.

10           Q     Okay.  And that's fine. I'll --

11           A     You're going to have to be much more

12       specific.

13           Q     I'll be happy to rephrase.  Did you have

14       any conversation with any of the witnesses that

15       personally witnessed the events giving rise to the

16       fire?

17           A     Oh, prior to the fire, you mean?

18           Q     Correct.

19           A     Oh.  I don't believe so.

20           Q     Didn't speak to them.  You also -- did you

21       speak to any authorities, fire department, police,

22       anything like that?

23           A     Before the fire you're asking?

24           Q     After the fire, about the fire.

25           A     Well, I certainly spoke to the manager and
```



```
 1         got as much information as he had.
 2          Q     Try to listen to my question.  My question
 3     is:  Did you speak to any of the authorities, the
 4     fire department, the police department, after the
 5     fire?
 6          A     I don't recall.  I don't believe so.  I
 7     don't recall.
 8          Q     Venetian Hills was first notified of the
 9     fire by Tory Sumlin, who was the acting property
10     manager at the time?
11          A     Correct.
12          Q     And Sumlin was also -- was Sumlin also
13     fulfilling the role as a patrolling officer at the
14     property at the time the fires occurred?
15          A     Yes.
16          Q     And Venetian Hills does not blame George
17     Hughes in any way for what happened to him?
18          A     Blame George Hughes?
19          Q     Correct.
20          A     No.
21          Q     He is a completely innocent victim?
22          A     I'm sorry?
23          Q     He is a completely innocent victim;
24     correct?
25          A     To the best of my knowledge, you know.  I
```



AccuTran, Inc.
770-426-9705

1    don't know the circumstances, all the

2    circumstances, but to the best of my knowledge.

3        **Q**    Did Venetian Hills do any investigation

4    with respect to the source of the fire?

5        A    Subsequent to the fire?

6        **Q**    Yes, sir.

7        A    We provided the police with the video of

8    the arsonist leaving the property and gave them

9    whatever information they requested.

10       **Q**    Do you know what information you gave the

11   police?

12       A    I have no idea.

13       **Q**    Did Venetian Hills try to figure out what

14   went wrong?

15       A    Did Venetian Hills try to figure out what

16   went wrong?  Seemed to be pretty obvious that an

17   arsonist set the fire in the apartment.

18       **Q**    So that's not responsive to my question.

19   I'm going to move to strike it.  My question is:

20   Did Venetian Hills do anything to investigate what

21   went wrong in this case?

22       A    Only in relation to our communicating with

23   the authorities.  Certainly I'm not going to

24   duplicate their efforts.  And I don't believe --

25   you know, I'm not the manager of the place -- that

1       I -- by Venetian Hills you're including everybody,

2       so I don't know what Tory Sumlin's information was.

3       I provided all the information I had to the police

4       and the fire department; to the authorities, if you

5       will.

6          Q     And it sounds like that was just the video

7       camera; right?

8          A     That's all that I know of that -- if they

9       interviewed me, I gave them whatever information I

10      had.

11         Q     And do you know -- did Venetian Hills try

12      to investigate -- let me break it down a little

13      bit.  Did Venetian Hills try to investigate how the

14      fire started independent of what the authorities

15      were doing?

16         A     I'm not the on-site person, okay.  I don't

17      know what may have occurred when I was not there.

18      All I know is what I did.

19         Q     I recognize that you're not the on-site

20      person, but your testimony today is on behalf of

21      Venetian Hills and so you're relating any knowledge

22      that you're relating to your property manager, if

23      the property manager is the proper party to talk to

24      then --

25         A     I'm sorry.  If the property manager is



AccuTran, Inc.
770-426-9705

```
 1      what?

 2          Q    If the property manager -- if you're saying

 3      the property manager has all of this knowledge --

 4          A    Has all what knowledge?

 5          Q    What Venetian Hills did, who they talked

 6      to, when they talked to them in investigating the

 7      fire.

 8          A    He knows what he did.  I know I had -- any

 9      conversations I had were, for the most part, other

10      than with Tory Sumlin, was the authorities.  It was

11      not my job to investigate and I didn't feel it

12      appropriate to try and second guess the

13      authorities.

14          Q    We just spent five minutes going around a

15      question that I think the answer is no to, and the

16      question is:  Outside of anything the authorities

17      did, did Venetian Hills do anything to try to

18      investigate what went wrong.  And I'm not trying to

19      be rude in any way.  I think if you will just

20      listen, I think --

21          A    Venetian Hills is more than me, okay, and I

22      am the not the on-site person so all I can do is

23      speak for myself.  You're saying Venetian Hills,

24      that's a pretty broad thing.  All I know is what I

25      did.
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 25 of 114

1    **Q**    You know you have been noticed to provide

2    testimony on behalf of Venetian Hills today?

3    **A**    Correct.

4    **Q**    You've already admitted to saying that

5    you've reviewed these topics and you're prepared to

6    testify as to these topics.

7    **A**    Correct.

8    **Q**    But now you're saying that you're limited

9    in the knowledge that you have about these topics

10    because you can only testify as to what you

11    personally did as an individual, not as Venetian

12    Hills.

13    **A**    I was not there 24/7 so things could have

14    occurred that I'm not aware of.  I don't know.

15    **Q**    Do you know, and I see you hedging and I

16    understand that -- but my question, sir, is:  Have

17    you done anything to be prepared to fully explore

18    what happened in the fire?  Who has what knowledge

19    and what your employees and agents of Venetian

20    Hills did in response to this fire?  Did you

21    prepare for that today?

22    **A**    No.

23    **Q**    Okay.  That's a problem.

24    **A**    I'm sorry?  That's a problem?

25    **Q**    Was there a smoke detector in building I5?

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 26 of 114

```
 1        A    Yes.

 2        Q    Was there a smoke detector at the time of

 3    the fire in building I5 on March 15, 2017?

 4        A    I wasn't there.

 5        Q    So you don't know?

 6        A    I know that it was inspected on a routine

 7    --

 8        Q    Mr. Maughan, please answer my question.  Do

 9    you know if there was a smoke detector in building

10    I5, under oath?

11        A    I did not go into building -- into unit I5

12    on the day of the fire.  I mean, okay?

13        Q    Did Venetian Hills have a functional smoke

14    detector in building I5 on the day of the fire?

15        A    I did not investigate.  I was not in

16    apartment I5 on the date of the fire.

17        Q    I'm not asking about you, John Maughan.

18    Remember you said last time I don't know, I don't

19    own it, that's Venetian Hills?  Now it's Venetian

20    Hills, and now you're charged to know these things

21    on behalf of Venetian Hills.

22             MR. GRANTHAM:  Object to that.  He's

23         charged to know what Venetian Hills knows.  If

24         Venetian Hills' answer is I don't know, that's

25         Venetian Hills' answer.
```



1              MR. SMITH:  That's what I was about to say.

2       So I don't know is a perfectly fine answer; if

3       you don't know, you don't know.  And, but, if

4       you do know or if you need more information,

5       that's where it's a problem, because if that

6       information is accessible, we would anticipate

7       you to be able to testify as to Venetian

8       Hills -- as to information that's in Venetian

9       Hills' possession, control, authority and so

10      forth.  Does that make sense?

11             THE WITNESS:  I guess so.

12      **Q.**  (By Mr. Smith)  So my question again is:

13      Does Venetian Hills know if there was a functioning

14      smoke detector in building I5 on the day this fire

15      occurred?

16      A    No.

17      **Q**    Did insurance -- your insurer is Kinsale

18      Insurance; is that right?

19      A    That's right.

20      **Q**    Did they come on the property in response

21      to this fire?  Did you notify them of the fire?

22      A    I'm sorry?

23      **Q**    Did you notify Kinsale of the fire?

24      A    Of course.

25      **Q**    Do you know when you notified them?



AccuTran, Inc.
770-426-9705

1    A    I've got -- yeah.  I've got the

2    information.  I do not have it right here.

3    **Q**    I know you've got the information, but do

4    you know when you did; after this fire occurred?

5    A    Yeah, it was after the fire occurred.

6    **Q**    Do you know how soon after the fire?

7    A    I'd have to go look it up.  I have the

8    information.  I'd have to go look it up.

9    **Q**    And you have received a preservation letter

10   in a case called the Boykin case that was arising

11   out of this fire as well in a letter dated

12   March 17th, 2017.  This fire occurred on March 15,

13   2017, by way of reminder.  Did you notify Kinsale

14   before March 17, 2017 or did you notify them after

15   that?

16   A    What is March 17?

17   **Q**    This was a preservation letter that was

18   sent to you in a prior case, the Boykin case, and

19   two days after the fire occurred.  My question is:

20   Do you know if you notified Kinsale of the fire

21   before March 17th, 2017, or after?

22   A    After, I'm quite sure.  Oh, no, I don't

23   know; I don't know that.  I'd have to took at my

24   records and see what they say.

25   **Q**    All right.  I'm going to hand you this.

```
 1        A    I doubt it.

 2        Q    Not marking this, Mr. Maughan, but those

 3   are photographs taken by Abercrombie, Simmons and,

 4   looks like, Gillette, Inc.  Do you see that?

 5        A    Yep.

 6        Q    And you see the photograph; you see the

 7   date where it's taken, 5-2-2017?

 8        A    And what was the date?  Is this after the

 9   fire?

10        Q    Yes, sir.  Yes, sir.  The fire occurred on

11   March 15th of 2017.

12        A    Okay.  So this is a month and a half later.

13        Q    Yes, sir.

14        A    Okay.

15        Q    So Kinsale would have been notified well

16   before any one of their agents came out to Venetian

17   Hills to take photographs or to inspect, by you;

18   correct?

19        A    I was not aware of this occurring --

20        Q    You weren't?

21        A    -- until now.

22        Q    But they wouldn't be on your property

23   unless they were notified about this fire; is that

24   fair?

25        A    I have no idea.  I don't know what is in
```

```
 1        their minds or what they did.  This is the first
 2        time I've seen this.
 3           Q     Is that right?
 4           A     Yes.
 5           Q     You've produced that document in this case,
 6        in this case.
 7           A     I am not aware of it.
 8           Q     Well, I'm just telling you, you have;
 9        you've produced that document and those photographs
10        in this case.
11           A     I'm not aware of that.  I've never seen
12        them before.
13           Q     Okay.  And you have been denied -- have you
14        been denied insurance coverage in this case?
15           A     I'm sorry?
16           Q     Have you been denied insurance coverage in
17        this case?
18           A     No.
19           Q     So your understanding is that Kinsale's
20        policy applies here in this case?
21           A     Yes.
22           Q     Did Kinsale's deny you insurance coverage
23        in the Boykin case?
24           A     No.  Oh, I'm sorry.  Yes, they did.
25           Q     And so anything that came out of that case
```



```
 1      was -- any costs were born by you individually;

 2      correct?

 3           A    No.

 4           Q    Were they born by the company, Venetian

 5      Hills?

 6           A    No.  Some of them were born by Kinsale.

 7           Q    And by that do you mean providing you a

 8      lawyer for a period of time?

 9           A    Yeah.

10           Q    But outside of that, those costs were born

11      by you?

12           A    Uh-huh, correct.

13           Q    Have you received any Reservation of Rights

14      letter in this case?

15           A    Yes.

16           Q    Do you know when you received that letter?

17           A    No.

18           Q    Okay.  And do you know that -- is it fair

19      to say that within a month of this happening, this

20      fire happening, that Kinsale was notified that

21      there was a fire at Venetian Hills and that someone

22      had died?

23           A    Yes.

24           Q    Do you know that -- and Kinsale was the

25      insurer on the date that this fire occurred;
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 32 of 114

```
 1    correct?

 2        A    Correct.

 3        Q    But Kinsale has never consulted with

 4    Venetian Hills as to the facts of this case; is

 5    that fair?

 6             MR. GRANTHAM:  As to the facts of the

 7         Hughes case?

 8             MR. SMITH:  Correct.

 9             THE WITNESS:  I'm sorry?

10        Q.   (By Mr. Smith)  No, you're fine.  Kinsale

11    insurance -- has Kinsale Insurance ever consulted

12    with Venetian Hills as to what happened with

13    Mr. Hughes, George Hughes?

14        A    I don't know.

15             MR. GRANTHAM:  Let me state for the record:

16         Obviously they communicated with me as the agent

17         and attorney for Venetian Hills.

18             MR. SMITH:  Sure.  Thank you.

19        Q.   (By Mr. Smith)  Do you understand that

20    Kinsale has offered zero dollars on behalf of

21    Venetian Hills to George Hughes' family?  Do you

22    understand that?

23        A    Yes.

24        Q    And that they have done nothing to protect

25    you or Venetian Hills by failing to offer them
```



AccuTran, Inc.
770-426-9705

```
 1      anything for his death.  Do you understand that?

 2          A    I'm sorry.  By refusing to offer what?

 3          Q    They've done nothing to protect you or

 4      Venetian Hills by not offering them anything; is

 5      that fair?

 6          A    By not offering?

 7          Q    Correct.

 8          A    They have not offered anything.

 9          Q    Correct.  And so my question is:  You

10      understand that you're personally liable, or the

11      entity is liable, beyond anything that's not

12      covered by Kinsale; is that right?  Do you

13      understand that?

14          A    Well, I'm not anticipating that but yes;

15      obviously, if there's a judgment that's beyond

16      Kinsale then I'm the guy, or, the Venetian Hills,

17      LLC is.  Not me, obviously; everything I say I now

18      is Venetian Hills, LLC.  Okay?

19          Q    Correct.  Just as if I ask you "you" I mean

20      Venetian Hills or you; right?

21          A    Okay.

22          Q    Glad we're on the same page here.  Does

23      Venetian Hills believe that the Hughes family is

24      entitled to receive one penny as a result of his

25      death?
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 34 of 114

32

```
 1        A    I don't believe so.
 2        Q    You have identified an expert of sorts in
 3   this case, Venetian Hills has; a man named Mr.
 4   Coler.
 5        A    Who?
 6        Q    A man named Mr.Coler, C-O-L-E-R.  Do you
 7   understand that?
 8        A    I'm sorry.  Who is he?
 9        Q    An expert.  Someone that will give opinions
10   as to the practices and policies of what Venetian
11   Hills had in place on the day of the fire.  Are you
12   aware of that?
13        A    What's his name?
14        Q    Coler.
15        A    Spell it for me.
16        Q    C-O-L-E-R.
17        A    That's not the name I recall, but okay.
18        Q    What name do you recall?
19        A    You're talking about an attorney?
20        Q    No, sir.
21        A    Oh.
22        Q    I'm talking about an expert that you,
23   Venetian Hills, has identified in this case to
24   provide testimony about the policies and procedures
25   that Venetian Hills had in place on the day this
```

AccuTran, Inc.
770-426-9705

1      fire occurred.  Do you understand that or did you

2      have any knowledge of that?

3          A     No.  You got to ask me that one again.  I'm

4      not -- I don't believe I'm aware of what -- any

5      such circumstances that you're saying.

6          Q     Have you ever spoken to a man -- what's his

7      first name?

8                MR. GRANTHAM:  Gregory.

9          Q.   (By Mr. Smith)  Greg Coler.  Have you ever

10     spoken to Gregory Coler?

11         A     Who is he?

12               MR. GRANTHAM:  He's an expert we identified

13         as a fire investigation --

14               THE WITNESS:  That we hired?

15               MR. GRANTHAM:  Yes.

16               THE WITNESS:  Okay.

17               MR. SMITH:  You want to switch seats?

18               THE WITNESS:  I don't recall that name.

19               MR. GRANTHAM:  That's okay.  That can be

20         your answer.

21               THE WITNESS:  I don't recall that name.

22         Q.   (By Mr. Smith)  So you don't remember ever

23     meeting with Gregory Coler; fair?

24         A     Okay.  Is it a recent occurrence?

25               MR. GRANTHAM:  John, just listen to his



AccuTran, Inc.
770-426-9705

34

```
 1        question and answer.  If you don't remember or

 2        you don't recall, just tell him.

 3             THE WITNESS:  Okay.  I don't remember and I

 4        don't recall.

 5             MR. SMITH:  Thank you, Counsel.

 6        Q.   (By Mr. Smith) So you wouldn't know if he's

 7   been retained by Venetian Hills -- it's pretty fair

 8   to say he hadn't been retained by Venetian Hills

 9   separate and apart from this case?  In other words,

10   Kinsale is paying for him to testify in this case; is

11   that --

12        A    Oh, oh, okay.  I wasn't aware.

13        Q    You're not privy to any of that, is what

14   you're saying?

15        A    No.  Kinsale hired him, not Venetian Hills,

16   LLC; correct?

17        Q    Well, that's what I'm trying learn from you

18   as part of your deposition.  So he is the man

19   listed here.  You see his last name there?

20        A    Oh, okay.

21        Q    It says Coler.  It says Gregory Coler.  Do

22   you see that?

23        A    Yeah.  Okay, no.

24        Q    He's the man that came on your property in

25   May of 2017.
```



```
 1        A     Okay.  I'm not aware of him.

 2        Q     Never met him.  He came on the property,

 3   took a bunch of pictures.  It looks probably,

 4   Kinsale probably sent him?

 5        A     Okay.

 6        Q     And --

 7        A     They did not advise me, I don't believe.

 8        Q     Does Venetian Hills have any internal

 9   incident reports of the fire itself to document

10   what --

11        A     I'm sorry?  I was looking at these.

12        Q     Does Venetian Hills have any internal

13   incident reports of the fire itself to document

14   what transpired?

15        A     Internal?  You don't mean the police or the

16   fire department?

17        Q     Correct.

18        A     Internal report?

19        Q     Any Venetian Hills paper that says this is

20   what we believe occurred in this event?

21        A     Only from someone.

22        Q     And by that are you referring to the

23   affidavit that someone provided?  Or, it wasn't

24   even an affidavit, it was kind of a signed

25   statement?
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 38 of 114

36

```
 1       A    Correct.

 2       Q    And that was in a prior case with respect

 3    to the facts giving rise to Ms. Boykin's incident;

 4    right?

 5       A    Okay.

 6       Q    Is that right?

 7       A    I believe so.

 8       Q    And outside of that, there's no other

 9    internal reports or records as to what happened in

10    this fire done by Venetian Hills; is that fair or

11    true?

12       A    I can't think of any.

13       Q    There's an estimate report that was

14    provided to us by your lawyers, and I'm just going

15    to ask you if you have ever seen this document

16    before today?

17       A    This here?

18       Q    Yes, sir.

19       A    Are these the same pictures as on the other

20    one?

21       Q    No.  This is a separate report, John.  My

22    question simply is:  Have you seen that document

23    before?

24       A    I don't believe so, no.

25       Q    And if you would, at the top there, just
```



Case 1:21-cv-03214-LMM  Document 81-1  Filed 10/11/23  Page 39 of 114

```
 1      read to familiarize yourself with the document and

 2      its contents.  Take a moment if you need to.

 3          A    Is this an estimate of restoration?

 4          Q    And when is it dated, sir?

 5          A    March 15 of '17.

 6          Q    No, sir.  That's when the incident

 7      happened.

 8          A    8/6 of '17.

 9          Q    And so based on this document here that I

10      showed you earlier --

11          A    Yes.

12          Q    And then that document there --

13          A    I'm not familiar with this.

14          Q    You're not familiar with either one of

15      these documents?

16          A    No.

17          Q    Can we agree that these documents are

18      reflective of photographs that were taken on the

19      date that is represented by each of these documents

20      in August and in March?

21          A    No question to doubt it.

22          Q    Nothing to doubt it?

23          A    I don't think there's any reason to doubt

24      it. I mean, I don't know.

25          Q    Is it fair to say that you notified Kinsale
```



Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 40 of 114

38

1    of this fire shortly after it occurred, within days

2    after it occurred; that the fire happened, a man

3    died and then they sent adjusters out, surveyors

4    out to come look at the restoration?

5         A    I'm aware that people came out to look at

6    it.

7         Q    You are aware of that?

8         A    Yes.

9         Q    And can you testify that Venetian Hills

10   notified Kinsale that there was a fire at the

11   premises a couple days after, or, within days of

12   when it occurred?

13        A    Yes.

14        Q    And that a man had died?

15        A    Yes.

16        Q    When either of these gentleman came on your

17   premises, did you meet with them as they were doing

18   their inspection?

19        A    I met with one of them, and it may have

20   been John what's-his-name, because I had other

21   communication.

22        Q    John?

23        A    Endire.

24        Q    Okay.  And then what other communication

25   did you have with him after this date?  Before or



AccuTran, Inc.
770-426-9705

1      after this date?

2          A    I sent him some information at the request

3      of Kinsale.

4          Q    Would you have met him on the date

5      inspection occurred at Venetian Hills?

6          A    I am not sure it was him.  There were two,

7      and I believe there were two in the reports that I

8      got and one of them was there at the time I

9      happened to go there; was coincidental.  And so I

10     went -- I was told he was there and so I went and

11     talked to him.

12         Q    And based on your thought process, that was

13     most likely John Endire?

14         A    I think so, but I'm not positive.  There

15     were two people and I think he was the one, but I'm

16     not positive.

17         Q    What did you talk to them about?

18         A    What he was doing.

19         Q    Do you remember anything that he said to

20     you about what occurred in the fire or give any

21     opinions or anything to that nature?

22         A    I don't recall that.

23         Q    Did you walk around the premises with him

24     as he was performing his inspection?

25         A    No.  I spoke to him outside.



1     **Q**     Have you been into any unit in I -- in

2     building I since this fire occurred?

3     A     Yes.

4     **Q**     Have you been into unit I5 since this

5     incident occurred?

6     A     Yes.

7     **Q**     Have you been into neighboring units I4 and

8     I6?

9     A     Yes.

10    **Q**     When did you last go into building I5?

11    A     A few days ago.

12    **Q**     And what was the purpose of that trip?

13    A     Because I'm looking at finally doing

14    something about it, repairing it.

15    **Q**     Repairing it.

16    A     Yes.

17    **Q**     Renovating it potentially?

18    A     Yes.

19    **Q**     You had made some reparations after the

20    fire occurred that you had already testified to

21    before, such as the roof, and you provided some

22    estimates?

23    A     Yes.

24    **Q**     I didn't see, other than this document

25    here, were any documents pertaining to renovations

```
 1        back in 2012 making it into a dormitory-style
 2        living space as opposed to a single family living
 3        space.  Do you have any of those documents?
 4            A     On what date?
 5            Q     Sir?
 6            A     Before or after the fire?
 7            Q     I'm in 2012.  I was talking about this
 8        document so I went back to 2012 when you performed
 9        some renovations.  The last time you performed
10        renovations on I5; right?
11            A     Right.
12            Q     So, in 2012, my question is:  You don't
13        have any documents pertaining to the renovations
14        that were made back in 2012 to building I5; do you?
15            A     I don't believe so.  I'm sorry.  Related
16        to, you said, before the fire; right?  Prior to the
17        fire.
18            Q     Yes, sir.
19            A     Yeah, okay.
20            Q     So this was back to the photographs by John
21        Endire.
22            A     Okay.
23            Q     Do you see where it says that unit 3 has no
24        visible extensive damage there on page three of his
25        document?
```



```
 1        A     Okay.

 2        Q     Do you agree with that?

 3        A     Yes.

 4        Q     Okay.

 5        A     Well, it depends what you call extensive.

 6        Q     And then it says, second level windows

 7     screens in place.  And then it says, no access to

 8     other units possible; do you see that?

 9        A     I see it now, yes.  I've never seen it

10     before, as I told you.

11        Q     Sure.  And in building I, that was --

12        A     You're saying there was not -- there was

13     no -- they could not get over to here; is that what

14     you're saying?

15        Q     I'm not saying anything.  It's their

16     document.  All I'm saying is:  Do you see this

17     phrase right here that says, no access to other

18     units possible?

19        A     Yes.

20        Q     I'm asking you:  Do you agree that at the

21     time that this was taken that there wasn't access

22     to unit I5; is that fair?

23        A     There was not access to unit I5 from there?

24        Q     I'm asking you the question, sir.  Do you

25     agree with that?  Was that the condition?
```

1      A      I'm asking you to clarify for me that

2      you're asking if there was access to I5 from I3

3      after the fire?

4      Q      Or anywhere.  Was there access to I5 --

5      A      From I3?

6      Q      Correct.

7      A      Not to the best of my knowledge.

8      Q      Was there access to I5 through the front?

9      A      From where?

10     Q      Through the front door?

11     A      To the front door of I5?

12     Q      Yes, sir.

13     A      When?

14     Q      On the date that this photo was taken,

15     August 2, 2017.

16     A      I don't know.

17     Q      Okay.  Would you rely on his observation as

18     an inspector to say that there was no access to

19     other units, including I5?

20     A      At the date of the photographs?

21     Q      Yes, sir.

22     A      I have no idea.  It's his report.  This is

23     the first time I've seen it.

24     Q      Would it be fair to say that given that

25     there was no access to other units -- because he

44

```
 1      was talking about unit 3; right?

 2          A    I'm sorry?

 3          Q    He was talking about unit 3 in this report;

 4      right?

 5          A    Right.

 6          Q    Would it be fair to say that if there was

 7      no access to other units, that no inspection at

 8      that time was performed on I5; is that fair?

 9          A    Say it again.

10          Q    He says his inspection is about I3 in this

11      document; right?

12          A    Right.

13          Q    And that's where Boykin lived.  Do you

14      remember that?

15          A    That's what?

16          Q    Where Ms. Boykin lived. Do you remember

17      that, I3?

18          A    Okay.

19          Q    Okay, great.  So he was out there

20      inspecting I3.  He says that there's no other

21      access, in his report, to any other units, okay.

22          A    From I3?

23          Q    It doesn't say that, John.  All it says is

24      there's no other access to other units.  And my

25      question to you is:  Is it fair to say that on that
```



```
 1      day he didn't inspect I5?

 2          A     He didn't inspect I5?

 3          Q     I'm asking you the question:  Is it fair to

 4      say, based on this report that you just reviewed,

 5      that Mr. John here did not inspect I5 given that

 6      there was no access to other units in his report?

 7          A     I'm sorry.  I'm not understanding.

 8          Q     Okay.

 9          A     I'm hearing, but I'm not understanding.

10          Q     What don't you understand?

11          A     I don't understand the question.

12          Q     What about the question don't you

13      understand?

14          A     Are you asking me if there was access to

15      other units from I3?

16          Q     Okay.

17          A     After the fire?

18          Q     Right.  So --

19          A     Is that what you're asking?

20          Q     I'm asking you if there was any way to get

21      into I5 on August the 2nd, 2017?

22          A     Is that the date of the pictures?

23          Q     Yes, sir.

24          A     Was there any way to get into I5?

25          Q     Yes.
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 48 of 114

46

```
 1        A     That was shortly after the fire, huh?  I
 2   don't know.
 3        Q     Just to sum all this up, I want to make
 4   sure I've got an adequate timeline, based on what
 5   you've seen today, and also your knowledge on
 6   behalf of Venetian Hills concerning the timing of
 7   this fire and when it was reported to you -- excuse
 8   me -- when you reported it to Kinsale, and then
 9   when some of these Kinsale representatives started
10   coming out to your property.  Okay?
11        A     Okay.
12        Q     So the fire occurred on -- when?
13        A     The 15th, I believe you said.
14        Q     The 15th of March of 2017.  Okay?
15        A     Okay.
16        Q     And your testimony is that within days of
17   that, you notified Kinsale of the fire and that
18   somebody had died; fair?
19        A     Yes.
20        Q     And, after that, they sent somebody out,
21   this document dated May the 2nd, of 2017.
22        A     Yes.  They sent out two people.
23        Q     And this was Coler, Gregory Coler, taking
24   pictures that you saw his name there that we talked
25   about; right?  And then you saw this document that
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 49 of 114

```
 1      I handed you as well that had John's name on it;

 2      right?  And that was a later date of August 6 of

 3      2017?

 4          A    Okay.  I never met with the first guy and

 5      was not aware of those photographs.

 6          Q    Very good.  The first guy, you mean Gregory

 7      Coler?

 8          A    Yes.

 9          Q    So that would be an accurate timeline

10      between when this happened, when you reported this

11      happening to Kinsale, and then the times that

12      Kinsale was on the property doing their

13      investigation?

14          A    Yes.

15          Q    After August the 6th, 2017, did any Kinsale

16      representative come back out to the property that

17      you know of?

18          A    It occurred in March after August?

19          Q    Fire occurred March 15th.

20          A    Yeah.

21          Q    The last record I had of a Kinsale

22      representative coming out is August the 6th of

23      2017.  My question to you is:  Did any Kinsale

24      representative, agent, adjuster, inspector come out

25      to evaluate your property?
```



AccuTran, Inc.
770-426-9705

1   A    I do not know or I do not recall, one or

2   the other.

3   Q    Do you know when Mr. George Hughes came to

4   live at Venetian Hills?

5   A    You've got his lease.

6   Q    That's not my question.  Do you know when

7   he came to live at Venetian Hills?

8   A    At the time of the lease.

9   Q    Do you know what time the lease that he

10  entered reflects?

11  A    I don't have it in front of me here.

12  Q    Since George Hughes died, did you ever

13  follow up with his family to see how they were

14  doing?

15  A    No.

16  Q    Venetian Hills never had any problems with

17  George; correct?

18  A    To the best of my knowledge.

19  Q    Venetian Hills was aware -- was Venetian

20  Hills aware that George suffered from disability?

21  A    Yes.

22  Q    And Venetian Hills placed him in an

23  upstairs apartment unit; correct?

24  A    Yes.

25  Q    Did Venetian Hills ever offer George a



```
 1       downstairs apartment unit?

 2           A     I don't know.

 3           Q     Was Venetian Hills obligated to provide

 4       George a safe and habitable dwelling unit?

 5           A     Yes.

 6           Q     That includes insuring that fire prevention

 7       and detection is fully functional and operational;

 8       agree?

 9           A     To the best of our ability, yes.

10                 (Plaintiff's Exhibit 2 was marked for

11            identification.)

12                 MR. SMITH:  I'm marking this as Plaintiff's

13            Exhibit 2.  It is the Furnished Efficiency

14            Agreement.

15           Q.    (By Mr. Smith)  You've seen this already,

16       John.

17           A     Yes.

18           Q     I'm going to ask just a few questions about

19       this document in reference to Venetian Hills'

20       knowledge of this case.  Okay?

21           A     Okay.

22           Q     So George Hughes came to live at Venetian

23       Hills on February the 10th of 2012; correct?

24           A     That's the date, the starting of the lease.

25           Q     The lease commenced then and it was
```



50

```
1     continuous until the date of his death.
2         A    Yes.
3         Q    And during his residency at Venetian Hills,
4     Venetian Hills had, you testified, no problems with
5     him.  He wasn't a disruptive tenant of Venetian
6     Hills; is that fair?
7         A    I am not the on-site manager, but I believe
8     so.
9         Q    And under this agreement, Venetian Hills
10    has the responsibility to inspect, maintain and
11    repair the premises to prevent injury or damage to
12    its tenants; agree?
13        A    I don't know.  I'd have to read the entire
14    way.  I'd have to read this to answer it.
15        Q    You haven't read that lease before today?
16        A    Not recently.
17        Q    We can do it right now.  If you'll look at
18    where it says use?
19        A    Okay.
20        Q    Excuse me.  Where it says repairs?
21        A    Okay.
22        Q    And then you go down one.  It says right to
23    access.  Management --
24        A    Right.
25        Q    Management may enter into the dwelling at
```

1    any time without notice to inspect, maintain,

2    repair the premises or to prevent injury or damage

3    to persons or property.  Do you see that?

4         A    Yes, I do.

5         Q    And you agree with that?

6         A    Yes.

7         Q    And you agree that Venetian Hills did not

8    prevent death or injury to George Hughes?

9              MR. GRANTHAM:  Object to the form.  You can

10        answer.

11             THE WITNESS:  And what was that?

12             MR. SMITH:  He just objected to my

13        question.  Are you asking what was my question?

14             THE WITNESS:  Yeah.  Am I to answer?

15             MR. GRANTHAM:  You are.

16             THE WITNESS:  Huh?

17             MR. GRANTHAM:  Yes, sir.

18             THE WITNESS:  Okay.  What's your question?

19        Q.   (By Mr. Smith)  Do you agree that -- you've

20   agreed that this language is a part of the contract

21   in the agreement as George as a tenant at Venetian

22   Hills?

23        A    Yes.

24        Q    My question is:  Do you also agree that, as

25   the language of this contract states, that Venetian

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 54 of 114

1    Hills did not prevent injury, and ultimately death,

2    to George Hughes?

3            MR. GRANTHAM:  Same objection.  You may

4        answer.

5            THE WITNESS:  I'm not getting the question.

6        State it again.

7            MR. SMITH:  Sure.

8        Q.   (By Mr. Smith)  Do you agree that Venetian

9    Hills did not prevent George Hughes' death?

10           MR. GRANTHAM:  Same objection.

11           THE WITNESS:  Obviously not.

12       Q.   (By Mr. Smith)  Obviously you don't agree, or

13   obviously Venetian Hills did not prevent his death?

14       A    Obviously he died.

15       Q    And the question is whether Venetian Hills

16   prevented his death as what's set forth here in the

17   efficiency agreement as an obligation of theirs?

18       A    I don't believe we could have prevented his

19   death.

20       Q    George was not in breach of his lease

21   agreement with Venetian Hills in any way; correct?

22       A    He was not what?

23       Q    In breach of his lease agreement with

24   Venetian Hills in any way; is that correct?

25       A    I don't believe so.



AccuTran, Inc.
770-426-9705

1     **Q**   And no evidence that George or any resident

2    ever tampered with any smoke detector or any

3    appliance in apartment I5 before this fire

4    occurred; agreed?

5    A   No resident tampered with?

6    **Q**   Yes.

7    A   Oh, I don't know.

8    **Q**   No evidence of that?

9    A   I don't know that.

10    **Q**   I'm saying you don't know if you have any

11    evidence of it?  Do you have any evidence of that?

12    A   I don't know if any resident tampered with

13    the --

14    **Q**   That's not my question.  My question is:

15    Do you have any evidence that anyone ever tampered

16    with any smoke detector or other appliance in I5

17    before this fire happened?

18    A   I have no evidence of it, no.

19    **Q**   Very good.  We asked you in your deposition

20    notice for all crime reports --

21    THE WITNESS:  Ask me about that one after;

22    would you, please?  The answer I just gave about

23    the tampering with.

24    MR. GRANTHAM:  Okay.

25    **Q.**  (By Mr. Smith)  We asked you for crime

```
 1      reports, incident reports, summaries, complaints,

 2      logs of crimes, criminal-related activity.  Okay.  We

 3      asked you for that, to produce those documents and to

 4      be able to testify on those things.  Okay?

 5          A    Okay.

 6          Q    Have you produced all incident reports,

 7      crime reports or summaries by Venetian Hills to us

 8      as a part of this notice in response to this

 9      notice?

10          A    I believe so.

11          Q    And can you verify that you have no other

12      documents in your possession related -- five years

13      before the subject incident, related to crime,

14      incidents, complaints and so forth?

15               THE WITNESS:  Does that -- is that in

16          reference to the one you just gave him?

17               MR. GRANTHAM:  Just listen to his question,

18          John.  Have you given him all the documents

19          related to crime reports from five years before

20          this incident?

21               THE WITNESS:  I believe so.

22               MR. SMITH:  We'll both go after you here.

23               THE WITNESS:  I'm sorry?

24               MR. SMITH:  I'm kidding.

25          Q.   (By Mr. Smith)  You gave us a document today
```

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 57 of 114

1    about some interaction that you had with Major

2    Vincent Moore.  Do you remember that?

3         A    That's correct.

4         Q    And as a part of that you write a fax,

5    which you're known to do; send him a fax.  It's

6    dated February 26, '15; right?

7         A    Correct.

8         Q    And in doing so, you had -- this is

9    reflective of some discourse or some exchanges that

10   you had had with Vincent Moore.  Can you tell us

11   about that?

12        A    Say again?

13        Q    This is reflective of maybe some ongoing

14   communications that you all had either -- in the

15   past about crime?

16        A    Prior to that you mean?

17        Q    Yes, sir, yeah, about some crime on the

18   property.  What --

19        A    We never had much communication about crime

20   on the property prior to that.

21        Q    Oh, you didn't?  Okay.  What is this

22   document in reference to that you produced?

23        A    I'm sorry?

24        Q    What is this document that you produced

25   today?  It's a fax to Vincent Moore.  What is this

1    in reference to?

2        A    He came out to the property.

3        **Q**    Okay.  Why?

4        A    He said that there were numerous crimes

5    committed at the property.  Crimes?  Is that the

6    right word?  I don't know.

7        **Q**    Did he set the meeting or did you?

8        A    I'm --

9        **Q**    Did he initiate the meeting or did you?

10       A    He did.  No.  He did.

11       **Q**    And what came out of that meeting?

12       A    He said that there were a number of

13   incidences and he gave me a large report; I think

14   number of pages is reflected in there.

15       **Q**    And did you agree with that?

16       A    No.  Obviously, I wrote the letter.

17       **Q**    Do you have all the reports that he gave

18   you that prompted you to write this response?

19       A    I probably do.  I'm not sure.

20       **Q**    Have you looked for those?

21       A    No.  I looked for that letter.  I only

22   found out about it yesterday.  Yesterday?  That it

23   was -- whenever you and I met.  Was that -- two

24   days ago.  I only found out about it two days ago

25   and I told Mr. Grantham of what I had in regard to

1    these two matters.

2        Q    Are there any incident reports behind this

3    document that are in your possession?

4        A    The ones that arose to that thing or any

5    other ones?

6        Q    Both.

7        A    I've got the ones that arose to that.

8        Q    And you realize that you were asked to

9    produce all of those as a part of your notice to

10   produce today?

11       A    I can see if I've got them.

12       Q    Great.  Would you do that?

13       A    Yeah.

14           MR. SMITH:  Good.  Let's go off the record.

15           THE VIDEOGRAPHER:  We're off the record.

16           (Off-the-record discussion.)

17           THE VIDEOGRAPHER:  We are now back on the

18   record.

19       Q.   (By Mr. Smith)  Mr. Maughan, you went, on a

20   break, in search for a document that -- it looks like

21   it's an Excel spreadsheet.  Okay?

22       A    Yes.

23       Q    And that is -- it's dated here in the top

24   left-hand corner 1/1/2012 to 2/20/2015?

25       A    Right.



```
1        Q    Is this a document that you created?

2        A    No.  No.  That's from the police

3   department.

4        Q    This is something that they gave to you?

5        A    Yes.

6        Q    Do you have any document like this, either

7   given to you or produced by yourself, from

8   2/20/2015 until March 15, 2017, which is the date

9   of the fire?

10       A    I pulled up, as a result of my letter, my

11  thing to Major Moore, Major -- whatever --

12       Q    Major Moore, you're right.

13       A    Yeah.  He sent to us a website.  And I

14  think I refer to it on there; don't I?

15       Q    Yeah.  We'll get to there.

16       A    So I do have that picture.  Should I get

17  that?

18       Q    What picture?

19       A    It's a picture of the website that has

20  crimes in the area.

21       Q    Like on your personal computer?

22       A    No.  I've got the picture of it, which I

23  can go again and get for you.  There's a website

24  that gives crimes in the area, and I've referred to

25  it in my letter to Major Moore, and I've got it up
```

```
 1      there if you'd like to see it.
 2          Q    Yes, please.
 3              MR. GRANTHAM:  Let me get your mic.
 4              (Off-the-record discussion.)
 5              THE VIDEOGRAPHER:  We are back on the
 6      record.
 7          Q.   (By Mr. Smith)  Mr. Maughan, you took another
 8      break to go find more documents in your office, which
 9      is here where we're having the deposition; right?
10      And you have produced a spreadsheet, which I'm going
11      to mark as Plaintiff's Exhibit 3.  Is that a true and
12      accurate depiction of what Atlanta PD gave to
13      Venetian Hills that reflects crime between January 1,
14      2012 and February 20, 2015?
15          A    No.
16          Q    Why not?
17          A    Huh?
18          Q    Why is it not an accurate --
19          A    It's what I pulled up on the website.  The
20      listing I gave you previously.
21          Q    Sorry.  This document.
22              MR. GRANTHAM:  This document is from APD;
23      right, John?
24          Q.   (By Mr. Smith)  That's the document that I
25      just asked you about.
```

1    A    Oh, that's the previous one, not the one I

2  just gave you.

3    **Q**    Right.  I'm just trying to --

4    A    Oh, okay.  I'm sorry.  I thought that was

5  the one I just gave you.

6    **Q**    No problem.

7    A    Okay.

8    **Q**    No problem.  So I'm going to mark that as

9  Plaintiff's Exhibit 3.

10   A    Okay.

11       (Plaintiff's Exhibit 3 was marked for

12   identification.)

13   **Q.**   (By Mr. Smith)  And is that a true and

14  accurate depiction of the spreadsheet that you got

15  from Atlanta PD?

16   A    I believe so.

17   **Q**    And it's got the date stamp up here from

18  January 2012 to February of '15.

19   A    Okay.  Maybe this will tell me.  Well, this

20  was faxed to me.

21   **Q**    Correct.

22       MR. GRANTHAM:  He's asking about this date

23   right here.  Do you see that?

24       THE WITNESS:  Okay.  But I think your

25   question was:  Is that what they gave me?



AccuTran, Inc.
770-426-9705

```
1              MR. SMITH:  Yes, sir.
2              THE WITNESS:  I don't think they gave it to
3       me at that time because it's faxed to me.  It
4       must have been faxed to me at another time.
5       Q.    (By Mr. Smith)  Did you --
6       A     I don't know.
7       Q     But that document is a summary of crimes
8       that took place at Venetian Hills prior to this
9       fire; right?
10      A     At the date specified.
11      Q     That's what I'm asking; right.  So the date
12      that's on the front of that document, that's
13      January 1, 2012 to February 2015, those are the
14      crimes that occurred at Venetian Hills?
15      A     Those are the crimes that were on this that
16      was sent to me.
17      Q     And that was --
18      A     Or faxed to Venetian Hills.
19      Q     Sent or faxed, you had a copy of everything
20      that was contained in there and noticed by APD of
21      what crimes had happened at your property for that
22      date range; fair?
23      A     I'm sorry.  Are you asking where I got it?
24      Q     No.
25      A     I'm sorry.
```



AccuTran, Inc.
770-426-9705

```
 1        Q     It's okay.  Did you get that document from
 2     APD?
 3        A     I'm not sure.  It was faxed to me.  I don't
 4     know where it came from.  I thought -- I was under
 5     the impression before right now that they brought
 6     it with them when -- at the meeting referred to
 7     here, but apparently not because it was faxed to
 8     me, but it's in relation to the same thing.
 9        Q     Independent of how you got it -- faxed,
10     pigeon, email, right -- you had that document
11     before the fire happened; right?
12        A     What was the date of the fire?
13        Q     March 15, 2017.
14        A     Yes.  This was before the fire.
15        Q     And so all the crimes that are contained in
16     that document and listed, you've been through
17     those; right?  Those are your notes on the paper?
18        A     Yeah.  I didn't go through each one in
19     detail, but I did go through them and marked
20     anything that I thought was important.
21        Q     So you got this --
22        A     Or potentially important.
23        Q     So, before the fire, you got this
24     spreadsheet; right?
25        A     Yes.
```

```
 1        Q    You met with an officer about the crimes
 2    that were committed, the offenses that happened at
 3    Venetian Hills with an officer?
 4        A    Yeah.  But they're not necessarily related,
 5    but both of those statements are correct.
 6        Q    What do you mean they're not related?
 7        A    I don't know that I got this at the time of
 8    the -- I apparently did not get this at the time of
 9    the meeting.
10        Q    At some point though --
11        A    Let me see the date.  2/26, 2/25.  I must
12    have got this in preparation for the meeting, I
13    would guess.
14        Q    There we go.
15        A    And I guess it's where it came from because
16    that's our fax at Venetian Hills.
17        Q    Right, right.
18        A    So, prior to the meeting, I probably had
19    them pull this up and fax it to me.  That's my
20    guess, from looking at this.
21        Q    I understand.
22        A    Because I got those the day before, and I
23    knew this meeting was coming up, so apparently I
24    asked for it and, I guess, a manager sent it to me.
25    But I'm just guessing because I didn't pull it up.
```

AccuTran, Inc.
770-426-9705

```
 1        Q    Got it.
 2        A    You know, I'm not good at that stuff.
 3             MR. GRANTHAM:  John, listen closely to his
 4        questions.  We'll be here all night.
 5             THE WITNESS:  Well, I want to make sure
 6        there's no misunderstanding.  Okay?
 7             MR. GRANTHAM:  I don't think there is.
 8             THE WITNESS:  And I want to make sure I
 9        don't say anything that isn't correct, whether
10        it takes all night or not.
11             MR. GRANTHAM:  I understand.  Just listen
12        to his questions.
13             THE WITNESS:  I want to answer the
14        questions accurately.
15             MR. GRANTHAM:  Yes, sir.
16        Q.   (By Mr. Smith)  We all want that, but we want
17        the questions answered, if that makes sense.
18        A    I understand, but sometimes I've got to
19        look to answer the question.
20        Q    That's perfectly reasonable.  And having
21        the benefit of looking, you acknowledge that a
22        meeting happened with APD to discuss the crime
23        problem at Venetian Hills?
24        A    Yes.
25        Q    And that happened in February of 2015;
```

```
 1    correct?

 2       A    Yes.

 3       Q    It says here at the top, fax, February, you

 4    had communications with him following this meeting.

 5       A    Yes.

 6       Q    So I'm going to mark this as Plaintiff's

 7    Exhibit 3, this spreadsheet.

 8       A    Okay.

 9       Q    It is true and accurate and those are your

10    notes that you've testified to; right?

11       A    Yes.

12       Q    And you've also testified that Venetian

13    Hills had notice of the crimes that were committed

14    at Venetian Hills during this time period?

15       A    Yes.

16       Q    And that notice was given to you by Atlanta

17    PD?

18       A    That I'm not sure.

19       Q    Right, okay.  But you had notice of the

20    crimes?

21       A    Yes.

22       Q    And so after that, you had an opportunity

23    to meet with an officer in person?

24       A    I believe it was after that but this is the

25    day before the meeting.
```



```
 1          Q     Around the time, around the time.
 2          A     So, you know, I want to answer your
 3     question accurately.
 4          Q     I appreciate that.  Thank you so much.
 5          A     This was the day before the meeting, this
 6     was my response, but I don't know what the
 7     meeting -- when the meeting was.  This is the date
 8     that I sent the fax.  It doesn't say on here, I
 9     don't think, what date the meeting was.  Okay.
10          Q     So that's fine.  My question is:  Around
11     that time you had the documents to meet with the
12     officer and you did meet with the officer?
13          A     Yes, that's correct.
14          Q     And this document here faxed to Major
15     Vincent Moore, APD, created February 26, 2015, this
16     document here was created by you; correct?
17          A     Correct.
18          Q     And it is true and accurate as to the
19     contents and your authorship; right?
20          A     Correct.
21          Q     Okay.  And so I'm going to mark this
22     document as Plaintiff's Exhibit 4 to your
23     deposition.
24          A     Okay.
25          Q     Okay.
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 69 of 114

 1              (Plaintiff's Exhibit 4 was marked for

 2        identification.)

 3        **Q.**    (By Mr. Smith)   And you've now produced a

 4     couple additional documents that is a map of the

 5     crime that happened in the vicinity of Venetian

 6     Hills.

 7        A     Correct.

 8        **Q**     And I'm going to mark this as Plaintiff's

 9     Exhibit 5.

10        A     Correct.

11        **Q**     And this is a true and accurate depiction

12     of that map; correct?

13        A     Correct.

14        **Q**     And you saw this map before the fire

15     occurred at Venetian Hills; correct?

16        A     Yeah.   This was all before the fire, right.

17        **Q**     Okay.   Very good.

18              (Plaintiff's Exhibit 5 was marked for

19        identification.)

20        **Q.**    (By Mr. Smith)   You've also got --

21        A     You know, when you ask me those

22     questions -- this is a number of years ago -- I got

23     to make sure I'm answering correctly in relation to

24     the timeframe when you put it in a timeframe.

25     Okay?



1      Q    Certainly.

2      A    I want to make sure I'm answering

3  accurately.

4      Q    Thank you.  And you have verified that that

5  document, which is the map, which is

6  Plaintiff's Exhibit 5 --

7      A    Correct.

8      Q    -- is correctly dated and it's true and

9  accurate.

10     A    February 25.

11     Q    Yes.

12     A    Yeah.

13     Q    And that the document is a depiction of

14  what it says; it's a map of the crimes in the

15  vicinity.

16     A    Correct.

17     Q    And those notes that are on Plaintiff's

18  Exhibit 5 are your notes.

19     A    Correct.

20     Q    And you've already retrieved for us a

21  document with additional photograph, or, a map, and

22  a list of crimes within the vicinity; right?

23     A    Yes.

24     Q    I'm going to mark this as Plaintiff's

25  Exhibit 6.



AccuTran, Inc.
770-426-9705

```
 1         A     Fine.

 2         Q     And is that a true and accurate depiction

 3    of the crimes in the vicinity of Venetian Hills?

 4         A     It's what I picked off.  The -- it's what I

 5    had picked off.  Not -- I didn't do it because I'm

 6    not into that, but I had that pulled up for me.

 7    And so I don't know whether it's an accurate

 8    description; it's what was on their website.

 9         Q     I see.  Okay.  And so, but the document

10    speaks for itself in that it is a list of crimes

11    that Venetian Hills had in its possession before

12    this fire; right?

13         A     Yes.

14         Q     Okay.  Very good.

15               (Plaintiff's Exhibit 6 was marked for

16     identification.)

17         Q.    (By Mr. Smith)  And between Plaintiff's

18    Exhibit 3, this crime list, this fax, and these maps

19    here, Venetian Hills had notice with respect to the

20    crime situation at Venetian Hills at that time; fair?

21    I'll break it down for you.  Okay?

22         A     Okay.

23         Q     Between these exhibits that you've --

24    you've reviewed and verified these exhibits; right?

25         A     Yes.
```

AccuTran, Inc.
770-426-9705

1      **Q**     Between these papers, you knew that there

2      was crime at Venetian Hills; correct?

3      A     I'm sorry?

4      **Q**     Did you know, based on these papers, that

5      there was an extensive amount of crime happening at

6      Venetian Hills?

7      A     No, I did not.

8      **Q**     Why did you not know that?

9      A     Because they're not crimes that occurred at

10     Venetian Hills.  The greatest preponderance of

11     them, the greatest, the most frequent are them

12     sitting in the driveway clocking people going by in

13     order to give them speeding tickets.

14     **Q**     What is the address of Venetian Hills?

15     A     1829 Campbellton Road.

16     **Q**     1829 Campbellton Road.  And so everywhere

17     that's indicated on Plaintiff's Exhibit 3 that says

18     1829 Campbellton Road and has a crime by it, you

19     attribute those crimes to and acknowledge that

20     those crimes are related to crimes that occurred at

21     Venetian Hills?

22     A     No.

23     **Q**     Why not?

24     A     Because they were guys sitting in their

25     cars clocking people in order to give them tickets.



AccuTran, Inc.
770-426-9705

 1     Q     Okay.

 2     A     The greatest number of them.

 3     Q     So when it says assault with a firearm that

 4     occurred at 1829 Campbellton Road February 15th of

 5     2014, you knew about that; right?

 6     A     I don't know that I knew about it.

 7     Q     You didn't know that there was a murder at

 8     your property in 2014?

 9     A     Murder?

10     Q     Yes.

11     A     Yes.

12     Q     You are aware of that?

13     A     Yes.

14     Q     And you're aware there was a murder at your

15     property in 2015; correct?  A homicide.

16     A     Yes.

17     Q     And are you aware that this fire was deemed

18     a homicide as well; correct?

19     A     Yes.

20     Q     Do you know that there was a homicide in

21     2019 at your property?

22     A     Is that the one you're referring to?

23     Q     No, sir.  This document is 2015.  I'm

24     asking you about 2019, which is this year.  Did you

25     know that there was a homicide at Venetian Hills

1    this year?

2       A    This year?  That's not in there.  That's

3    not 2019.

4           MR. GRANTHAM:  He's asking if you know

5       about it.

6           THE WITNESS:  Tell me what it is and I'll

7       tell you yes or no.

8       Q.   (By Mr. Smith)  Do you know that a homicide

9    occurred at Venetian Hills in this year?

10      A    This year?

11      Q    Yes, sir.

12      A    Who and what?

13      Q    I'm just asking if you know of any homicide

14   that occurred at your property this year.

15      A    I don't know.

16      Q    In this meeting with, or, this fax to Major

17   Moore that we talked about that you provided to us

18   today for the first time, it says surprise Captain

19   Career didn't give me any indication that there

20   would be anyone coming to the party other than

21   himself.

22      A    Right.

23      Q    What party?  Or was that just a figure of

24   speech?

25      A    Figure of speech.



Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 75 of 114

 1       **Q**    You go on to say that the purpose of the

 2    actual meeting, as I see it, was to attempt a

 3    considerably -- attempt to considerably reduce what

 4    APD considers to be an inordinate amount of crime

 5    at Venetian Hills.  Do you acknowledge that?

 6       A    Yes.

 7       **Q**    "I repeatedly expressed my surprise at the

 8    claim that we had a lot of crime at the property."

 9    And you reference, it seems, these documents that

10    you've testified to as having received from APD.

11       A    Okay.  I'm not sure of the -- okay.

12       **Q**    But is it your testimony?

13       A    This was not received from them.

14       **Q**    Did APD make any security recommendations

15    to you or to Venetian Hills as a result of these

16    documents?

17       A    As a result of these documents?

18       **Q**    Yes, or any --

19       A    No.

20       **Q**    Did they make any recommendations to you

21    during that meeting at all about security on the

22    premises?

23       A    I don't recall.  I know there was one

24    about -- something to do with landscape.  I

25    remember that because it was really weird.  That's

```
 1      the only one I recall, other than saying that there
 2      was a lot of crime.
 3          Q    Did you take any action with respect to
 4      landscape following this meeting in the notice you
 5      received?
 6          A    No.
 7          Q    Did you --
 8          A    It was a weird comment and I didn't
 9      understand it.
10          Q    Did you take any action with respect to any
11      other security measure following this incident or
12      this meeting?
13          A    Not specifically related to that, I don't
14      think.  Always taking actions.
15          Q    What actions did you take after 2015?
16          A    I'm not sure that I took any in direct --
17      what I did was investigate it because I considered
18      it a serious accusation.  So I met with someone and
19      they threw all this stuff at me so I decided to see
20      if it was true.  And I found out that, to the best
21      of my knowledge, it's not true.
22          Q    So is it your testimony that Venetian Hills
23      is in a better position to assess the crime that's
24      happening on its property and the surrounding area
25      than Atlanta Police Department?
```

AccuTran, Inc.
770-426-9705

```
 1        A    I don't believe that the guy sitting in our
 2   driveway clocking people going by is a crime
 3   related to Venetian Hills.
 4        Q    Assault firearm, assault other, assault,
 5   drug abuse violation --
 6        A    I looked at them all and I addressed them
 7   accordingly.
 8        Q    Let me finish.  Disorderly conduct,
 9   forgery, drug abuse, stolen property, larceny
10   theft, motor vehicle theft, robbery, firearm.
11   That's a lot different than just sitting in their
12   car clocking people going by.
13        A    Correct.
14        Q    Okay.  So that's a bigger epidemic than
15   giving speeding tickets that's happening at your
16   property.  Okay; agree?
17        A    Okay.  You say so; I don't.
18        Q    No, I don't say so.  The document that you
19   just produced says so; agree with that?
20        A    If you read it that way, yes.
21        Q    I'm not reading it a certain way or the
22   other.  I'm reading plain language of the document
23   that you just handed me that lists an extensive
24   amount of crime.
25        A    It's a document I've received.
```

1    **Q**    And you disagree with this document because

2    you don't think that APD was in a good position to

3    give you recommendations about how to run your

4    property; isn't that true?

5    **A**    I think that they made accusations that are

6    not -- many accusations that are not reflective of

7    crime at Venetian Hills.

8    **Q**    You're entitled to your opinion, sir, but

9    do you have any training in police investigations

10    or crime reports?

11    **A**    No, I do not.

12    **Q**    Do you have any training as a negligence

13    security expert or a security expert?

14    **A**    No, I do not.

15    **Q**    So your opinions really are just that;

16    they're just your opinions about whether or not an

17    incident happened that's reflected in

18    Plaintiff's Exhibit 3 in these reports?

19    **A**    I'm not saying the incident didn't happen.

20    **Q**    What are you saying, then, sir?

21    **A**    I'm not saying anything.

22    **Q**    So my question is:  Do you disagree that

23    there was a serious crime problem at Venetian Hills

24    when you received this report?

25    **A**    Yes.

```
 1        Q    And you acknowledge, however, that APD
 2   considered you, Venetian Hills, to have, in your
 3   words, an inordinate amount of crime at Venetian
 4   Hills?
 5        A    That's what they said.
 6        Q    And did you accept any recommendations made
 7   to you by APD in response to that inordinate amount
 8   of crime at Venetian Hills?
 9        A    No, I did not.
10        Q    And instead you refuted any of their
11   findings as inaccurate, as you have done so here
12   today; correct?
13        A    No.  I didn't refute any of their things as
14   inaccurate.  I didn't say that those were
15   inaccurate.
16        Q    You just challenged the serious nature of
17   what they had reported to you; fair?
18        A    (No oral response.)
19        Q    Did you hear my question?
20        A    Yes.  I don't know how to respond to it.
21        Q    Okay.  It's either yes or no or I don't
22   know, or if you have another response it would be
23   fine.
24        A    Okay.  Say it again.
25             MR. SMITH:  Would you read the question
```



```
 1        back, please?
 2             THE WITNESS:  I don't know.  Is that a
 3        satisfactory response?
 4        Q.  (By Mr. Smith)  I'm not judging whether or
 5   not it's a satisfactory response.  I just want your
 6   response, sir.
 7             MR. SMITH:  Please read back.  The record
 8        was read back.)
 9             THE WITNESS:  I do not believe that it was
10        anywhere near as --
11        Q.  (By Mr. Smith)  Serious?
12        A    -- as serious as they led me to believe so
13   I investigated it to my best -- to the best of my
14   ability.
15        Q    And do you believe -- do you agree with the
16   statement that perception is nothing, facts and
17   action are everything?
18        A    Perception is nothing.
19        Q    Facts and action are everything.  Those are
20   your words.
21        A    Correct.
22        Q    Have you produced all crime reports,
23   incidents reports, now that you've produced these
24   documents, everything related to crimes that
25   occurred at the subject premises five years before
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 81 of 114

1    the incident?

2         A    I believe so.

3         Q    What would give you more confidence to

4    answer beyond just a belief where you could say yes

5    or no, you have or haven't?

6         A    I don't know.

7         Q    Did any tenant of Venetian Hills make any

8    crime-related complaints to Venetian Hills, its

9    manager or agents, at any time before this fire

10   occurred?

11        A    I don't know.

12        Q    We asked that you be able to testify about

13   incident reports, summary complaints, logs,

14   materials reflecting fire prevention; right?  Fire

15   prevention?

16        A    Right.

17        Q    Okay.  Fire safety standards, complaints

18   related to fire.  Venetian Hills keeps maintenance

19   logs within the resident files themselves; correct?

20        A    Correct.

21        Q    You had previously testified that there's

22   also a maintenance logbook that Sumlin or whoever

23   would have had; correct?

24        A    A maintenance logbook?

25        Q    Yes, sir.



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 82 of 114
30(b)(6) Deposition Of Venetian Hills Apartment, LLC (John Maughan)
December 18, 2019

80

```
 1        A     Just work orders.  That's the only thing I
 2     am familiar with.
 3        Q     And is the process that you get the work
 4     order and then the work order goes into the
 5     person's file?
 6        A     Correct.
 7        Q     And so if there are any complaints about
 8     fire, if there's any logs as far as maintenance to
 9     a particular unit, that would be found in the
10     individual's apartment unit; correct?  Apartment
11     unit file?
12        A     That I do not know.
13        Q     That you don't know?
14        A     I have no idea.
15        Q     Is there anybody else from Venetian Hills
16     that can testify as to how you keep your logs, your
17     maintenance materials and so forth, aside from you?
18        A     Manager I guess.
19        Q     Who is your manager today?
20        A     Veronica Cortez.
21        Q     Does she work for another company or is she
22     employed by Venetian Hills?
23        A     She is an independent contractor for
24     Venetian Hills.
25        Q     On September 6th of this year, 2019,
```

1  Venetian Hills produced tenant files for building I

2  because, as you testified before, that's where

3  these logs would be.  If they had --

4      A    I'm sorry?

5      Q    So you produced some files; do you remember

6  that?

7      A    Yeah.

8      Q    For building I?

9      A    Yeah.

10     Q    You produced five files for tenants; do you

11  remember that?

12     A    At what date?  That's in relation to this

13  incident.

14     Q    Yes, sir.  This was a couple of months ago.

15  Five folders just like this.

16     A    Correct.

17     Q    And that would contain any complaints or

18  maintenance requests that those individual tenants

19  in building I had; right?

20     A    Any maintenance requests.  It should

21  contain any -- it should contain any maintenance

22  request.

23     Q    Thank you.  And you have not found any

24  document, any file, any tenant file -- what do you

25  call these; a tenant file?

```
 1        A    Yeah.
 2        Q    You haven't found a single tenant file in
 3    relation to Building I5, which is where this
 4    incident occurred; correct?
 5        A    Correct.
 6        Q    And that's where George Hughes lived;
 7    correct?
 8        A    Correct.
 9        Q    And you haven't been able to put hands on
10    any tenant file in apartment I5 at all?
11        A    This year?
12        Q    Ever.
13        A    I can't remember whether we produced them
14    in relation to the Boykin case or not.  I can't
15    remember.
16        Q    Do you have any tenant file for any
17    resident at Venetian Hills within the last ten
18    years?
19        A    I don't keep the files here.
20        Q    Not my question.  My question is:  Do you
21    have any tenant file in relation to building I5 for
22    the past ten years?
23        A    Only any current ones that we've given you,
24    because I believe we gave you all the ones we had
25    for that building.
```

1    **Q**    Do I need to ask you again?

2    A    Yes.

3    **Q**    Okay.  For the past ten years you've had

4    many people live in and out of I5; correct?

5    A    Correct.

6    **Q**    I'm not talking about building I.  You see

7    this one here you produced it says I12; right?

8    A    Right.

9    **Q**    I'm not talking about I12 for now. I'm

10    talking about I5.

11    A    Right.

12    **Q**    Do you have any tenant file for anyone that

13    has lived in I5 at Venetian Hills in the last ten

14    years?

15    A    Other than what I've given you?

16    **Q**    You haven't given me anybody for I5.

17    A    I gave you those.

18    **Q**    This is Franklin Pemfins (phonetic.) he

19    lives in I12.  I'm asking for I5, building I5.

20    A    Oh, oh.  No, I don't believe so.

21    **Q**    Okay.  Can you verify that you've got no

22    other tenant file at Venetian Hills related to I5?

23    A    I believe not.

24    **Q**    Did any tenant make any complaint related

25    to fire or smoke detectors to Venetian Hills within

30(b)(6) Deposition of Venetian Hills Apartment, LLC (John Maughan)
Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 86 of 114
December 18, 2019

84

1    a five-year period before this fire?

2        A    Not to the best of my knowledge.

3        Q    You had testified before some about this,

4    John, in your prior deposition, but just on behalf

5    Venetian Hills, I wanted to ask you a couple of

6    questions about your written policies.

7        A    Okay.

8        Q    You have no written fire prevention policy

9    for tenants; correct?

10       A    Correct.

11       Q    You have no written fire prevention

12   policies for --

13       A    Fire prevention policies?

14       Q    For staff or managers, property managers,

15   at your property; correct?

16       A    Just the inspection reports that we do

17   that.  Is that --

18       Q    No, no.  We will talk about the inspection

19   report in a second, but as far as written

20   materials, like a guideline or a guidebook.

21       A    Oh, no.

22       Q    No written fire prevention policy for

23   employees?

24       A    Right, right, that's correct.  Okay.

25   That's expressed in a manner that I can understand.



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 87 of 114

85

1        **Q**    Good, good.  No training about what to do

2    in the event of a fire?

3        A    No.

4        **Q**    No fire evacuation plan either for

5    employees or for attendants?

6        A    No.

7        **Q**    Now you reference this inspection sheet;

8    correct?  And we spoke about that at your

9    deposition, and I'm going to ask you a couple of

10    questions about it.  Okay?

11        A    Okay.

12        **Q**    On behalf of Venetian Hills, because I know

13    that you heavily rely on this document.

14        A    Correct.

15        **Q**    This is very important to your defense;

16    right?

17        A    Right.

18        **Q**    And is this document important to you and

19    Venetian Hills as to why you believe that George

20    Hughes should not get any recovery out of this

21    case?

22        A    I don't know about that one way or another.

23    I mean, that's -- I don't know.

24        **Q**    Okay.  But it's important to you in your

25    defense because you claim this document shows that

1    you inspected the smoke detectors in George's

2    apartment; right?

3         A    By you --

4         Q    Venetian Hills.  Venetian Hills.

5         A    Yes.

6         Q    And there was one smoke detector in I5;

7    right?

8         A    I believe so.  I do not know.  I believe

9    so.

10        Q    Who from Venetian Hills can tell me how

11   many smoke detectors were in apartment I5?

12        A    Tory Sumlin, I guess.

13        Q    What about the tenants?  Would you take

14   their knowledge over anyone else given that they

15   live there?

16        A    No, not necessarily.

17        Q    Why not?

18        A    I don't have any knowledge of that.

19        Q    But you personally don't know how many

20   smoke detectors were there; right?  You had

21   testified that there was just the one in the

22   stairwell?

23        A    I believe so.  That is customary.

24        Q    But that there wasn't any on the first

25   floor?

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 89 of 114

1      A    Well, I've never walked all units and

2   looked at every unit and made notes.  It was

3   customary for that to be the location of the smoke

4   detector because that's where it's been since the

5   property was built; and, it is a logical place to

6   have it, in my opinion.

7      Q    Now, as it pertains to this inspection

8   sheet that you've discussed and produced, you don't

9   have any written policy about how to conduct an

10  inspection; do you?

11     A    Not written.

12     Q    You don't have any written policy about

13  what to do when you learn of faulty or inoperable

14  equipment?

15     A    Yes.  We have a policy.

16     Q    Where is that written policy?

17     A    Oh, not written, no.

18     Q    You don't have any written policy about how

19  to repair or replace faulty equipment?

20     A    No.

21     Q    You don't have any written policy about

22  where smoke detectors should be placed?

23     A    No.

24     Q    No written policy about where the fire

25  extinguishers should be placed?

```
 1        A    Not -- no.
 2        Q    Aside from this document, you have no
 3   documentation that supports that there was a smoke
 4   detector in apartment I5; is that fair?
 5        A    At the time of the fire?
 6        Q    Ever.  That you've ever had a smoke
 7   detector in I5.
 8        A    There were other ones done, but I don't
 9   have documentation here.  There were other
10   inspections done, obviously, but I do not have them
11   here.
12        Q    Where are they?
13        A    If anywhere, they're at the Hills, but I
14   would doubt that they're there.
15        Q    John, since your deposition we talked about
16   prior inspections a lot of apartment I5?
17        A    We did, okay.
18        Q    You don't remember that?
19        A    No.  Prior to that one?
20        Q    Yes, sir.
21        A    No, I don't recall.
22        Q    And we asked you to go get these documents
23   and produce them in discovery.  You haven't done
24   that.
25        A    I don't have them.
```

AccuTran, Inc.
770-426-9705

1      **Q**    Have you looked?  Have you attempted to get

2     them?

3      A    After that, there were none that I could

4     find at the apartment.

5      **Q**    So you did go look at Venetian Hills?

6      A    I believe so.  If I recall correctly, I

7     believe so.  I either looked or asked somebody to

8     look, I believe.

9      **Q**    Who did you ask to look?

10     A    I believe I asked somebody to look for them

11    but I'm not positive.

12     **Q**    That's okay.  And if you had asked somebody

13    to look, who would you have asked to look?

14     A    Probably the manager.

15     **Q**    Which is whom; Ms. Cortez?

16     A    It depends what date it was.  No, that was

17    prior to Ms. Cortez being there.

18     **Q**    From this summer until today, who would you

19    have asked between your deposition to go get those

20    documents?

21     A    We've had numerous managers, so I would

22    have to -- if there was a specific date, I would

23    have to look up who the manager was at that time.

24     **Q**    And my question to you is:  Aside from this

25    document, you don't have any other evidence that

```
 1     there was in fact a smoke detector installed in
 2     apartment I5; do you?
 3          A    At the time of the incident?
 4          Q    Are you asking for a clarification?
 5          A    I'm sorry?  At the time of that or at the
 6     time of the incident?
 7          Q    Ever, sir.  Do you have any other
 8     document -- I received zero documents with respect
 9     to smoke detector installation, manufacturing
10     number, who manufactured it, what serial number it
11     was, nothing with respect to your smoke detectors.
12     Okay?
13          A    Okay.
14          Q    I'm asking that if, aside from this
15     inspection checklist that we know you're fond of,
16     do you have any other document that would support
17     that there was in fact a smoke detector in I5?
18          A    At what time?
19               MR. GRANTHAM:  Ever.
20               THE WITNESS:  No.
21          Q.   (By Mr. Smith)  Aside from this document, do
22     you have any other record of maintaining smoke
23     detectors in I5?
24          A    No.
25               MR. SMITH:  We're going to mark this
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 93 of 114

```
 1        document and we're going to call it Plaintiff's

 2        6.

 3              MR. GRANTHAM:  Seven.

 4              MR. SMITH:  Seven, okay.

 5              (Plaintiff's Exhibit 7 was marked for

 6         identification.)

 7        Q.   (By Mr. Smith)  And there you are, sir.  Do

 8     you want to go off the record for a second and we'll

 9     get our exhibits organized?

10              THE VIDEOGRAPHER:  We are now off the

11         record.

12              (Off-the-record discussion.)

13              MR. SMITH:  We can go back on.

14              THE VIDEOGRAPHER:  Back on the record.

15        Q.   (By Mr. Smith)  Mr. Maughan,

16     Plaintiff's Exhibit 7, which is in front of you, is

17     the inspection sheet that you contend was created

18     before this fire happened; is that right?

19        A    Yes.

20        Q    What evidence do you have that supports

21     that this document was created before the fire?

22        A    The document itself.  My instructions to

23     have this done and that it was done.

24        Q    How do you know that it was done?

25        A    I've got correspondence with the person
```



```
 1        that I asked to do it and subsequently said that he

 2        had done it.

 3            Q    Where is that correspondence?

 4                 THE WITNESS:  Is that not part of our file?

 5        My communications with Cordamosh.

 6                 MR. SMITH:  Unfortunately you can't ask

 7        your lawyer questions during your deposition.

 8            Q.   (By Mr. Smith)  My question to you is:  Have

 9        you received any correspondence from Mr. Cordamosh

10        that says, hey, John, I inspected all the smoke

11        detectors at your property?

12            A    Not written correspondence, no.

13            Q    So verbal.  He called you and said, hey, I

14        inspected all your smoke detectors?

15            A    No.  I reviewed all those letters that you

16        have with him personally.  I presented it to him

17        personally.

18            Q    Okay.  And he told you that he did that, he

19        did the inspection.

20            A    I'm not saying that.  I presented the

21        letters to him.

22            Q    You said you received correspondence from

23        Mark Cordamosh?

24            A    No.  I gave him correspondence.

25            Q    So you don't have any document where he's
```

```
 1    saying, yes, John, I did the inspection at --
 2        A    No.
 3        Q    That he created, that he sent to you, that
 4    he communicated to you in written form?
 5        A    No.
 6        Q    And please circle the portion of the
 7    document that you contend supports that this
 8    inspection was done before the fire occurred at
 9    Venetian Hills.  Please circle that with your pen
10    there.
11        A    Yeah.  I know it's not complete up here.
12    That's what you're asking?
13        Q    And if you would just hold that up for the
14    camera, please, sir.
15        A    (Complying.)
16        Q    And the portion that you circled, what do
17    you contend that represents?
18        A    The date that I believe the inspection was
19    done.
20        Q    And what date is that?
21        A    I believe -- can't remember.  I've told you
22    that before.
23        Q    Well, now you're testifying on behalf of
24    Venetian Hills that this was done, which is a
25    critical aspect of the case; would you agree?
```

AccuTran, Inc.
770-426-9705

1        A    I understand.

2        Q    But you cannot swear under oath on behalf

3    of Venetian Hills when it was done; is that fair?

4        A    I have a lot of evidence that it was done

5    on that date, that's all.

6        Q    On what date?

7        A    I didn't bring all my files with me.  Okay.

8    I have told you the date.

9        Q    Do you know the date that that document was

10    created?

11        A    No.

12        Q    Do you know who created that document?

13        A    To the best of my knowledge, somebody,

14    probably the manager, undoubtedly the manager, on

15    that date -- not on that date; on the date that I

16    asked for it -- copied it for me.  I asked for the

17    inspection report relating to I5 and they had to

18    pull all the inspection reports, and I asked for

19    the page that reflected I5.

20        Q    Not my question.  My question is with

21    respect to who created the inspection report that

22    you're relying on.  Who filled in the boxes?

23        A    I'm sorry?

24        Q    Who checked the boxes in that document?

25        A    I believe it was Cordamosh.

```
 1        Q      And what do you base that belief off of?

 2        A      The conversations I had and the memos I

 3    gave to him before and after.

 4        Q      Did Cordamosh tell you that he filled that

 5    document in?

 6        A      Did he tell me he filled it in?

 7        Q      Yes, sir.

 8        A      I don't recall him telling me that, no.

 9        Q      But you're telling me now that Cordamosh

10    gave you that document, Plaintiff's 7?

11        A      I didn't say that.

12        Q      Okay.

13        A      I said that at the time that it was

14    required, I went out there to the Hills and I asked

15    for the inspection report.  I copied the page that

16    had I5 or they copied the page that was I5 for me.

17        Q      What time are you talking about, the time

18    it was requested?  What does that mean, sir?

19        A      When the matter came up and I required it,

20    I went out there and asked for it.

21        Q      Do you agree that it's a code violation not

22    to have functioning smoke detectors in your

23    apartment units?

24        A      Yes.  I guess it is, yes.

25        Q      Okay.  Are you aware that there was a
```

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 98 of 114

96

```
 1        Atlanta Housing Code violation in apartment
 2        building I for one of the smoke detectors that's
 3        represented to have worked there but it actually
 4        didn't work.  Are you aware of that?
 5            A    No.  When was that?  I'm not aware of it.
 6            Q    So you contend that --
 7            A    What date what was?
 8            Q    Hold on one second.  You contend that that
 9        inspection report was completed when?
10            A    I don't know.  I've given you that
11        information previously.
12            Q    Okay.
13            A    The date here.
14            Q    The circle with the squiggly?
15            A    Yeah.
16            Q    How many months before the fire was that
17        inspection -- in your testimony, was that
18        inspection report done?
19            A    How many months?
20            Q    Yes, sir.
21            A    It was only a few weeks, a couple of weeks.
22        You've got the timeline.
23            Q    No, sir, I don't.  I don't.  It's not clear
24        at all.  And we went through that in your prior
25        deposition.  We're not going to go back through it
```

AccuTran, Inc.
770-426-9705

```
1     again, but my question to you is:  You've got code

2     violations from Atlanta Housing code officials that

3     say that you need to repair smoke detectors, or

4     install smoke detectors that weren't installed in

5     your apartment units.  You realize that's a

6     violation; correct?

7          A    I don't recall that and -- I don't recall

8     that.

9          Q    Do you dispute any document --

10         A    I'd like to see the document.

11         Q    I'd be happy to show it to you.

12         A    Please.

13         Q    That says that you've got a code violation

14    in that building, building I.

15         A    I am not aware of it.  And would you --

16         Q    I'd be happy to.  You produced it to me.

17    It was in your files.

18         A    Oh, really?

19         Q    You certainly did, yeah.

20         A    Okay, fine.  I'm not aware of it.

21         Q    Okay.  This was a part of your production

22    that you gave to me, sir.

23         A    Okay.

24         Q    All right.  And this is, you can see this

25    is one of your tenants here, I12.
```

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 100 of 114

```
 1        A     Okay.

 2        Q     Do you recognize that as building I, unit

 3     12?

 4        A     Yes.

 5        Q     If it were building 5, it would say I5;

 6     right?

 7        A     Correct.

 8        Q     So as a part of his file, you go to the

 9     back page here and it says general sanitary

10     conditions, no smoke detector.  Do you see that,

11     sir?

12        A     Yes, I see that.

13        Q     And it says, remedial action:  Repair,

14     replace or install smoke detectors.  Do you see

15     that?

16        A     I see that.

17        Q     And do you acknowledge that?

18        A     I have never seen that document before, to

19     the best my knowledge.  But I provided it to you as

20     part of the file?

21        Q     You certainly did.

22        A     Okay.

23        Q     And if you look here, sir, you've got --

24     we're at building I12.

25        A     Uh-huh.
```

1     **Q**    Do you see that.

2     **A**    Uh-huh.

3     **Q**    If you go down here and it says building

4  I12 and you go under smoke detectors, do you see

5  that?

6     **A**    Uh-huh.

7     **Q**    You see how it's checked that there is a

8  smoke detector?

9     **A**    Yes.

10    **Q**    So that would actually be inaccurate in

11  reference to this document that says that there is

12  no smoke detector; is that right?

13    **A**    What is the date of this document?

14    **Q**    This document was sent, it looks like, by

15  John Maughan on February 28th of '19.

16    **A**    By me?

17    **Q**    Is that your name?

18    **A**    Yeah.

19    **Q**    Okay.  And it says received by Venetian

20  Hills Apartments; do you see that?

21    **A**    Yep.

22    **Q**    So you acknowledge that you received that.

23    **A**    Yeah.  What was the date of it?

24    **Q**    The date of the inspection was January 30

25  of 2019.

AccuTran, Inc.
770-426-9705

```
 1        A    Okay.

 2        Q    So my question to you is --

 3        A    I didn't see that or I did not notice --

 4        Q    Okay.

 5        A    -- that particular item.

 6        Q    So, based off of that, were that the case

 7   when that inspection was performed, that inspection

 8   report would be inaccurate, is my question.

 9        A    Say it again?  They're four years apart;

10   right?

11        Q    No, sir.  No, sir.  That's incorrect.  This

12   is January of 2019.

13        A    Okay.

14        Q    When did the fire that gave rise to

15   George's death occur?

16        A    No.  What is the date --

17        Q    No.  Answer my question.  When did the fire

18   that gave rise to George's death occur?

19        A    I don't know.

20        Q    Okay.  So you're saying there's a four-year

21   difference.  All right?

22        A    I'm sorry?

23        Q    You're saying there's a four-year

24   difference.  This is January of 2019, no smoke

25   detector in that apartment.
```

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 103 of 114

1      A      Okay.

2      Q      You're subject to a code violation because

3   of it.  Okay?

4      A      Okay.

5      Q      And then this fire happened March 15, 2017.

6   Do you understand that?

7      A      Two years, not four.  I made a mistake by

8   saying four.

9      Q      My question to you, sir, is:  You have zero

10  evidence that shows that you had functioning smoke

11  detectors outside of that single inspection report

12  that has no date on it; correct?

13     A      No.  I have evidence.  My conversations

14  with, and written correspondence with Cordamosh,

15  and the fact that we bought all of the information

16  for these inspections just a couple of days before.

17     Q      You have no other inspection report for any

18  inspection that was performed on building I aside

19  from that document; is that correct?

20     A      That is correct.

21     Q      Do you agree that had there been a fire in

22  I12 before this code violation was received --

23     A      Had there been a fire in I12?

24     Q      My question is hypothetical:  If there had

25  been a code violation -- excuse me.  If there had

AccuTran, Inc.
770-426-9705

102

1    been a fire in building I12 before that code

2    violation was received that says no smoke detector

3    in the apartment and a fire broke out and somebody

4    died, wouldn't you agree that Venetian Hills would

5    be responsible in that event?

6        A    I'm sorry.  I'm not understanding.

7        Q    You saw the code violation for I12;

8    correct?

9        A    In 2019.

10       Q    That's right.

11       A    Yes.

12       Q    So say there is no smoke detector in I12,

13   as that code violation says; right?

14       A    Right.

15       Q    And a fire breaks out and somebody dies in

16   I12, wouldn't you agree that Venetian Hills would

17   be responsible for that death?

18       A    Not necessarily.

19       Q    If there were no smoke detectors in that

20   apartment unit?

21           MR. GRANTHAM:  Object to the form.  He can

22       answer.

23           MR. SMITH:  You can answer.

24           THE WITNESS:  No.

25       Q.   (By Mr. Smith)  Even in that event, Venetian



AccuTran, Inc.
770-426-9705

1    Hills didn't provide a smoke detector, Venetian Hills
2    still wouldn't be responsible in the event of a fire
3    and death?
4        A    If we didn't fulfill the inspection?
5    The -- I'm not understanding what you're asking.  I
6    seen that you showed me the violation in 2019.
7    What is the question?
8        Q    If you were put on notice that there was no
9    smoke detector in an apartment unit, a fire breaks
10   out, somebody dies, Venetian Hills is responsible
11   for that notice and that death in that situation;
12   correct?
13       A    Depending.  Yeah, depending on the
14   circumstances and dates of the notice and the fire.
15           MR. GRANTHAM:  Sorry.  I didn't want to
16       interrupt.  Object to the prior question, to the
17       form.
18           THE WITNESS:  Huh?
19           MR. GRANTHAM:  Go ahead.  I was objecting
20       to his question.
21       Q.   (By Mr. Smith)  Tory Sumlin was your property
22   manager at the time of the incident; correct?
23       A    Correct.
24       Q    And he had no formal training by Venetian
25   Hills; correct?

```
 1        A     Correct.
 2        Q     And that is both with respect to what he
 3     did as a property manager; right?
 4        A     Correct.
 5        Q     And what he also did with respect as a
 6     security officer; is that also correct?
 7        A     Not by Venetian Hills.
 8        Q     Correct.  No security training was provided
 9     to him?
10        A     Not by Venetian Hills.
11        Q     That's my question.  Right?
12        A     Yes.
13        Q     And he was under the direction of Venetian
14     Hills at the time of the incident that gave rise to
15     George's death; correct?
16        A     Say that again.
17        Q     He was an employee of Venetian Hills at the
18     time of the fire; right?
19        A     Venetian Hills, LLC, yes.
20        Q     Correct.  That's my question.  And Venetian
21     Hills, LLC could fire him from his job; is that
22     right?  At that time, at the time of the incident?
23        A     Of course.
24        Q     And Venetian Hills actually did fire him
25     after this -- a couple months after this fire;
```



AccuTran, Inc.
770-426-9705

```
 1     correct?

 2          A     I believe so.

 3          Q     You're the sole member of Venetian Hills;

 4     correct?

 5          A     I'm sorry?

 6          Q     You're the sole member of Venetian Hills;

 7     correct?

 8          A     That's correct.

 9          Q     Nobody else has managerial authority over

10     Venetian Hills other than you; right?

11               MR. GRANTHAM:  Object to the form.  You can

12          answer.

13               THE WITNESS:  Huh?

14               MR. GRANTHAM:  I was objecting to the form

15          of his question.  You can answer.

16               THE WITNESS:  Nobody else what?

17          Q.    (By Mr. Smith)  You're the manager of

18     Venetian Hills; correct?

19               MR. GRANTHAM:  Object to the form.

20          Q.    (By Mr. Smith)  Or you're the member of

21     Venetian Hills; correct?

22          A     Yeah.

23          Q     There's no other member?

24          A     That's correct.

25          Q     You make the decisions for Venetian Hills;
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 108 of 114

```
 1      correct?
 2            MR. GRANTHAM:  Object to the form of the
 3        question.  He can answer.
 4            THE WITNESS:  I make the decisions that are
 5        the responsibility of Venetian Hills, LLC.
 6        Q.  (By Mr. Smith)  Venetian Hills fired Tory
 7    Sumlin after this fire; correct?
 8        A    I believe so.  I'm not sure.
 9        Q    Is he currently employed at Venetian Hills?
10        A    No.
11        Q    In the months following this fire --
12        A    Well, I'm not sure whether he was fired or
13    quit going back, you know.  I'd have to evaluate
14    that.  I don't remember.  He is no longer there.
15        Q    You testified this summer in this case that
16    he was fired a couple months after the death --
17        A    Probably.
18        Q    But now you don't remember?  That's fine.
19    So anyone else employed --
20        A    It's just the word fired that I'm --
21        Q    Discharged, let go.
22        A    Went.  Okay.  I'm not -- I can't recall at
23    this moment, and maybe I answered it inaccurately
24    previously.  I would have to think about it for a
25    while as to what happened relating to his
```

1    departure.

2       Q    At the time of the fire, he was an employee

3    of Venetian Hills; correct?

4       A    Correct.  Is no longer.

5       Q    Anyone else employed at Venetian Hills to

6    perform security at the time of the incident?

7       A    No.  I don't believe so.

8       Q    I'm sorry?

9       A    Whoa.  Just a second.  I'm not -- to

10   perform security.  I don't know.  I'd have to

11   check.  We had various security people, other

12   security people, and I'm not sure we had any at

13   that time.  I don't believe so, but I'm not

14   absolutely positive.

15      Q    You had an agreement between Tory Sumlin

16   and Venetian Hills -- Venetian Hills and Tory

17   Sumlin had an agreement to provide security on the

18   premises; correct?

19      A    He provided security prior to his

20   employment at the Venetian Hills and continued to

21   do so.

22      Q    That wasn't my question, and let's go off

23   the record just for a second please.

24           THE VIDEOGRAPHER:  We are now off the

25      record.

AccuTran, Inc.
770-426-9705

30(57/6) Deposition of Venetian Hills Apartment, Inc. (John Maughan)
Case 1:21-cv-03214-LMM   Document 81-1   Filed 10/11/23   Page 110 of 114
December 18, 2019

108

1           (Off-the-record discussion.)

2           MR. SMITH:  We will put on the record that

3       the deposition is being continued by agreement

4       of both parties to another date to occur within

5       the next month or a time as early as convenient.

6           (Deposition adjourned at 3:42 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    E R R A T A   P A G E

2    Pursuant to Rule 30(e) of the Federal Rules of Civil
     Procedure and/or Georgia Code Annotated 9-11-30(e), any
3    changes in form or substance which you desire to make
     to your deposition testimony shall be entered upon the
4    deposition with a statement of the reasons given for
     making them.

5

6    To assist you in making any such corrections, please
     use the form below.  If supplemental or additional
7    pages are necessary, please furnish same and attach
     them to this errata sheet.

8

     I, the undersigned, JOHN MAUGHAN, do hereby certify
9    that I have read the foregoing deposition and that to
     the best of my knowledge, said deposition is true and
10   accurate (with the exceptions of the following
     corrections below).

11

12   Page / Line /          Change       /      Reason
13   _____ / _____ / _____ / _____
14   _____ / _____ / _____ / _____
15   _____ / _____ / _____ / _____
16   _____ / _____ / _____ / _____
17   _____ / _____ / _____ / _____
18   _____ / _____ / _____ / _____
19   _____ / _____ / _____ / _____
20   _____ / _____ / _____ / _____
21   _____ / _____ / _____ / _____
22   _____ / _____ / _____ / _____
23   _____ / _____ / _____ / _____
24   _____ / _____ / _____ / _____
25   _____ / _____ / _____ / _____

```
1    Page / Line /        Change        /      Reason

2    _____ / _____ / _____ / _____

3    _____ / _____ / _____ / _____

4    _____ / _____ / _____ / _____

5    _____ / _____ / _____ / _____

6    _____ / _____ / _____ / _____

7    _____ / _____ / _____ / _____

8    _____ / _____ / _____ / _____

9    _____ / _____ / _____ / _____

10   _____ / _____ / _____ / _____

11   _____ / _____ / _____ / _____

12   _____ / _____ / _____ / _____

13   _____ / _____ / _____ / _____

14   _____ / _____ / _____ / _____

15   _____ / _____ / _____ / _____

16   _____ / _____ / _____ / _____

17

18                        _____

                              JOHN MAUGHAN

19

20   Sworn to and subscribed before me

21   _____,

22   Notary Public, this _____ day of

23   _____, 2020.

24   My commission expires: _____

25
```



1          C E R T I F I C A T E

2

3   STATE OF GEORGIA:

4   COUNTY OF FULTON:

5            I hereby certify that the foregoing

6       transcript was taken down as stated in the

7       caption, that the witness was first duly sworn,

8       and the questions and answers thereto were reduced

9       to typewriting under my direction; that the

10      foregoing pages 1 through 110 represent a true,

11      correct, and complete transcript of the evidence

12      given upon said hearing, and I further certify

13      that I am not of kin or counsel to the parties in

14      the case; am not in the regular employ of counsel

15      for any of said parties; nor am I in anywise

16      interested in the result of said case.  The

17      witness did reserve the right to read and sign the

18      transcript.

19            This, the 16th day of June, 2020.

20

21

22

23                  _____

                    SHARON H. ROSS, CCR-2886

24

                    Registered Professional Reporter

25



AccuTran, Inc.
770-426-9705

```
1              COURT REPORTER DISCLOSURE

2

3        Pursuant to Article 10.B of the Rules and
    Regulations of the Board of Court Reporting of the
4    Judicial Council of Georgia, I make the following
    disclosure:

5

         I am a Georgia Certified Court Reporter.  I am here
6    as a representative of Regency-Brentano, Inc.

7        I am not disqualified for a relationship of
    interest under the provisions of O.C.G.A. §9-11-28 ©.

8

         Regency-Brentano, Inc. was contacted by the offices
9    of Accutran to provide court reporting services for this
    deposition.

10

         Regency-Brentano, Inc. will not be taking this
11   deposition under any contract that is prohibited by
    O.C.G.A. §15-14-37 (a) and (b).

12

         Regency-Brentano, Inc. has no exclusive contract to
13   provide reporting services with any party to the case,
    any counsel in the case, or any reporter or reporting
14   agency from whom a referral might have been made to
    cover this deposition.

15

         Regency-Brentano, Inc. will charge its usual and
16   customary rates to all parties in the case, and a
    financial discount will not be given to any party to
17   this litigation.

18

19

20

21                        _____

                          Sharon H. Ross, CCR-2886
22

23

24

25
```



AccuTran, Inc.
770-426-9705