# DEPOSITION OF JOHN MAUGHAN
# TAKEN ON JULY 30, 2020

Certified Copy Transcript

# In The Matter Of:

Marie Hughes et al vs. Venetian Hills Apartments, LLC et al

Venetian Hills Apartments, LLC 30(b)(6) (John Maughan)

July 30, 2020



**AccuTran, Inc.**

*---certified court reporters---*

707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
Phone: 770-426-9705
Fax: 770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

Case 1:21-cv-03214-LMM  Document 81-2  Filed 10/11/23  Page 3 of 125
Venetian Hills Apartments, LLC 30(b)(6) John Maughan
July 30, 2020

1

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

MARIE HUGHES, as Authorized      )
Administrator of the Estate      )
of GEORGE HUGHES,                )
                                 )
        Plaintiff,               )
                                 )
    vs.                          ) CIVIL ACTION FILE NO.
                                 ) 19A73694
VENETIAN HILLS APARTMENTS, LLC,)
and JOHN MAUGHAN,                )
                                 )
        Defendants.              )

* * *

Videotaped 30(b)(6) deposition of VENETIAN HILLS

APARTMENTS, LLC, (John Maughan) taken on behalf of the

Plaintiff, pursuant to Notice and agreement of counsel,

in accordance with the Georgia Civil Practice Act, before

Debbie C. Hennings, Registered Professional Reporter, at

Courtyard by Marriott, 2655 Deerfield Parkway,

Alpharetta, Georgia, on the 30th day of July 2020,

commencing at the hour of 1:02 p.m.

* * *

ACCUTRAN, INC.
--certified court reporters--
707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
770-426-9705



AccuTran, Inc.
770-426-9705

2

```
1              I N D E X   T O   E X A M I N A T I O N S

2    JOHN MAUGHAN
           BY MR. HINSON . . . . . . . . . . . . . . . . . .   5
3
                           * * *
4

5

6              I N D E X   T O   E X H I B I T S

     Plaintiff's
7    Exhibit No.            Description                    Page

8     8        Notice to Take Continued Videotaped 30(b)(6)   6
               Deposition of Defendant Venetian Hills
9              Apartments, LLC

10    9        "Venetian Hills, LLC Luxury Living" brochure   116

11    10-13    Photographs                                    14

12    14       Photograph                                     17

13    15       Memo to Mark - Dated 3/8/17                    31

14    16       City of Atlanta Department of City Planning    45
               Office of Buildings
15
16                         * * *

17

18

19

20

21

22

23

24

25
```

AccuTran, Inc.
770-426-9705

3

```
 1                    A P P E A R A N C E S

 2     ON BEHALF OF THE PLAINTIFF:
       (By Zoom)
 3
               DARRELL W. HINSON, ESQUIRE
 4             KYLE JACKSON, ESQUIRE
               Shiver Hamilton, LLC
 5             3490 Piedmont Road
               Suite 640
 6             Atlanta, Georgia  30305
               404-593-0020
 7             kyle@shiverhamilton.com
               darrell@shiverhamilton.com
 8
       ON BEHALF OF THE DEFENDANT:
 9
               BRYAN M. GRANTHAM, ESQUIRE
10             Hawkins Parnell Thackston & Young, LLP
               303 Peachtree Street, NE
11             Suite 4000
               Atlanta, Georgia  30308-3243
12             404-614-7654
               bgrantham@hptylaw.com
13
       ALSO PRESENT:
14
               Duke Korey, Videographer
15             Atlanta Legal Media
               404-803-9290
16
                              * * *
17
              (Pursuant to O.C.G.A. Section 9-11-29(a) and (d) and
18
        Section 15-14-37(a), (b) and (c), the court reporter
19
        disclosure statement is tendered at the end of the
20
        transcript.)
21                            * * *

22

23

24

25
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 6 of 125
Venetian Hills Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

4

```
 1          THE VIDEOGRAPHER:  We are now on video record.

 2          COURT REPORTER:  Do you want me to swear him,

 3     Darrell?

 4          MR. HINSON:  Yeah, let me go ahead and get on the

 5     record first with counsel.

 6          This will be the deposition of the 30(b)(6) for

 7     Venetian Hills Apartments continued.

 8          Mr. Grantham, are you okay with the previous

 9     stipulations last time, plus the addition that because

10     this is a remote deposition, obviously for the

11     convenience of the witness, as well as counsel, in light

12     of the COVID-19 situation that we're -- in addition to

13     having the videographer and court reporter in the room,

14     I'm remote and we'll be using the Zoom technology in

15     addition to the technology in the room?

16          MR. GRANTHAM:  That's all fine.

17          MR. HINSON:  I'm sorry, I couldn't hear.

18          MR. GRANTHAM:  I said that's all fine.

19          MR. HINSON:  Okay.  Brian, I'm sorry, you're a

20     little muffled.  If I ask you to repeat yourself, I'm not

21     being rude.  I just can't hear you.

22          All right.  If you could swear the witness, please.

23                         JOHN MAUGHAN,

24     being first duly sworn, was examined and testified as

25     follows:
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 7 of 125
Venetian Hills Apartments, LLC 30(b)(6) (John Maughan)
July 30, 2020

5

```
 1                    EXAMINATION
 2   BY MR. HINSON:
 3       Q.   Mr. Maughan, my name is Darrell Hinson.  We haven't
 4   met before.  We're doing this by video, so thank you for
 5   working with us.  I hope this is a convenient arrangement, as
 6   far as a method of getting this done for you to participate
 7   remotely.
 8            Could you state your full name, please, so we're
 9   clear.
10       A.   John Maughan.
11       Q.   Do you have a middle name, sir?
12       A.   Pardon me?
13       Q.   Do you have a middle name?
14       A.   Yeah, Frederick.
15       Q.   Thank you.  What is your current residence address?
16       A.   3020 Big Creek Court, Alpharetta, Georgia 30005.
17       Q.   And you understand we're here today for a
18   continuation of the deposition that was taken in this lawsuit
19   filed by the Hughes family against Venetian Hills Apartments
20   and yourself dealing with the fire?
21       A.   Yes.
22       Q.   Okay.  And do you understand you're under oath
23   today?
24       A.   Yes.
25       Q.   Okay.  Is there any reason that you're not
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 8 of 125
Venetian 451 LLC Apartments, LLC 30(b)(6) John Maughan
July 30, 2020

6

```
 1    physically or mentally able to listen to my questions

 2    and answer them today?

 3         A.    No.

 4         Q.    We are doing this remotely, sir, so please

 5    speak up if you cannot hear me or cannot understand my

 6    question, okay?

 7         A.    Okay.

 8         Q.    All right.  And if you need to take a break,

 9    please let me know.

10         A.    Okay.

11               (Plaintiff's Exhibit No. 8 marked.)

12    BY MR. HINSON:

13         Q.    Our first exhibit for today will be

14    Plaintiff's Exhibit 8, which is the Notice for this

15    deposition.

16               MR. HINSON:  Ms. Court reporter, can you show

17         him Exhibit 8.

18               COURT REPORTER:  I handed it to him.

19    BY MR. HINSON:

20         Q.    Mr. Maughan, did you bring any documentation

21    with you today?

22         A.    No.

23         Q.    In addition to the items that were requested

24    from you at the first part of this deposition, we also

25    asked for documents, generally speaking, regarding
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 9 of 125
Venetian Apartments, LLC 30(b)(6) (John Baughan)
July 30, 2020

7

 1    violations, inspections, compliance notices concerning codes,

 2    housing, building, zoning codes.  Do you have any

 3    documentation responsive to that request?

 4        A.    I don't have any with me.  I'm not quite sure of the

 5    question.  We from time to time have had code violations,

 6    small ones.  A resident calls up code instead of us because

 7    they're annoyed at us.  And code comes out.  We rectify it.

 8    They go.  You're not referring to those, are you?

 9        Q.    I'm referring to any documents that you have

10    concerning any violations or inspections or notice of

11    compliance regarding housing codes, building codes, or zoning

12    codes.  Do you have any documents with you today?

13        A.    Does this fall under that category?  From time to

14    time we get -- a resident will call code because they're

15    ready to be evicted or they're annoyed at us, whatever, and

16    they don't tell us and code arrives.  They check it.  We fix

17    it.  They go.

18            MR. GRANTHAM:  His question is, do you have any

19        documents, John?

20            THE WITNESS:  To that effect?

21            MR. GRANTHAM:  Yes.

22            THE WITNESS:  Not with me, no.  And, you know, the

23        ones that have been done I destroyed or I don't pay any

24        attention to them.  I don't file them, let's put it that

25        way.  There may or not be some at the Hills.  I don't

```
 1        know.
 2    BY MR. HINSON:
 3        Q.    Okay.  Mr. Maughan, let me ask it this way.  So
 4    before your deposition today, we asked that you bring with
 5    you today any documents from the time period of March 15,
 6    2012, to the present regarding housing, building, or zoning
 7    code violations.  You do not have any documents with you
 8    today, correct?
 9        A.    That is correct.  And those -- the ones that I just
10    spoke about are what we have had.
11        Q.    Okay.  Before you came today, did you look for any
12    such documents?
13        A.    No.  I didn't think that was what you were referring
14    to.
15        Q.    Okay.  So does that mean you did not look for these
16    documents?
17        A.    No.
18        Q.    And I didn't ask that right.  Have you looked for
19    any of these documents, sir?
20        A.    Those are the only documents there are, to the best
21    of my knowledge, and I did not look for any.
22        Q.    Okay.  When you say, those are the only documents,
23    to the best of your knowledge, what documents are you
24    referring to, just so we're clear?
25        A.    I'm referring to documents where housing code came
```



Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 11 of 125
Veletran #11-19 Apartments LLC 30(b)(6) - John Vaughan
July 30, 2020

9

```
 1   out and cited us for various things, which we corrected.
 2   Generally, they are called by the resident.  They come out,
 3   we fix it, and that's it.
 4        Q.   And, sir, and I'm asking about the actual documents.
 5   My question is, do you have any documents concerning those
 6   from the dates of 2012 to the present?
 7        A.   Are you referring to those documents as well?
 8        Q.   Yes, sir, what you just described.
 9        A.   I did not bring them with me.  I would have to dig
10   them out, whatever we've got.
11        Q.   Did you have any?
12        A.   I do not have any with me, no.
13        Q.   No, I meant, do you have any at anyplace at all, in
14   your office --
15        A.   I would have to look.
16        Q.   I'm sorry?
17        A.   I would have to look.
18        Q.   Okay.  And --
19        A.   I did not realize that's what you're referring to.
20        Q.   Okay.  And I'm just trying to get on the same page.
21   You have not looked yet; is that correct?
22        A.   I'm sorry?
23        Q.   Am I correct that you have not looked for these
24   documents yet?
25        A.   I didn't understand.  I do not have the documents.
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 12 of 125
Videotaped 30(b)(6) of John Maughan
July 30, 2020

10

```
 1    I will see what I've got.
 2        Q.    Sir, since your last deposition, have you looked for
 3    any original documents, the originals of any documents you
 4    have already produced in this case?
 5        A.    No.
 6        Q.    I'm sorry.  If you answered, I did not hear.
 7              COURT REPORTER:  He said no.
 8              MR. HINSON:  Thank you.
 9    BY MR. HINSON:
10        Q.    Mr. Maughan, what did you do in preparation for your
11    deposition today?
12        A.    Nothing.
13        Q.    Did you review any documents to prepare for your
14    deposition?
15        A.    No.  I have provided all the documents I thought you
16    require.  I will look for the documents in question.
17        Q.    Did you review any documents to prepare for today?
18        A.    I'm sorry?
19        Q.    Did you review any documents to prepare for today?
20        A.    No.
21        Q.    Did you speak with any people to prepare for today?
22        A.    No.
23        Q.    Have you reviewed your earlier deposition
24    transcripts in this case?
25        A.    I'm sorry?
```



1     **Q.**    Have you reviewed the transcripts from your previous

2  depositions in this case?

3     A.     No.

4     **Q.**    Sir, have you spoken with any law enforcement

5  officials about the fire of March 2017?

6     A.     The fire department people, no.

7     **Q.**    You have not spoken with the fire department people?

8     A.     I'm sorry?

9     **Q.**    Have you spoke within the fire department people

10  about the fire?

11     A.     No.

12     **Q.**    Have you spoken with any police about the fire?

13     A.     No.

14     **Q.**    And when I say "the fire" today, I mean the fire in

15  March of 2017; do you understand?

16     A.     I understand that.

17     **Q.**    Have you spoken with anyone about the fire in March

18  of 2017 since your last deposition in December of last year?

19     A.     Since deposition last year, no.

20     **Q.**    Okay.  Do you recall that a lawyer named Brandon

21  Smith came to your home last year in December and took a

22  deposition with you?

23     A.     Yes.

24     **Q.**    Okay.  Have you talked with anyone about the fire

25  since that date you spoke with Mr. Smith?

```
 1      A.    No.

 2      Q.    I would like to ask you now about Venetian Hills

 3   Apartments and their status, okay?

 4      A.    Okay.

 5      Q.    Who are the current employees of Venetian Hills?

 6      A.    Who are the current employees?

 7      Q.    Yes, sir.

 8      A.    They're all 1099s.  They're independent contractors.

 9   Manager Art Robinson and two part-time maintenance people --

10   three part-time maintenance people.

11      Q.    Any other 1099 independent contractors?

12      A.    I'm sorry?

13      Q.    Are there any other persons working for Venetian

14   Hills --

15      A.    Those are the ones.

16      Q.    How long has Mr. Art Robinson been working as the

17   manager?

18      A.    That's correct.

19      Q.    Did you hear my question?

20      A.    How long?  There was a break in his time with me,

21   ten years.

22      Q.    When did he come back?

23      A.    At about the time of the fire -- no, I'm sorry.

24   When did he come back?  Six months ago.

25      Q.    You told Mr. Smith last time that Mr. Robinson
```

13

```
 1   wasn't working for Venetian Hills because of problems with

 2   theft; do you remember that?

 3        A.    I remember that.

 4        Q.    Do you remember that?

 5        A.    Yes.

 6        Q.    Why did you hire Mr. Robinson back?

 7        A.    Because I felt he was competent and learned his

 8   lesson.  He was with me ten years previously.

 9        Q.    You have three part-time maintenance people and

10   that's all?

11        A.    I have part-time maintenance people.

12        Q.    Have there been any changes to Venetian Hills

13   Limited Liability Company as far as structure or ownership

14   since your last deposition last year in December?

15        A.    Have I changed anything?

16        Q.    Yes, sir.

17        A.    No.

18        Q.    Are you still the sole member of Venetian Hills?

19        A.    Yes.

20        Q.    We represent George Hughes.  George Hughes was in

21   unit I-5 at the time of the fire; do you understand that?

22        A.    Yes.

23        Q.    Is unit I-5 rented out now?

24        A.    I'm sorry?

25        Q.    Is unit I-5 being rented out now?
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 16 of 125
Valevrania Apartments LLC 30(b)(6) John Vaughan
July 30, 2020

14

```
 1        A.    No.

 2        Q.    Is unit I-5 in condition to be rented out now?

 3        A.    No.

 4        Q.    Have any renovations been done on unit I-5 since the

 5   fire?

 6        A.    No.  Well, right after the fire it was closed in and

 7   a new roof was put on.

 8        Q.    But as I understand it, some debris would have been

 9   cleaned out and the unit I-5 would have been boarded up; is

10   that right?

11        A.    I don't know that boarded up is the right word, but

12   it is not occupied.

13        Q.    Has it been occupied at any point since the fire?

14        A.    No.

15              MR. HINSON:  Ms. Court Reporter, could we please

16        show some exhibits to the witness.

17              COURT REPORTER:  Sure.

18              (Plaintiff's Exhibit No. 10, Exhibit No. 11,

19        Exhibit No. 12, Exhibit No. 13 marked.)

20              MR. HINSON:  Could we please show Exhibit 13,

21        Exhibit 10, Exhibit 11 and Exhibit 12.

22              COURT REPORTER:  Yup, hang on just a second.

23              MR. HINSON:  Starting with Exhibit 10, please.

24              COURT REPORTER:  He has them in front of him.

25   BY MR. HINSON:
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 17 of 125
Veletran 411 Apartments LLC 30(b)(6) / John Maughan
July 30, 2020

15

1    Q.    And, Mr. Maughan, please let me know if you need to

2    see these or we need to take a break.

3    A.    Okay.  That looks like pictures of the unit.

4    Q.    Okay.  Thank you.  Could you have Plaintiff's No. 10

5    in front of you, please.

6    A.    Okay.

7          COURT REPORTER:  He's looking at it.

8    BY MR. HINSON:

9    Q.    Okay.  Does No. 10 show the front of unit I-5?

10   A.    I don't know if it's as of this date.

11   Q.    I'm sorry, sir, I could not hear what you said.

12   A.    I said, I do not know if it's as of this date.

13   Q.    No, sir, thank you.  Does Exhibit 10 show -- I'll

14   represent to you this was provided by your lawyers.  Does

15   Plaintiff's Exhibit 10 show the condition of the front of

16   unit I-5 as of July -- or the summer of 2017?

17   A.    Oh, these pictures are from the summer of 2017?

18   Q.    That's what they were produced, yes, sir.

19   A.    Okay.  Could be.

20   Q.    Could be?

21   A.    I don't know the date of them.

22   Q.    All right.  This is -- does that picture show the

23   unit of I-5?  Is that building I?

24   A.    It certainly is.

25   Q.    I'm sorry, I couldn't hear you.



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 18 of 125
Venetian Hills Apartments LLC 30(b)(6) / John Vaughan
July 30, 2020

16

```
 1        A.      Yes.

 2        Q.      Thank you.  Plaintiff's Exhibit 11, does that

 3   picture show the interior of unit I-5 as it would have been

 4   in the summer of 2017?

 5        A.      I don't know for sure, but...

 6        Q.      I'm sorry, sir --

 7        A.      I don't know for sure.  I wasn't there when the

 8   picture was taken.

 9        Q.      Does that appear to you to be the interior of unit

10   I-5?

11        A.      We have -- yes, probably.

12        Q.      Do you have any reason to think that's not the

13   interior of unit I-5?

14        A.      No, I have no reason to think one way or another.

15        Q.      I'm sorry, sir, I couldn't hear what you said.

16        A.      I have no reason to believe one way or another.

17        Q.      I'm sorry.  You had no reason to believe one way or

18   the other?

19        A.      Yeah, that that's the way it was on that date.

20   That's two years ago.

21        Q.      I'm sorry?  Could you repeat.  I could not hear you.

22             COURT REPORTER:  He said that was two years ago.

23   BY MR. HINSON:

24        Q.      Have you been inside unit I-5?

25        A.      Yes.
```

AccuTran, Inc.
770-426-9705

1    **Q.**    Have you been inside unit I-5 since the fire?

2    A.    Yes.

3    **Q.**    Does that picture that you have in your hand, 11,

4    show how the immediate interior of unit I-5 looks?

5    A.    Yes.

6    **Q.**    Plaintiff's Exhibit 12, could you tell me, does that

7    appear to be the rear of unit I-5?

8    A.    I presume so.

9         COURT REPORTER:  He said, "I presume so," Darrell.

10        MR. HINSON:  Thank you.

11        COURT REPORTER:  He's very soft-spoken, so

12        just let me know and I'll repeat it.

13   BY MR. HINSON:

14   **Q.**    Mr. Maughan, you're very soft-spoken.  I'm

15   not being rude.  The microphone doesn't always pick it

16   up, so we we'll muddle along.  Sir, could you look at

17   Exhibit 13.  Does that also show the rear of unit I-5?

18   A.    I presume so.

19   **Q.**    I couldn't hear what you said.

20   A.    I said, "I presume so."

21        (Plaintiff's Exhibit No. 14 marked.)

22        MR. HINSON:  Could you show the witness,

23        please, Plaintiff's Exhibit 14.

24        COURT REPORTER:  He has it.

25   BY MR. HINSON:



 1      Q.    Mr. Maughan, is Plaintiff's Exhibit 14 a picture of

 2  building I?

 3      A.    Yes.

 4      Q.    Thank you.

 5          MR. HINSON:  Can you please show the witness

 6      Plaintiff's Exhibit 2.

 7          COURT REPORTER:  He has it.

 8  BY MR. HINSON:

 9      Q.    Mr. Maughan, this was an exhibit that was used

10  earlier in this deposition in December.  Do you recognize

11  this document?

12      A.    Yes.

13      Q.    All right.  This is the -- Plaintiff's Exhibit 2 is

14  the document that's been provided to us as the lease

15  agreement for George Hughes for apartment I-5.  Do you agree

16  with that?

17      A.    I agree with that.

18      Q.    All right.  And the lease date on this document on

19  Exhibit 2 is 2012?

20      A.    I'm sorry?

21      Q.    The date on the lease for Mr. Hughes on Exhibit 2 is

22  dated 2012; do you see that?

23      A.    Yes, I do.

24      Q.    Okay.  What was the charge for Mr. Hughes appears to

25  be $120 per week; is that accurate?

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 21 of 125
Venetian Hills Apartments LLC 30(b)(6) / John Maughan
July 30, 2020

19

1    A.    What I'm looking at says 120.

2    Q.    Okay.  Was that Mr. Hughes' rent, $120 per week?

3    A.    That's what it says, 120 it says.

4    Q.    Okay.  That was what Mr. Hughes was paying to lease

5 one bedroom and common areas shared with others in apartment

6 I-5; is that right?

7    A.    A one bedroom?

8    Q.    Sir, I'm looking at the top of page 1 on Exhibit 2.

9 It says, Lease Date:  February 10, 2012; do you see that?

10   A.    Yup.

11   Q.    And it also says, Venetian Hills Apartments leases

12 one bedroom, and common areas shared with others in apartment

13 No. I-5/B located at 1829 Campbellton Road SW, Atlanta,

14 Georgia, to George Hughes, (Resident).  Do you see that?

15   A.    No.  Where is that you're reading?

16   Q.    I'm reading the first sentence on the lease

17 documents.  Do you see that, sir?

18   A.    The lease date?

19   Q.    Yes, sir.

20   A.    Leases one bedroom and common areas shared with

21 others, right.

22   Q.    That's what was leased to Mr. Hughes in February of

23 2012?

24   A.    That's correct.

25   Q.    And for that, he was paying $120 per week, according

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 22 of 125
Velectra 4411 Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

20

```
 1    to this document?

 2         A.    That's correct.

 3         Q.    Did Mr. Hughes' rent change at any point from 2012

 4    to 2017?

 5         A.    Did he what?

 6         Q.    Did his rent change in amount?

 7         A.    I don't know.  I would have to check the records.  I

 8    don't know.

 9         Q.    I couldn't understand your answer, sir.  I couldn't

10    hear you.

11         A.    I'm not sure.  I don't have those records.  I can

12    look it up, but I don't have the -- whether it changed or

13    not.

14         Q.    You say you could look it up.  So that information

15    is available?

16         A.    Yes, I have the rent roll.

17         Q.    But you have not provided it to us?

18         A.    I have not provided?  I provided everything you have

19    asked for.

20         Q.    Well, what you have provided us from the lease

21    documents is Plaintiff's Exhibit 2.  I'm just trying to find

22    out, are there more documents about what Mr. Hughes was

23    paying you to live there?

24         A.    I would have to determine whether his rent was

25    increased during his time there.
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 23 of 125
Venetran Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

21

1     **Q.**    Okay.  You do not know today?

2     A.    I do not know today.

3     **Q.**    Speaking about Venetian Hills as a whole, in 2017,

4 were all the apartments rented by the week?

5     A.    I believe so.  I have to check.  I'm not sure what

6 date we switched over.

7     **Q.**    Well, for the -- in the apartment complex of

8 Venetian Hills, so would the one-bedrooms, two-bedrooms,

9 three-bedroom units all be leased by the week?

10    A.    Generally, yes.  They are now.  I would have to go

11 back to see when we started that policy.

12    **Q.**    Now, Mr. Hughes was leased one bedroom and common

13 areas.  When did Venetian Hills start renting one bedroom and

14 common areas like was rented to George Hughes?

15    A.    I don't know.  Right around that time.  Right around

16 that time.  I'm not sure if he was the first one or not.

17    **Q.**    Mr. Hughes was in unit I-5.  Were you renting one

18 bedrooms in any other units other than unit I-5 in 2012?

19    A.    I don't know.

20    **Q.**    Is there some way you could figure that out?

21    A.    Yes.

22    **Q.**    How would you figure that out?

23    A.    Look at the rent roll.

24    **Q.**    Look at what, sir?

25    A.    Huh?

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 24 of 125
Venetian Hills Apartments, LLC 30(b)(6)/John Maughan
July 30, 2020

22

 1      Q.    I didn't hear what you said.

 2      A.    I can look at the rent roll and determine whether

 3  there were any other others at that time.  I don't believe

 4  so.  I'm not sure.

 5      Q.    Do you have the rent roll for 2012?

 6      A.    Yes.

 7      Q.    Do you have the rent roll from 2012 to the present?

 8      A.    Yes.  The rent roll for I building was provided to

 9  you.

10      Q.    Do you have rent rolls for other buildings other

11  than building I?

12      A.    I should have rent rolls for all the buildings.  I

13  have rent rolls for all the buildings.

14            We're not having a clear connection here, I guess.

15            MR. GRANTHAM:  Just speak up a little bit, John.

16  BY MR. HINSON:

17      Q.    What was the reason for starting to lease out one

18  bedrooms like you did with Mr. Hughes?

19      A.    We thought it was -- there was a requirement for

20  that section.

21      Q.    Sir, could you repeat your answer.

22      A.    I'm sorry?

23      Q.    Could you repeat your answer, please.  I could not

24  hear you.

25      A.    We felt there was a need for that.

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 25 of 125
Venetian Hills Apartments, LLC 30(b)(6)/John Maughan
July 30, 2020

23

1      **Q.**    Okay.  And what do you mean by a need?

2      **A.**    I'm sorry?

3      **Q.**    I'm just trying to understand, what do you mean by a

4  need?

5      **A.**    What do I mean by that?

6             MR. GRANTHAM:  Yeah, what do you mean there was a

7       need for it, John?

8             THE WITNESS:  I'm sorry?

9             MR. GRANTHAM:  What do you mean there was a need for

10       one bedrooms?

11             THE WITNESS:  I think there were people like George

12       Hughes that needed an apartment that was less expensive

13       than our one bedroom, our regular one bedroom.

14  BY MR. HINSON:

15      **Q.**    And who was it that decided to start renting out the

16  one bedrooms to meet that need in the community?

17      **A.**    When did it -- when did I start?

18      **Q.**    Who was it that made the decision to do that?  Was

19  it you?

20      **A.**    Yes.

21      **Q.**    And this was to help with people out there that

22  needed a place to stay that may not -- for whatever reason

23  did not want to live in a one-bedroom, two-bedroom, or

24  three-bedroom apartment?

25      **A.**    That's correct.  I was informed that and I thought

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 26 of 125
Velocatran 41 LLC Apartments LLC 30(b)(6) John Maughan
July 30, 2020

24

```
 1   it was a good idea.
 2          MR. HINSON:  Mr. Videographer or Ms. Court Reporter,
 3       would it help if Mr. Maughan moved his mic up on his
 4       clothing or is that as good as it gets?
 5          THE WITNESS:  I'm sorry?
 6          MR. HINSON:  I'm talking to the court reporter now.
 7          COURT REPORTER:  Darrell, I don't think that that's
 8       going to make a difference.
 9          THE VIDEOGRAPHER:  That's just for recording to my
10       camera.  That doesn't go through the Zoom.
11          COURT REPORTER:  I'll move my computer up a little
12       bit.  He just is very soft-spoken in his answers
13       sometimes.
14          MR. HINSON:  That's fine.  I'm just trying to get
15       where I can hear him.
16          COURT REPORTER:  Yeah, I know.  Just ask me to
17       repeat, if you need to.
18          THE WITNESS:  Okay.
19   BY MR. HINSON:
20       Q.    All right.  Sir, we're talking about unit I-5, where
21   Mr. Hughes rented a bedroom, okay?
22       A.    Okay.
23       Q.    And you said that shortly before Mr. Hughes came on
24   board, that's when you started renting out one bedrooms to
25   customers, okay?
```



Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 27 of 125
Venetran Hills Apartments, LLC 30(b)(6) / John Maughan
July 30, 2020

25

```
 1        A.     I believe it was right about that time, but I would
 2   have to check.
 3        Q.     Did you make any modifications to unit I-5 before
 4   you started renting out the bedrooms to the people?
 5        A.     We made them appropriate to the efficiency, what we
 6   called efficiency.
 7        Q.     Okay.  What I heard was "efficiency."  Could you
 8   repeat your answer, please.
 9              (Whereupon, the court reporter read the referred-to
10        answer.)
11   BY MR. HINSON:
12        Q.     Okay.  Explain what you mean by that, please.
13        A.     Well, we provided a bedroom and other amenities and
14   access to the kitchen, if I recall correctly.  That's what's
15   referred to in there.  I believe there is other common areas.
16        Q.     And my question was, unit I-5, before you started
17   renting out the bedrooms, did you make any modifications to
18   the building, to the structure itself?
19        A.     Not to the structure itself, I don't believe.
20             MR. HINSON:  Ms. Court Reporter, could you repeat
21        his answer.
22             (Whereupon, the court reporter read the referred-to
23        answer.)
24   BY MR. HINSON:
25        Q.     Sir, would it refresh your memory that you had told
```

26

1  us earlier that there was a bedroom on the first floor in

2  unit I-5?  Does that sound familiar to you?

3      A.    That's correct.

4      Q.    Could you repeat your answer, sir.  I could not hear

5  you.

6           COURT REPORTER:  He said, "That's correct."

7           MR. HINSON:  Let's take a quick break really quick.

8      Off the record for second.

9           THE VIDEOGRAPHER:  We are now off the record.

10          (A break was taken at 1:37 p.m., and the deposition

11     resumed at 1:39 p.m.)

12          THE VIDEOGRAPHER:  We are back on the record.

13  BY MR. HINSON:

14     Q.    Mr. Maughan, you told us that bedroom would have

15  been added on the first floor of I-5 before you began renting

16  out the bedrooms; is that right?

17     A.    A bedroom was added?

18     Q.    Yes, sir.  Did you not -- wasn't a bedroom put on

19  the first floor of I-5 to rent out?

20     A.    Well, we rented what was there.  I don't know what

21  modifications we may have made.

22     Q.    There was -- earlier in this case you had talked

23  about in unit I-5, Mr. Hughes was in B and there was also A,

24  B, C, D --

25     A.    Correct.



AccuTran, Inc.
770-426-9705

1       Q.      -- in unit I-5?  I want to make sure we're on the

2   same page.  There were three bedrooms upstairs and one

3   bedroom on the first story?

4       A.      That's correct.

5       Q.      Okay.  When that bedroom was added on to unit I-5 on

6   the first floor, did you make any other changes to the

7   interior of the apartment?

8       A.      We may have made some modifications on the first

9   floor.

10      Q.      Like -- modifications like what?

11      A.      I'm sorry?

12      Q.      Modifications like what?

13      A.      Probably -- I don't know.  I would have to look at

14  it.

15              COURT REPORTER:  Darrell, hang on a second.

16              (A break was taken at 1:42 p.m., and the deposition

17      resumed at 1:43 p.m.)

18              THE VIDEOGRAPHER:  Back on the record.

19  BY MR. HINSON:

20      Q.      We're talking about modifications to I-5 before

21  Mr. Hughes would have moved in.  Would there have been any

22  changes to the plumbing or the wiring in unit I-5?

23      A.      I would have to check.  There would not be any to

24  the wiring.  There may have been some plumbing change and

25  there may have been a wall.  I would have to go look at it.

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 30 of 125
Valetravn #119 Apartments, LLC 30b(6)/6/11/23   John Vaughan

July 30, 2020

28

```
 1              COURT REPORTER:  May have been what?

 2              THE WITNESS:  A wall.

 3  BY MR. HINSON:

 4       Q.    Who would have done that work on I-5?

 5       A.    I don't know.

 6       Q.    Would you have any way of finding it out?

 7       A.    No.

 8       Q.    Were other units other than I-5 modified in a

 9  similar way for renting one-bedroom apartments?

10       A.    Efficiency apartments.

11       Q.    Efficiency apartments?

12       A.    Yes.

13       Q.    Okay.  Which other ones?

14       A.    I don't know.  There were two or three others.  I

15  can identify them if you want me to.

16       Q.    Please repeat that.  Speak up, sir.

17       A.    I can identify them if you want me to.

18       Q.    Okay.  Tell me, please.

19       A.    I don't have the information here.  We stopped doing

20  it.

21       Q.    All right.  Well, I want to know from 2012 until the

22  fire in 2017, how many units were set up for efficiency

23  apartments renting one bedroom?

24       A.    I-5 was the first one, if I recall correctly.  I-5

25  was the first one.
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 31 of 125
Venetian Hills Apartments, LLC 30(b)(6) / John Vaughan
July 30, 2020

29

1     **Q.**    Okay.  Tell --

2     A.    So there were none.  There were none.

3     **Q.**    Were there any others, other than I-5?

4     A.    No.

5     **Q.**    Were there any other apartment units in Venetian

6  Hills between 2012 and 2017 that were set up to lease one

7  bedroom, what you call efficiency units?

8     A.    No.  I believe no.

9     **Q.**    Sir, after the fire in 2017, were any other

10  apartment units modified to lease as one-bedroom

11  efficiencies, as you describe them?

12     A.    After 2017?

13     **Q.**    '17?

14     A.    Say that date again.

15     **Q.**    The fire, 2017.

16     A.    After?

17     **Q.**    Yes, sir.

18     A.    Yes, there were a couple that were done after.

19     **Q.**    Which units would those have been?

20     A.    I'm sorry?

21     **Q.**    Which buildings?

22     A.    I would have to check.  I think one was in H and I

23  think one was somewhere else.

24     **Q.**    One in H and what was the other letter, sir?

25     A.    I'm sorry?

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 32 of 125
Valetran #1198 Apartments, LLC 30(b)(6); John Haughan
July 30, 2020

30

```
 1        Q.     What was the other letter?

 2        A.     I'm not sure of the other building.

 3        Q.     Okay.

 4        A.     I think there was another one.

 5        Q.     Well, we're going to look at the document -- just to

 6   refresh your memory, we're going to look at the document

 7   about unit C-6.  Does that refresh your memory?

 8        A.     No.

 9        Q.     Okay.  All right.

10        A.     I believe it was done but it's not so now.

11        Q.     Okay.  What do you believe was done?

12        A.     I believe that we may have done the same thing in

13   C-6.  I would have to check.

14        Q.     And you may have done -- you may have rented

15   one-bedroom efficiencies in building H and some other

16   building that you don't recall?

17        A.     I believe H was the only other one.

18        Q.     Who would have done the modifications to building C,

19   to unit C-6?

20        A.     I don't recall.

21        Q.     Do you have that documentation anywhere?

22        A.     I don't know.  Probably not.

23        Q.     Sir, if you could look at Exhibit 2, which is in

24   front of you, the --

25        A.     I'm sorry?
```

 1      Q.    Will you look at Exhibit 2, please.

 2      A.    Yup.

 3      Q.    If you will turn the page to the third page of that

 4   document.  On the third page of that document at the

 5   top it says, "Please Bring."  That's the page I'm

 6   looking at.

 7      A.    Yup.

 8      Q.    Okay.  At the very bottom, the handwritten

 9   says -- appears to say, "When we open C-6 Eff for

10   Mr. Hughes."  Do you see that?

11      A.    I see it.

12      Q.    What does that mean to you?

13      A.    It means that we were probably working on C-6 at the

14   time and he might have preferred another layout.

15      Q.    And when you say working on C-6, do you mean setting

16   up unit C-6 so that you would rent out a one bedroom to

17   Mr. Hughes?

18      A.    I would guess so.  I was -- I never noticed this

19   before.

20      Q.    So could there have been more than one unit other

21   than I-5 in 2012 that was being used for renting out one

22   bedrooms to people?

23      A.    It appears that we were planning on doing it

24   to C-6 because we had -- we had very good reaction to

25   I-5.

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 34 of 125
Veletron-Miller Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

32

```
 1              (Plaintiff's Exhibit No. 15 marked.)

 2              MR. HINSON:  Ms. Court Reporter, could you hand

 3         Mr. Maughan Plaintiff's Exhibit 15, please.

 4              COURT REPORTER:  15, did you say?

 5              MR. HINSON:  One-five, yes.  Thank you.

 6              COURT REPORTER:  He has it.

 7    BY MR. HINSON:

 8         Q.    Sir, what's been marked as Plaintiff's Exhibit 15

 9    was actually an exhibit in an earlier deposition of yours.

10    Do you recognize this document?

11         A.    Yes, I do.

12         Q.    Okay.  What is it?

13         A.    Okay.  I don't believe either C-6 -- I don't -- I

14    would have to check, but --

15              MR. GRANTHAM:  John, his question is, what is that

16         document?  What is it?

17              THE WITNESS:  It's a memo that I sent to Mark

18         Courtemache.

19    MR. HINSON:

20         Q.    All right.  You got ahead of me on my question.

21    There is a sentence at the top that says "Studios."  First of

22    all, what do you mean by studios?

23         A.    Like Mr. Hughes had.  Well, maybe not like

24    Mr. Hughes had.  I can't remember.  I would have to go check.

25    We started doing different things to accommodate what we felt
```

Case 1:21-cv-03214-LMM  Document 81-2  Filed 10/11/23  Page 35 of 125
Vanetran #1119 Apartments LLC 30(b)(6) John Vaughan
July 30, 2020

33

1    was best.

2        Q.    Okay.  I need you to explain what you mean by that,

3    please.

4        A.    We may have changed the configurations in a

5    different way.

6        Q.    Was a -- what do you mean when you were referring to

7    studios in this memo that you wrote to Mark, which is

8    Plaintiff's Exhibit 15?

9        A.    Studios to us are less than a one-bedroom apartment.

10   In the case of I-5 when Mr. Hughes was there, we had it in a

11   certain manner and then we decided subsequently, I believe --

12   and I would have to check on this -- that the configuration

13   of those two units may have been different than the one

14   Mr. Hughes was in.

15            There were three-bedroom apartments to start out

16   with, but the configuration may have been different.  We may

17   have adjusted it, adjusted them.

18       Q.    And when you say you may have adjusted them, how

19   would they have been different than the one bedroom and

20   common areas arrangement that Mr. Hughes had?

21       A.    I believe we may have provided a small refrigerator,

22   toaster oven, things to make it more complete to share a

23   kitchen.

24       Q.    So that's -- what you just described, that would be

25   a studio?

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 36 of 125
Valentran-McLeMore Apartments, LLC 30(b)(6) / John Vaughan
July 30, 2020

34

1    A.    Yeah, it's still a studio.  The only thing is,

2  instead of having a common kitchen, I believe we put some, as

3  I said, refrigerator.  And I believe the word -- whatever the

4  word I just said.  I don't have a toaster oven, so I don't

5  know.  Toaster oven.

6    Q.    Okay.

7    A.    So that they didn't have to share a kitchen.

8    Q.    I see.  And I'm just trying to understand.  So

9  Mr. Hughes was in a one bedroom with a shared kitchen

10  arrangement; is that right?

11    A.    I believe they did.

12    Q.    Now, I want to make sure I understand what you told

13  me earlier.  So what do you call the arrangement that

14  Mr. Hughes was in?

15    A.    What do I call it?

16    Q.    Yes, sir.

17    A.    We call it a studio.

18    Q.    No, no, Mr. Hughes, where you're leasing one bedroom

19  with a common area and shared with others; what is that

20  arrangement?  What do you call that?

21    A.    I call it a studio.

22    Q.    Okay.  Between 2012 and between 2017, when the fire

23  happened, okay, I want to ask you about that period of time.

24  So when Mr. Hughes first came to stay with you up until the

25  fire, were there any other apartment units, three-bedroom

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 37 of 125
Valuetran #119 Apartments, LLC 30(b)(6)/John Vaughan
July 30, 2020

35

```
 1    apartment units, that were set up to rent out one bedroom,

 2    either as an efficiency or studio or anything like that?

 3         A.    I believe in H building.

 4         Q.    In H?

 5         A.    Yes.

 6         Q.    And how many units in building H would have been

 7    used for that?

 8         A.    There were either one or two.

 9         Q.    Okay.  But what --

10         A.    They were --

11         Q.    What number unit in building H?

12         A.    How many?

13         Q.    No, what --

14         A.    There is eight units total in building H.

15         Q.    And which units in building H would have been used

16    in that situation where you would have been renting out a

17    bedroom?

18         A.    What units?

19         Q.    Yes, sir.

20         A.    I believe there were H-1 and H-5 or -4.  I'm not

21    sure.

22         Q.    I just want to make sure I heard you right.  You

23    said H-1 and H-4 or -5?

24         A.    Yes.

25         Q.    Other than in building H, were there any other
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 38 of 125
Valentran-Hanley Apartments, LLC 30(b)(6), John Vaughan
July 30, 2020

36

```
 1    buildings, other than building I and building H, in that
 2    period of 2012 to 2017, where you were renting out bedrooms?
 3         A.    I don't believe so.
 4         Q.    Who did the work to build out building H, do you
 5    know?
 6         A.    No.
 7         Q.    Who was the manager during this period of time of
 8    2012 to 2017?
 9         A.    Arthur Robinson.
10         Q.    When people would be living and renting the bedrooms
11    from you in building I or in building H, would they be
12    signing lease documents similar to what Mr. Hughes signed?
13         A.    I believe so.
14         Q.    Do you have the lease agreements for unit I-5 for
15    people other than George Hughes?
16         A.    No.
17         Q.    Not at all?
18         A.    No.
19         Q.    Why?
20         A.    I had a manager who destroyed everything.
21         Q.    Who?
22         A.    Jarvis Thomas.
23              COURT REPORTER:  Thomas, Jarvis Thomas?
24              THE WITNESS:  Thomas, T-H-O-M-A-S.
25    BY MR. HINSON:
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 39 of 125
Valectran #1 LLC Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

37

1     **Q.**    When did that happen?

2     A.    Subsequent to this.

3     **Q.**    After the fire?

4     A.    Yes.  Yes.

5     **Q.**    I'm just trying -- you said --

6     A.    Yes.

7     **Q.**    -- what you mean.

8     A.    Yeah.

9     **Q.**    So you -- I don't understand, why do you have George

10 Hughes' lease agreement but you don't have a lease agreement

11 for anyone else?

12    A.    I got that before Jarvis Thomas was gone.

13    **Q.**    I couldn't hear you, sir.

14    A.    I got that before -- I sent that to you before

15 Jarvis Thomas was gone.

16    **Q.**    Jarvis Thomas worked for you?

17    A.    Yes.

18    **Q.**    Does he still work for you?

19    A.    No.

20    **Q.**    You're saying he destroyed the lease agreements for

21 the people in unit I-5?

22    A.    He destroyed a lot of stuff.

23    **Q.**    How do you know that?

24    A.    I'm sorry?

25    **Q.**    How do you know he destroyed them?

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 40 of 125
Veletron #119 Apartments, LLC 30(b)(6), John Vaughan
July 30, 2020

38

| | | |
|---|---|---|
| 1 | A. | Because it wasn't there after he was gone. |
| 2 | Q. | I couldn't hear you. |
| 3 | A. | A lot of things were -- many things were not there |

4 after he was gone.

5     Q.    Do you have the lease agreement for the people that
6 would have been renting bedrooms from you in building H?

7     A.    No.

8     Q.    Do you have the lease agreements for people that
9 were renting bedrooms from you in building C after the 2017
10 fire?

11     A.    No.

12     Q.    Are you renting out bedrooms now?

13     A.    No. Studios you mean? No, we are not.

14     Q.    Are you renting out studios now?

15     A.    No.

16     Q.    Are you renting out furnished efficiencies now?

17     A.    No, I don't believe so.

18     Q.    Do you have any tenants that are paying to rent one
19 bedroom and a common area with others?

20     A.    Do I have plans to do it?

21     Q.    No. Do you have any tenants right now, today, that
22 are paying you to lease one bedroom and common areas shared
23 with others?

24     A.    I don't believe so.

25     Q.    When was the last time you rented to someone who was

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 41 of 125
Venetran Hills Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

39

```
1    leasing one bedroom and common areas shared with others?

2        A.    A couple of years ago.

3        Q.    When?

4        A.    A couple of years ago.  Couple of years ago.

5        Q.    Okay.  Why did you stop renting out one bedrooms in

6    common areas shared with others?

7        A.    Because we had other plans.

8        Q.    I can hear you when you speak --

9        A.    We decided not to do it.

10       Q.    Why did you decide not to do it?

11       A.    It didn't seem like a good idea.

12       Q.    Could you please speak up.

13       A.    It didn't seem like a good idea.

14       Q.    Why did it not seem like good idea?

15       A.    Because I didn't -- I decided  I didn't want to do

16   it.

17       Q.    Why did you not want to do it?

18       A.    Because I wanted to do other things.

19       Q.    Because you wanted to do other things?

20       A.    Yup.

21       Q.    What do you mean by that?

22       A.    I wanted to go in another direction.

23       Q.    And what does that mean, sir?

24       A.    It means that I wanted to go in another direction.

25       Q.    When you say you wanted to go in another direction,
```



40

```
 1   what do you mean by in another direction?
 2        A.    I wanted to do something different.
 3        Q.    I'm sorry, I couldn't --
 4        A.    I wanted to do something different.
 5        Q.    You wanted to do something different than leasing
 6   one bedrooms in common areas shared with others?
 7        A.    Yes.
 8        Q.    And you don't have any reason for that other than
 9   you just wanted to; is that what you're saying?
10        A.    That's what I'm saying.
11        Q.    Sir, if you look at Plaintiff's Exhibit 15 again,
12   number one-five.  Plaintiff's Exhibit 15 is the memo that you
13   wrote to Mark; do you see that, sir?
14        A.    Okay.
15        Q.    Okay.  You have Exhibit 15 in front of you?
16        A.    Yes.
17        Q.    All right.  I want to ask you about the bottom part
18   of the memo, where it says, "My 'business' plan."
19        A.    Correct.
20        Q.    It has written here that your business plan is to
21   increase profits by $100,000; did I read that right?
22        A.    That's correct.
23        Q.    And this would have been -- this memo was in March
24   8, 2017, is what it says at the top?  Is that right?
25        A.    That is correct.
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 43 of 125
Valectran #11-MV Apartments, LLC 30(b)(6), John Gaughan
July 30, 2020

41

```
 1        Q.     Okay.  And it says, Art: $40,000; Torrey: $15,000.

 2   And then off to the side it says $25,000?

 3        A.     Yes.

 4        Q.     Okay.  And next it says, Studios $2,500, period.

 5   Extra each vs 3BR X 10 new units, $25,000?

 6        A.     Right.

 7        Q.     What does that sentence mean?  Explain it to me.

 8        A.     It suggested that at that time I wanted to do more

 9   units.

10        Q.     When you say "more units," what do you mean?

11        A.     More studios.

12        Q.     And by studios, what do you mean?

13        A.     Well, we were changing what we were going to do with

14   studios at that time, and we decided not to do it.

15        Q.     And I understand you decided not to do it; you said

16   that.  But at the time you wrote this in March of 2017, your

17   business plan was to add more studios; is that correct?

18        A.     Yes.

19        Q.     All right.  At that time you had determined that

20   there was a way to increase profits by adding studios?

21        A.     Correct.

22        Q.     And you would get more money as a studio than in a

23   three bedroom; is that what that means?

24        A.     Yes, it means convert three bedrooms to studios.

25        Q.     Okay.  And when you would convert a three bedroom to
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 44 of 125
Veleeran Hills Apartments, LLC 30(b)(6) - John Vaughan
July 30, 2020

42

```
 1    a studio, what would be done to do that?
 2        A.    At the time, we were going to do more of it being
 3    self-sufficient.  Self-sufficient I mean not so much common
 4    areas.
 5        Q.    So it was a studio --
 6        A.    But we did not do it, okay, we did not proceed.
 7        Q.    All right.  You were talking about taking a three
 8    bedroom and making it to independent -- strike that.  Let me
 9    ask that better.
10            When you were planning to do studios, were you going
11    to take three bedrooms and convert them for a way for you to
12    rent out each bedroom individually; is that right?
13        A.    We were going to -- I can't recall exactly what the
14    plan was at that point, but we were -- our intention was to
15    have less common areas.  I mentioned to you about the
16    refrigerator and stuff, and there were other things that we
17    were talking about doing at that time to make them as much --
18    as little as common areas as possible.
19        Q.    And it looks like at the top of this memo -- so is
20    that what you were doing, in progress of doing in March of
21    2017 on units C-6 and C-13?
22        A.    No.
23        Q.    Explain that -- what does it mean at the top when it
24    says, "You advised me that C-6 and C-13 would be complete by
25    last Thursday?"
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 45 of 125
Venetian Hills Apartments, LLC 30(b)(6), John Vaughan
July 30, 2020

43

 1      A.    We were supposed -- we were doing C-6 and C-13 at
 2  that time.
 3      Q.    You were doing C-6 and C-13 as studios at that time?
 4      A.    That's correct.  Different plan, now, not the same
 5  as George Hughes.
 6      Q.    Okay.  And the units in building H, were they the
 7  same as studios or were they the same as Mr. Hughes?
 8      A.    I believe they were more like Mr. Hughes, but each
 9  one depended on what we did at the time.
10      Q.    Now, you were the one who prepared this memo on
11  Exhibit 15 and this was your business plan to make these
12  studios; is that right?
13      A.    To do more studios, yes.  We did not proceed.
14      Q.    I'm sorry, could you speak up.
15      A.    We did not proceed beyond C -- the two C building
16  ones.
17      Q.    And whatever was in building H?
18      A.    The one in building H I believe was prior to this.
19      Q.    Did you ever actually rent out a studio to someone?
20      A.    I'm sorry?
21      Q.    Did you ever actually rent out a studio to someone?
22      A.    Me personally, you're saying?
23      Q.    Well, you being -- yes, you Venetian Hills.
24      A.    Okay.  Did we what?
25      Q.    Did you actually rent out these studios that you're

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 46 of 125
Venetian Hills Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

44

```
1   talking about?  I know you decided not to do them, but did
2   you ever actually rent them out?
3        A.    At least one of them, I believe.  At least one of
4   them, I believe.
5        Q.    When you prepared unit I-5 for George Hughes to come
6   and rent a bedroom, okay?
7        A.    Yes.
8        Q.    What did you do to prepare for fire protection?
9        A.    To prepare for fire protection?  You mean did we
10  change anything?
11       Q.    Yes, sir.
12       A.    I don't believe so.
13       Q.    When you changed unit I-5 to rent out one bedrooms,
14  at that time did you take any new measures to protect the
15  tenants from fire?
16       A.    I don't believe so.
17       Q.    What about in unit -- in building H, did you make
18  any modifications to protect tenants from fire in those units
19  where you were renting out bedrooms?
20       A.    I don't believe so.
21       Q.    How much money did you spend to convert unit I-5
22  before Mr. Hughes moved in?
23       A.    To convert it to studios, you mean?
24       Q.    To convert it to what you rented to Mr. Hughes.
25       A.    I have no idea.
```

1    **Q.**    Did you work with whoever you -- strike that.

2          Did you pay whoever did the work inside?

3    A.    Did I pay who?

4    **Q.**    Whoever did the work inside.  Let me ask that again.

5    Did you hire someone to do the work?

6    A.    Yes.  I don't recall whether they were

7    already working for us or whether we hired somebody

8    specifically for it.  It varied.

9    **Q.**    Who decided how much rent to charge George

10   Hughes?

11   A.    Art and I, the manager and I.

12   **Q.**    Did you have the final say-so on how much

13   rent was going to be?

14   A.    Do I have a file that says how much the rent

15   was going to be?

16   **Q.**    When you decided what to charge George Hughes

17   to live in the one bedroom, did you have the final

18   say-so on what he was going to pay?

19   A.    Yes.

20          (Plaintiff's Exhibit No. 16 marked.)

21   BY MR. HINSON:

22   **Q.**    Sir, if you could look at Plaintiff's Exhibit

23   16.

24          MR. HINSON:  Ms. Court Reporter, could you hand it

25    to him.

```
 1              COURT REPORTER:  He has it.
 2    BY MR. HINSON:
 3        Q.    Mr. Maughan, I'm showing you Exhibit 16, which is a
 4    document provided by you, City of Atlanta Violation
 5    Correction Notice.
 6        A.    Okay.
 7        Q.    Do you see that?
 8        A.    Yup.
 9        Q.    And that's a violation correction notice dated July
10    15 of 2019?
11        A.    Yes.
12        Q.    And that's a violation.  It states nature of
13    violation:  Illegal use of land, illegal rooming house in
14    MR-3 zoning district; is that right?
15        A.    That's right.
16        Q.    And it says --
17        A.    Just a second.
18        Q.    -- cease and desist operating an illegal rooming
19    house, (Apt C-6) in MR-3 existing district?
20        A.    Yes.
21        Q.    Did I read that right?
22        A.    You, read it correct.
23        Q.    Okay.  Well, first of all, was -- why -- what is
24    your understanding about why you received this violation?
25        A.    I'm sorry?
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 49 of 125
Velocran 4 LLM Apartments LLC 30(b)(6) John Maughan
July 30, 2020

47

```
 1        Q.    What is your understanding about why you received

 2   this violation?

 3        A.    He said some of the aspects of it were out not

 4   legal.

 5        Q.    And is apartment C-6, is that one of the units where

 6   you were renting out bedrooms?

 7        A.    We were renting out studios, yes.

 8        Q.    Well, and the studio consisted of renting out a

 9   bedroom, right?

10        A.    It was different in C-6 than it was in I-15, if I

11   recall correctly.

12        Q.    Okay.  And you said I-15.  Do you mean I-5?

13        A.    I'm sorry, I-5 is what I meant.

14        Q.    What did you do about this violation in July of 2019

15   for illegal rooming house?

16        A.    We stopped doing it.

17        Q.    What do you mean you stopped doing it?

18        A.    We gave them notice to vacate.

19        Q.    And when you say "them," do you mean the people

20   living in C-6?

21        A.    Yes.

22        Q.    Did you move them to a different apartment?

23        A.    No.  He said what we were doing was not legal, so I

24   didn't move them anywhere else.

25        Q.    Did you have any other studios in use in July of
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 50 of 125
Valentrans Apartments, LLC 30(b)(6) - John Vaughan
July 30, 2020

48

1   2019 when you received this violation notice?

2       A.   I believe we may have had one other, which we do not

3   have now as a result of that.  And I think there was one in H

4   building.  I'm not sure.

5       Q.   Okay.  What was -- it may have been in H and it may

6   have been where?

7       A.   I'm sorry?

8       Q.   It sounds like you told me two different buildings;

9   you may have had one in building H and one in building what?

10      A.   And the one in building C there.

11      Q.   C?

12      A.   Yes, this one.  He was very pleasant, okay, and he

13  told us what was wrong.  And he said, you can continue to

14  rent them as studios, but you've got to do -- bring them up

15  to code in certain aspects, okay?

16      Q.   What did he tell you was not satisfactory about

17  them?

18      A.   I can't remember the exact details, but I decided

19  not to do them.

20      Q.   I couldn't hear you, sir.

21      A.   I don't remember the details, but I decided not to

22  do them at the time.

23      Q.   Do you have any memory at all about what the

24  inspector told you that needed to be changed about apartment

25  C-6?

AccuTran, Inc.
770-426-9705

1    A.    He told us a couple of things.  I can't remember

2    exactly what they were.  There were two or --

3         Q.    Generally what were they?

4         A.    I can't remember.

5         Q.    You don't have any memory at all?

6         A.    No, because I decided not to do it.

7         Q.    Okay.  So what did you do with unit C-6 after you

8    removed the tenants from there because of the violation

9    notice?

10        A.    It's closed.  It's closed.

11        Q.    Have you opened it since?

12        A.    No, I don't believe so.

13        Q.    Is it still closed today?

14        A.    I don't believe -- no, I don't believe we have done

15   anything with it.  I don't believe we have done anything with

16   it.  I can check that out for you.

17        Q.    I'm sorry?

18        A.    I can check that out for you.  I have the rent roll.

19   I can check it out.

20        Q.    All right.  You could tell from the rent roll; is

21   that right?

22        A.    That's right, I have a rent roll which tells me what

23   was rented, so I can look at C-6 after that date.

24        Q.    How about building H; did you continue to rent out

25   one bedrooms?

  1      A.     I believe not.

  2      Q.     When did you stop in building H?

  3      A.     Probably at the time that Mr. Mosley told us about C

  4   building.

  5      Q.     Mr. Maughan, we have been talking for a little

  6   while.  Would you like to take a break or are you okay?

  7      A.     I'm fine right now.

  8      Q.     All right.

  9      A.     But I am old, so I may not get all the way through

 10   this.

 11      Q.     You just tell me when you need to take a break.

 12      A.     Okay.

 13      Q.     Thank you.  Do you need some water?  You have to

 14   speak --

 15      A.     No, no, I'm fine.

 16      Q.     All right.  Mr. Maughan, we have looked at Exhibit

 17   16, which was the Violation Correction Notice for the rooming

 18   house, right?

 19      A.     This violation here, yes.  The one I just -- we just

 20   discussed, yes.

 21      Q.     Yes.  Okay.  Have you -- has Venetian Hills received

 22   any other violation notices about rooming houses other than

 23   what we just looked at?

 24      A.     No, no.

 25      Q.     Has anyone from the department of city planning been

```
 1   back out to Venetian Hills since July of 2019?

 2        A.    Has the people -- have they what?

 3        Q.    Has anyone from the City of Atlanta Planning been

 4   back out to Venetian Hills Apartments since the July 19

 5   Notice of Violation?

 6        A.    No.

 7        Q.    Did you speak with the person that prepared this

 8   violation on No. 16, Mr. Mosley?

 9        A.    My attorney did, and he was extremely helpful.

10        Q.    Who was your attorney?

11        A.    Brad McClung.

12        Q.    Did you ever speak with Mr. Mosley?

13        A.    I don't believe so.

14        Q.    Have you ever spoken with anyone associated with the

15   City of Atlanta about rooming houses, period, at all?

16        A.    Personally?

17        Q.    Yes, sir.

18        A.    No, not personally.

19        Q.    Has anyone with Venetian Hills?

20        A.    I'm sorry?

21        Q.    Has anyone with Venetian Hills spoken with anyone in

22   the City of Atlanta about rooming house violations?

23        A.    No.

24        Q.    Have you ever applied for a license to run a rooming

25   house?
```

52

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Let's talk about unit I-5, okay? |
| 3 | A. | Okay. |
| 4 | Q. | Was there a fire alarm in unit I-5? |
| 5 | A. | Yes. |
| 6 | Q. | I want to be clear.  Was there a fire alarm in unit |
| 7 | I-5? | |
| 8 | A. | Yes. |
| 9 | Q. | Tell me about that. |
| 10 | A. | It was a smoke detector and a fire extinguisher. |
| 11 | Q. | Okay.  I was asking you about a fire alarm.  You |
| 12 | said there was a smoke detector and a fire extinguisher? | |
| 13 | A. | Correct. |
| 14 | Q. | I want to make sure I understand you.  You're saying |
| 15 | there was a smoke detector and fire extinguisher in unit I-5? | |
| 16 | A. | Yes. |
| 17 | Q. | And was there a smoke detector and fire extinguisher |
| 18 | in unit I-5 at the time of the fire in March of 2017? | |
| 19 | A. | Yes. |
| 20 | Q. | Where was the smoke detector that was in I-5 at the |
| 21 | time of the fire? | |
| 22 | A. | The head of the stairs, I believe. |
| 23 | Q. | I couldn't hear you. |
| 24 | A. | The head of the stairs, I believe. |
| 25 | Q. | You said that there was a smoke detector at the head |

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 55 of 125
Venetran Hills Apartments LLC 30(b)(6), John Vaughan
July 30, 2020

53

```
 1   of the --
 2        A.    No, the smoke detector was at the head of the
 3   stairs.
 4        Q.    Okay.  I want to make sure I heard you right.  You
 5   said that there was a smoke detector at the head of the
 6   stairs in unit I-5?
 7        A.    Yes.
 8        Q.    And that was --
 9        A.    I'm quite sure it was the head of the stairs, yes.
10        Q.    Could you say that again.
11        A.    I'm quite sure it was the head of the stairs.
12        Q.    And how do you know there was a smoke detector at
13   the head of the stairs in unit I-5 at the time of the fire?
14        A.    Because it was in all three-bedroom units.
15        Q.    In all three bedroom units --
16        A.    Throughout the complex.
17        Q.    Okay.  So you're telling me that in all
18   three-bedroom units throughout the Venetian Hills complex,
19   there was a smoke detector at the top of the stairs?
20        A.    Yes.
21        Q.    And that is the reason why you say there was a smoke
22   detector at the top of the stairs in I-5 on the day of the
23   fire?
24        A.    Yes.
25        Q.    That's the reason why you're saying it?
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 56 of 125
Valextran #119 Apartments, LLC 30(b)(6) / John Vaughan
July 30, 2020

54

1        A.      Yes.

2        Q.      Do you have any personal knowledge that there was a

3    smoke detector at the top of the head of the stairs in unit

4    I-5 on the day of the fire?

5        A.      I did not go into I-5 on the day of the fire.

6        Q.      Do you have any knowledge of any person who saw a

7    smoke detector at the top of the stairs in unit I-5 that

8    would have been there at the time of the fire?

9        A.      The person -- yes, the manager was aware of it.

10       Q.      Who?

11       A.      The manager.

12       Q.      Who would that be, sir?

13       A.      Arthur Robinson.

14       Q.      Mr. Robinson.  How do you know Mr. Robinson knew

15   that?

16       A.      I'm sorry?

17       Q.      How do you know Mr. Robinson knew that?

18       A.      How do I know what?

19       Q.      You told me that Mr. Robinson would know that there

20   was a smoke detector at the top of the stairs in unit I-5 on

21   the day of the fire; did I hear that right?

22       A.      Correction.  Correction.  Mr. Sumlin was the manager

23   at the time of the fire, okay?  And he was just taking over

24   at that time from Arthur Robinson, okay?

25       Q.      Okay.  So I want to know, do you know of any person

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 57 of 125
Venetran #1 LMM Apartments, LLC 30(b)(6) - John Maughan
July 30, 2020

55

```
 1    who knows whether there was a smoke detector at the top of
 2    the stairs the day of the fire?
 3         A.    Yes.
 4         Q.    Tell me.
 5         A.    Well, I don't -- when you say "the day of the fire,"
 6    nobody inspected it on the day of the fire, okay?  It had
 7    been there forever, since I bought the place.
 8         Q.    Are you saying that the smoke detector had been
 9    there at the top of the stairs since you bought the place?
10         A.    Yes.
11         Q.    When did you buy the place?
12         A.    Forty years ago.
13         Q.    Well, all right.  But you just told me earlier that
14    you, without question, believe that there was a smoke
15    detector at the top of the stairs at the time of the fire?
16         A.    Yes.
17         Q.    So what you have told me is there was one since you
18    bought the place.  But sometime over the 40 years since you
19    bought the place, do you have any way of telling me that
20    there was a smoke detector there in 2017?
21         A.    We had it inspected on a regular basis.
22         Q.    Okay.  When was it last inspected before the fire?
23         A.    You've got that information.  Months prior.
24         Q.    Okay.  Are we talking about Exhibit 7?
25               MR. HINSON:  Ms. Court Reporter, could you show that
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 58 of 125
Veletran #1139 Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

56

```
1        to him.
2                  THE WITNESS:  Yes.
3                  MR. HINSON:  Are you ready, Ms. Court Reporter?
4                  COURT REPORTER:  He has it.
5    BY MR. HINSON:
6        Q.    Mr. Maughan, I have shown you Plaintiff's Exhibit 7
7    from this deposition; do you see that?
8        A.    Yes.
9        Q.    Is that what you're talking about when you say I've
10   got that information?
11       A.    Yes.
12       Q.    Okay.  So make sure we're on the same page.  So
13   you're saying that Exhibit 7 -- what would you call this
14   document?
15       A.    I'm sorry?
16       Q.    What do you call this document, Exhibit 7?
17       A.    Inspection report, that's what I call it.
18       Q.    The inspection report.  So you're telling me that
19   the inspection report, Exhibit 7, is the documentation of
20   when the smoke detector was last inspected in unit I-5?
21       A.    Correct.
22       Q.    And to be clear, what is the date of this document,
23   the inspection report, Exhibit 7?  When was that prepared?
24       A.    It was either February 20 or February 22nd of that
25   year.
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 59 of 125
Venetian Hills Apartments, LLC 30(b)(6) / John Vaughan
July 30, 2020

57

1     **Q.**    And how do you know that?

2     A.    Part of the date was cut off on the documentation.

3  I'm trying to get one with more complete date.

4     **Q.**    Okay.  And earlier in this deposition you marked

5  what you're referring to when you say the date; that's the

6  circle?

7     A.    I'm sorry?

8     **Q.**    The circle on the top right-hand corner, is that

9  what you're talking about the date on Exhibit 7?

10     A.    Yes.

11     **Q.**    So is that the only -- that is -- let me ask that

12  again.

13     So what you have circled on Exhibit 7, that is the

14  reason you say that inspection report was prepared in

15  February?

16     A.    Of that year, yes.  Yes, February 20 or 22nd, I

17  believe.

18     **Q.**    And the reason you say it was February 20 or 22nd

19  was because of the --

20     A.    The date got cut off the document that was provided

21  to you.

22     **Q.**    And do you have the original document?

23     A.    I'm trying to locate it.

24     **Q.**    Well, I mean, we -- sir, you have been trying to

25  locate it a long time.  We have been asking --

58

```
1     A.     That is correct.

2     Q.     Have you made any attempt to look for it?

3     A.     I am attempting to get additional documentation.

4     Q.     Is there any other thing that you can point to, any

5  other part of Exhibit 7 that you can point to that shows that

6  that was prepared in February of 2017?

7     A.     That this document was prepared on that date?

8     Q.     Yes, sir.

9     A.     I'm attempting to find it.

10    Q.     To be clear, you're --

11    A.     I believe there is one with a more complete date.

12    Q.     All right.  And where did you find this document,

13 Exhibit 7?

14    A.     It was requested by the insurance company and I sent

15 it to them.

16    Q.     What insurance company?

17    A.     When?

18    Q.     What insurance company?

19    A.     Back when the Boykin situation was happening.

20         MR. GRANTHAM:  What insurance company, John?

21         THE WITNESS:  Oh, Kinsale.

22 BY MR. HINSON:

23    Q.     Do you have -- let me ask that again.  Where do you

24 think this inspection document is?

25    A.     Why do I think it is?
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 61 of 125
Velectran Miller Apartments, LLC 30(b)(6), John Vaughan
July 30, 2020

59

1  **Q.** Where do you think it is?

2  A. When do I think it is?

3  **Q.** Where? Where is it?

4  A. Where is it, the original?

5  **Q.** Yes, sir.

6  A. Destroyed.

7  **Q.** Do you have any inspection documents for any other

8 time period for building I?

9  A. Any other inspection report?

10  **Q.** Yes, sir.

11  A. No, that's the only inspection report right at that

12 time.

13  **Q.** Okay. Is this the only inspection report you have

14 for building I, Exhibit 7?

15  A. That dates to that, yes. Yes.

16  **Q.** Do you have inspection reports for building H?

17  A. It was the same, but it was not requested so I

18 didn't provide it to Kinsale.

19  **Q.** But my question is, do you have inspection reports

20 now for building H?

21  A. Dating to then?

22  **Q.** Yes, sir.

23  A. No. They were destroyed, I believe.

24  **Q.** Do you have inspection reports for building C?

25  A. I don't have the rest of the inspection report that

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 62 of 125
Venetian Hills Apartments, LLC 30(b)(6) / John Maughan
July 30, 2020

60

```
 1   you're referring to here.  I was asked by Kinsale to provide
 2   it, that page for I building, and that's what I did.
 3       Q.     And why were you asked to provide them with this
 4   page?
 5       A.     Because it was relating to the Boykin matter a
 6   couple years ago.
 7       Q.     What was -- what was their request to you that
 8   prompted you to send them this page, Exhibit 7?
 9       A.     They asked for a number of things and that was one
10   of them.
11       Q.     What else did you give to Kinsale at that time?
12           MR. GRANTHAM:  I'm going to object and ask him not
13       to answer.  I think that's prepared in anticipation of
14       litigation.
15           MR. HINSON:  I'm sorry, Bryan.  Can you repeat it.
16       I can't hear.
17           MR. GRANTHAM:  I'm going to object and instruct him
18       not to answer that line of questioning because I think
19       you're getting into materials prepared in anticipation of
20       litigation.
21   BY MR. HINSON:
22       Q.     Mr. Maughan, did you provide any other documents to
23   your insurance company dealing with the fire in unit I-5 or
24   the I buildings other than Exhibit 7?
25       A.     Yes.
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 63 of 125
Venetian Hills Apartments, LLC 30(b)(6)/John Vaughan
July 30, 2020

61

1      **Q.**    And the documents that you provided, were they

2   records of your apartment complex, Venetian Hills?

3      **A.**    They were what was requested.

4      **Q.**    What other records did you provide to Kinsale

5   Insurance concerning unit I-5 after the fire?

6      **A.**    Yes.

7      **Q.**    No, what?  What other records did you provide to

8   Kinsale Insurance concerning unit I-5 after the fire?

9      **A.**    What or where?

10      **Q.**    What.

11      **A.**    Well, this, and other documentation that they

12   requested.

13      **Q.**    Which was what?

14         MR. GRANTHAM:  Darrell, same objection.  I think

15      you're getting into materials prepared in anticipation of

16      litigation.

17         MR. HINSON:  Okay.  And I just -- and I hear you,

18      but I'm also -- if there is some sort of document similar

19      to a maintenance inspection report that he had that he

20      has provided to anyone, especially now, that's no longer

21      magically disappeared, I think that's probably fair game.

22         MR. GRANTHAM:  Why don't you ask him that specific

23      question.  That would be fine.

24         MR. HINSON:  I'm sorry, I can't hear anybody.

25         MR. GRANTHAM:  Sorry.  If you want to ask him what

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 64 of 125
Velectran 411-19 Apartments LLC 30(b)(6), John Maughan
July 30, 2020

62

```
 1        other inspection reports he provided or if he provided

 2        any other inspection reports regarding fire inspection or

 3        whatever, I'm fine with that.  I just don't want to go

 4        through a laundry list of everything he gave his

 5        liability insurer.

 6            MR. HINSON:  Okay.  We'll see what he remembers.

 7   BY MR. HINSON:

 8        Q.    Mr. Maughan, did you provide any other inspection

 9   reports to Kinsale Insurance other than what's been marked as

10   Exhibit 7?

11        A.    No, I don't believe so.

12        Q.    Did you provide any documentation to the insurance

13   company concerning smoke detectors following the fire?

14        A.    No.

15        Q.    Did you provide --

16        A.    I don't believe so.

17        Q.    Did you provide -- I'm sorry?

18        A.    I don't believe so, not following the fire.

19        Q.    Did you provide any documentation to your insurance

20   company following the fire concerning the lease agreement of

21   George Hughes?

22        A.    You've got the information.

23        Q.    I understand I've got what you gave me.  Did you

24   provide Kinsale Insurance with any lease documentation

25   concerning George Hughes?
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 65 of 125
Valecia Hill v. WP Apartments, LLC 30(b)(6) / John Maughan
July 30, 2020

63

```
 1          MR. GRANTHAM:  Did you give the insurance company

 2     Mr. Hughes' lease, John?

 3          THE WITNESS:  I'm sorry?

 4          MR. GRANTHAM:  Did you give the insurance company

 5     Mr. Hughes' lease?

 6          THE WITNESS:  Yes.

 7          THE WITNESS:  Now, the insurance company versus

 8     them.  I mean, I'm calling them one in the same; is that

 9     correct?

10          MR. GRANTHAM:  No.

11          THE WITNESS:  Oh, okay.  Well, you know, that thing

12     that I gave you that incorporated that to Irondale or

13     whatever his name is, that was the representative from

14     Kinsale, correct?  So --

15          MR. GRANTHAM:  You and I don't get to ask questions

16     right now, John.  Just answer whatever questions counsel

17     has.

18  BY MR. HINSON:

19     Q.    Okay.  Mr. Maughan?

20     A.    Yeah.

21     Q.    What started this conversation was I was asking you,

22  how did you know that there was a smoke detector at the top

23  of the stairs in unit I-5 at the time of the fire; do you

24  remember that?

25     A.    Yes, it was in -- the inspection report was done
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 66 of 125
Velectran Hills Apartments, LLC 30(b)(6) / John Vaughan
July 30, 2020

64

```
1    shortly before the fire.

2         Q.    Okay.

3         A.    Either February 20 or 22.  I'm not sure which.

4         Q.    And other than the inspection report that you say

5    was prepared in February of 2017, do you have any other

6    reason to say that there was a smoke detector at the top of

7    the stairs in unit I-5 at the time of the fire?

8         A.    The inspection report said it was there and it was

9    okay.

10        Q.    And my question was is, do you have any other

11   information other than your inspection report that makes you

12   think that there was a fire smoke detector at the top of the

13   stairs in unit I-5.

14        A.    Just the inspection report.  I had the inspection

15   done at that time.

16        Q.    Anything else, any other reason you say that there

17   was a smoke detector in unit I-5 other than your inspection

18   report?

19        A.    No.

20             MR. GRANTHAM:  Darrell, let's take a quick break.

21             MR. HINSON:  Sure thing.

22             THE VIDEOGRAPHER:  We are off the record.

23             (A break was taken at 2:44 p.m., and the deposition

24        resumed at 2:59 p.m.)

25             THE VIDEOGRAPHER:  We are back on the record.
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 67 of 125
Valecrest 41-19 Apartments LLC 30(b)(6), John Maughan
July 30, 2020

65

1  BY MR. HINSON:

2      Q.    Mr. Maughan, can you hear me okay?

3      A.    I hear you.

4      Q.    Great.  We were talking -- you were telling me about

5  the smoke detector at the top of the stairs and we had a

6  whole conversation about your documentation about that,

7  right?

8      A.    Yes.

9      Q.    All right.  You also wanted to tell me -- well,

10  first of all, were there any other smoke detectors in unit

11  I-5 other than at the top of the stairs?

12     A.    I don't believe so.  I don't believe so.

13     Q.    Now, you said there was a fire extinguisher in unit

14  I-5?

15     A.    Yes.

16     Q.    Where was the fire extinguisher?

17     A.    In the kitchen, I believe.

18     Q.    And why do you believe that?

19     A.    Because that's where it was in all of them, and the

20  inspection report said it was there.

21     Q.    You believe that for the same reason we just got

22  through telling me about Exhibit 7, correct?

23     A.    I'm sorry?

24     Q.    You believe there was a fire extinguisher in the

25  kitchen of unit I-5 for the same reason that we just



AccuTran, Inc.
770-426-9705

1   discussed --

2       A.   Yes.

3       **Q.**   -- Exhibit 7?  That's the only reason you believe

4   there was an extinguisher there; is that right?

5       A.   Yes.

6       **Q.**   Was there a fire alarm system in unit I-5 a fire

7   alarm, with a bell ringing?

8       A.   No.

9       **Q.**   Was there sprinklers in unit I-5?

10      A.   A what?

11      **Q.**   Sprinkler system?

12      A.   I'm not --

13           COURT REPORTER:  Sprinkler system.

14           THE WITNESS:  No.

15  BY MR. HINSON:

16      **Q.**   Did any units at Venetian Hills Apartments have a

17  fire sprinkler system?

18      A.   They've got the same as I-5.

19      **Q.**   All the units at Venetian Hills have the same as

20  I-5?

21      A.   Correct.  Now, some of them don't have stairs, okay,

22  so the smoke detector is located in a different place.

23      **Q.**   But the fire protection, the fire safety measures

24  that you have in place in unit I-5 was a smoke detector at

25  the top of the stairs and a fire extinguisher in the kitchen?



Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 69 of 125
Venetian 441 Apartments LLC 30(b)(6) John Vaughan
July 30, 2020

67

 1    That's what you say, right?

 2         A.    Correct.

 3         Q.    What was your process how you would track where the

 4    smoke detectors were installed, when they were maintained?

 5    What was your process for that?

 6         A.    We inspected the property, the -- all units

 7    regularly.

 8         Q.    And that's Exhibit 7 that you were talking about

 9    before?

10         A.    I'm sorry?

11         Q.    That is documented in Exhibit 7?

12         A.    Correct.

13         Q.    And Exhibit 7 is the only document you have

14    concerning unit I-5?

15         A.    The only document I have concerning I-5?

16         Q.    Exhibit 7 is the only document you have concerning

17    inspections of unit I-5 for smoke detectors and fire

18    extinguishers?

19         A.    I believe there is one with a greater date on it,

20    but that would be the only likely difference, a more precise

21    date.

22         Q.    And that's still the same piece of paper, though,

23    right?  It's still Exhibit 7?

24         A.    Yes.

25         Q.    You don't have any other dates?



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 70 of 125
Venetian Hills Apartments, LLC 30(b)(6), John Vaughan
July 30, 2020

68

```
 1        A.    No.

 2        Q.    In the past ten years, has Venetian Hills been cited

 3   for any fire code violation?

 4        A.    In the past what?

 5        Q.    Ten years has Venetian Hills apartments been cited

 6   for any fire code violations?

 7        A.    Not to the best of my knowledge.

 8        Q.    Has Venetian Hills been cited for not having smoke

 9   detectors in apartment units at any time in the past ten

10   years?

11        A.    No.

12        Q.    Has Venetian Hills been cited for any zoning

13   violations other than the rooming house one we already

14   discussed in the past ten years?

15        A.    No.

16        Q.    Has Venetian Hills been cited for any building code

17   violations in the past ten years?

18        A.    No.

19        Q.    Has Venetian Hills ever applied for any variances to

20   the zoning codes of any kind?

21        A.    No.

22        Q.    Have you -- has Venetian Hills ever been granted any

23   variances from compliance with any fire safety codes at any

24   time?

25        A.    No.
```

69

1      Q.      Are you aware of any photographs taken of unit I-5

2  after the fire, other than what's already been produced to

3  us?

4      A.      No.

5      Q.      When was the debris cleaned up in unit I-5 after the

6  fire?

7      A.      I don't know the precise date, but very shortly.

8      Q.      Who did that?

9      A.      I hired somebody to put the new roof on and did

10  other things to it, and I presume we did the immediate stuff.

11  And then I hired somebody to put the roof on and do other

12  things to enclose it properly.

13      Q.      And when you say "enclose it properly," do you mean

14  the exterior?

15      A.      I would have to look up exactly what was done.

16      Q.      Okay.  Yeah --

17      A.      I hired an outside organization for that.

18      Q.      What exactly has been done to unit I-5 since the

19  fire?

20      A.      It has not been modified inside.

21      Q.      It has not been modified inside since the fire?

22      A.      Correct.

23      Q.      Who did you hire to do any work at all on unit I-5

24  since the fire?

25      A.      I told you I hired somebody immediately after to go

70

```
 1    in and clean it up, if you would, put a new roof on because
 2    that's where a lot of the damage was.  And other things, too,
 3    enclose it.
 4        Q.    Don't forgot to speak up, Mr. Maughan.  My question
 5    was, who did you pay to do that?
 6        A.    I would have to get the bill out.  I do have it.
 7        Q.    You do have the bill?
 8        A.    Yeah.
 9        Q.    You have the bill for whoever you paid to do work on
10    unit I-5 after the fire?
11        A.    No, but I have it.
12        Q.    That's what I'm asking.  You do have it?
13        A.    Do I have it with me?  No.
14        Q.    Do you have it where you can get it?
15        A.    Yes.
16        Q.    Why have you not finished the inside of unit I-5
17    since the fire?
18        A.    Because I decided not to.
19        Q.    Why did you decide not to?
20        A.    Because I want to.  I have not wanted to.
21        Q.    Have you repaired any of the units in building I
22    that were damaged by the fire?
23        A.    I believe unit I-2 was damaged slightly and we did
24    bring that back on line.  It was not much work to be done.
25        Q.    What about unit I-3?
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 73 of 125
Venetvral Hills Apartments, LLC 30(b)(6) John Maughan
July 30, 2020

71

```
 1        A.    I believe I-3, -4, -5 and -6 are vacant.

 2        Q.    Could you repeat that.  I couldn't hear the --

 3        A.    I believe I-3, -4, -5 and -6 are vacant.

 4        Q.    Are not?

 5        A.    Are vacant.  I believe they're vacant as a result of

 6   the fire.  Now, I'm going from memory.  You know, I don't

 7   have it right in front of me, but I believe those four.

 8        Q.    So, Mr. Maughan, in talking with you today, it

 9   sounds like you still have to look for some additional

10   documents that we have asked for; is that right?

11        A.    I'm sorry, say that again.

12        Q.    It sounds like you have to still look for some

13   additional documents?

14        A.    There was one that you asked me to look for and I'm

15   going to do it.  I didn't make a note of it.

16              THE WITNESS:  What was it I promised I would get

17         him; do you remember?  I started to write it down.

18              MR. GRANTHAM:  He asked about code violation

19         documents.

20              THE WITNESS:  Oh, yeah, okay.

21   BY MR. HINSON:

22        Q.    And you say you're going to look for the original of

23   the document that you say establishes there was a smoke

24   detector in unit I-5?

25        A.    I don't have the original document.
```

72

```
 1        Q.    You're going to look for a copy?

 2        A.    I'm going to look for a copy that has a more

 3   complete date.

 4        Q.    And do you have any idea if you have such a copy?

 5        A.    I'm sorry?

 6        Q.    Do you have any idea if you have a copy that has a

 7   better date?

 8        A.    I believe there is a copy that has at least the 20th

 9   or the 22nd on it.

10        Q.    Okay.  Mr. Maughan, you rented George Hughes a room,

11   one bedroom with shared common areas, because that is what

12   customers like him could afford and wanted to live in, right?

13        A.    Right.

14        Q.    And at Venetian Hills you have people of all ages

15   and financial circumstances living with you, don't you?

16        A.    Of course.

17        Q.    Right?

18        A.    Yes.

19        Q.    You have families and elderly people?

20        A.    Yes.

21        Q.    You've got disabled people?

22        A.    I'm sorry?

23        Q.    Do you have disabled people?

24        A.    No.

25        Q.    Do you have young people?
```

AccuTran, Inc.
770-426-9705

| | | |
|---|---|---|
| 1 | A. | Young people? |
| 2 | **Q.** | Yes, sir. |
| 3 | A. | Yes.  Well -- |
| 4 | **Q.** | Children? |
| 5 | A. | -- depends on your definition of young. |

6      **Q.**    Do you agree that a business that owns and operates

7  apartments, that nothing is more important than the safety of

8  your residents?

9              MR. GRANTHAM:  Object to the form.

10             THE WITNESS:  Yes.

11             MR. GRANTHAM:  He can answer.

12  BY MR. HINSON:

13     **Q.**    Do you agree that protecting human life is one of

14  the most important things that any company or any person

15  could do?

16             MR. GRANTHAM:  Same objection.

17             You can answer.

18             THE WITNESS:  Go ahead.

19             MR. GRANTHAM:  You can answer.

20             THE WITNESS:  Yes.

21  BY MR. HINSON:

22     **Q.**    And as a landlord you take people's rent money, in

23  exchange you provide them with a place to live, right?

24     A.    Yes.

25     **Q.**    And your tenants who are paying you this money,



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 76 of 125
Velecran 441 LM Apartments LLC 30(b)(6) John Vaughan
July 30, 2020

74

```
 1    they're entitled to a safe place to live, aren't they?
 2             MR. GRANTHAM:  Object to the form.  He can answer.
 3             THE WITNESS:  Yes.
 4    BY MR. HINSON:
 5        Q.    I'm sorry, I didn't hear you, sir.
 6        A.    Yes.
 7        Q.    And do you agree that you should take reasonable
 8    steps to keep the property safe for your tenants?
 9        A.    Yes.
10        Q.    And do you agree that part of providing your tenants
11    a safe place to live means making sure that all the
12    applicable fire safety codes are followed?
13        A.    Yes.
14             MR. GRANTHAM:  Object to the form.  He can answer.
15    BY MR. HINSON:
16        Q.    Do you agree that fire safety codes are the minimum
17    of what should be done to protect a tenant against fire?
18             MR. GRANTHAM:  Object to the form.  He can answer.
19             THE WITNESS:  What was the question again?
20    BY MR. HINSON:
21        Q.    Yes, sir.  Do you agree that the fire safety codes
22    are the bare minimum of what should be done to protect
23    tenants against fire?
24        A.    I would have no knowledge of that.
25        Q.    Well, don't you agree that if you don't keep the
```



Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 77 of 125
Venetian Hills Apartments, LLC 30(b)(6); John Vaughan
July 30, 2020

75

1  property safe, if you don't comply with the minimum fire

2  safety codes, people can be injured or die?

3      A.    I understand that the -- that we need to have fire

4  extinguishers and a smoke detector, which is what we have.

5      Q.    But would you agree, if you don't keep the property

6  safe and comply with fire safety codes, that people could be

7  injured or even die?

8      A.    The answer is the same.

9      Q.    Well, that's why we have fire safety codes, right,

10  to protect your tenants?

11     A.    That's why we have what?

12     Q.    Fire safety codes.

13     A.    Yeah.

14     Q.    I mean, fire prevention in apartments is a major

15  responsibility; would you agree with that?

16     A.    Yes.

17     Q.    And would you agree that Venetian Hills should do

18  everything within its power to keep its residents safe from

19  fire?

20          MR. GRANTHAM:  Object to the form.  He can answer.

21          THE WITNESS:  Yes.

22  BY MR. HINSON:

23     Q.    And you would agree that Venetian Hills is required

24  to comply with all the applicable fire safety codes, right?

25          MR. GRANTHAM:  Same objection.  He can answer.

```
 1              THE WITNESS:  Yes.
 2    BY MR. HINSON:
 3       Q.     And you would agree that smoke detectors are a
 4    primary life safety equipment for protecting tenants against
 5    fire, wouldn't you?
 6       A.     Yes.
 7       Q.     I mean, that's the point of a smoke detector, right,
 8    is --
 9       A.     Yes.
10       Q.     -- designed to warn people of fire?
11       A.     Yes.
12       Q.     And smoke detectors give early warning of fire to
13    give people more time to escape from a fire, right?
14       A.     Yes.
15       Q.     And would you agree that it's less likely that
16    someone would know about a fire in an apartment that didn't
17    have the proper required smoke detectors?
18       A.     Say that again.
19       Q.     Yes, sir.  Would you agree it's less likely that
20    someone would know about a fire in an apartment that didn't
21    have all the required smoke detectors?
22       A.     Yes.
23       Q.     Would you agree that more than one smoke detector is
24    more likely that someone would have early warning of a fire?
25       A.     I don't know that.  I don't know.
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 79 of 125
Venetran Hills Apartments LLC 30(b)(6)/John Vaughan
July 30, 2020

77

1      **Q.**    You don't know whether --

2      A.    We have one smoke detector and one fire

3  extinguisher.

4      **Q.**    If you had multiple smoke detectors, would it be

5  more likely that someone would have early warning of a fire?

6      A.    I have no idea.

7      **Q.**    Well, if there was a smoke detector on the first

8  floor and a fire started on the first floor, there would be

9  early warning of that fire, right?

10     A.    There would be what?

11     **Q.**    If there was a fire on the first floor, sir, and

12  there was a smoke detector on the first floor, that should

13  provide an earlier warning than if there was a smoke detector

14  on the second floor, right?

15     A.    I don't think so.

16     **Q.**    Sorry?

17     A.    I don't believe so.

18     **Q.**    Okay.  Tell me why.

19     A.    It was placed at the head of the stairs for a

20  reason.  Smoke goes up.  It was put in where it was supposed

21  to be, I believe.

22     **Q.**    Well, why was there not a smoke detector on the

23  first floor?

24     A.    Never has been.

25     **Q.**    Why was there not a smoke detector in the bedrooms?

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 80 of 125
Venetian Hills Apartments, LLC 30(b)(6) John Vaughan
July 30, 2020

78

| | | |
|---|---|---|
| 1 | A. | We don't have smoke detectors in every room. |
| 2 | Q. | Why not? |
| 3 | A. | What we're doing is, to my understanding, the |

applicable code requirement and therefore what's required.

5    Q.    Do you agree that you failed to provide the
6  appropriate smoke detectors in unit I-5?

7    A.    That I have failed?

8    Q.    Correct.

9    A.    No.

10    Q.    Do you agree that failing to provide smoke detectors
11  on the first floor was a violation of what Venetian Hills was
12  required to do under law?

13    A.    That we're required to have them on the first floor?

14    Q.    Yes, sir.

15    A.    No, I'm not aware of that.

16    Q.    I didn't hear your answer, sir.

17    A.    I'm not aware of that.

18    Q.    Sir, how long have you been managing Venetian Hills
19  Apartments?

20    A.    I'm sorry?

21        MR. GRANTHAM:  Object to the form.

22  BY MR. HINSON:

23    Q.    Sir, how long have you owned Venetian Hills
24  apartments?

25    A.    Forty years.

```
 1        Q.    And you are telling me the smoke detector at the top

 2  of the stairs, that's where it's been the whole time?

 3        A.    I believe so.

 4        Q.    Sir, you're the sole representative of Venetian

 5  Hills, right?

 6        A.    I'm what?

 7        Q.    You are the sole member of Venetian Hills

 8  Apartments?

 9        A.    That's correct.

10        Q.    You have owned it for 40 years and it's then been

11  owned by the limited liability corporation, right?

12        A.    I'm sorry?

13        Q.    You have owned it for 40 years, you or the LLC?

14        A.    When did it become an LLC?

15        Q.    No, sir.  I just saying, you have owned it for 40

16  years?

17        A.    Yes.

18        Q.    And Mr. Hughes died from a fire at your apartment

19  complex?

20        A.    I'm sorry, say that again.  I didn't hear.

21        Q.    I'm saying that my client, Mr. Hughes, died from a

22  fire at Venetian Hills Apartments, right?

23        A.    Yes, I guess -- yes.

24        Q.    Wouldn't you agree that dying from a fire is one of

25  the worst things imaginable?
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 82 of 125
Venetran Hills Apartments LLC 30(b)(6) / John Maughan
July 30, 2020

80

```
 1        A.     I can't judge that.

 2        Q.     And you understand that Mr. Hughes' family claims

 3   that his death could have been prevented if Venetian Hills

 4   had done more?

 5        A.     No.

 6        Q.     Would you agree that these are very serious

 7   allegations against your apartment complex?

 8        A.     I'm sorry?

 9        Q.     Would you agree that these are very serious

10   allegations against your apartment complex?

11        A.     They're allegations.

12        Q.     Well, I mean, these people are paying you money in

13   exchange for a safe place to live, right?

14        A.     Right.

15        Q.     And these are serious allegations that your

16   apartment complex could have done more to prevent a man

17   burning to death, right?

18        A.     I guess those are the allegations.

19        Q.     Did you look to see if the family is right about

20   whether these allegations are true?

21        A.     Pardon me?

22        Q.     Well, I mean, do you agree with these allegations

23   that Venetian Hills could have done more to prevent his

24   death?

25        A.     I refuse to answer that.
```

Venetran Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

81

 1      Q.    Do you agree that Venetian Hills could have done

 2   more to prevent Mr. Hughes dying?

 3      A.    I'm sorry, say that again.

 4      Q.    Yes, sir.  Do you agree that Venetian Hills could

 5   have done more that could have prevented Mr. Hughes from

 6   dying from fire?

 7      A.    I refuse to answer that.

 8      Q.    Sir, do you think Venetian Hills did anything wrong,

 9   anything at all, in how it provided fire protection to the

10   people living in building I?

11      A.    I refuse to answer that.

12      Q.    I couldn't hear you, sir.  What did you say?

13      A.    I refuse to answer that.

14      Q.    Do you think Venetian Hills made any mistakes in how

15   it had been providing fire protection --

16      A.    That we have made any mistakes?

17      Q.    I'm sorry?

18      A.    Say the question again.

19      Q.    Yes, sir.  Do you think that anyone with Venetian

20   Hills made any mistakes in how it went about in providing

21   fire protection to the people living in unit I-5?

22      A.    I refuse to answer that question.

23      Q.    I'm sorry.  I couldn't hear.

24      A.    I refuse to answer that question.

25      Q.    After everything that's happened, Mr. Maughan, as we

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 84 of 125
Venetian Hills Apartments, LLC 30(b)(6)—John Maughan
July 30, 2020

82

1   sit here today, you're still providing the tenants at

2   Venetian Hills with the same level of protection that you

3   gave to George Hughes and those people in unit I-5, right?

4        A.   Yes.

5        Q.   You haven't changed one thing since this fire?  Let

6   me ask that better.  You haven't changed one thing as far as

7   fire protection at Venetian Hills since this fire?

8        A.   I would have to consider -- consider that.

9        Q.   I'm sorry, I didn't hear you, sir.

10       A.   I'm sorry?

11       Q.   Sorry, I could not hear you.

12       A.   I would have to consider that.

13       Q.   Are you going to answer the question?

14       A.   No.

15       Q.   Mr. Maughan, I'm going to check my notes.  I'm going

16  to need about a five-minute break.

17            THE VIDEOGRAPHER:  We are off the record.

18            (A break was taken at 3:26 p.m., and the deposition

19       resumed at 3:29 p.m.)

20            THE VIDEOGRAPHER:  We are now back on the record.

21  BY MR. HINSON:

22       Q.   Mr. Maughan, we have taken a break.  I want to ask

23  you, do you think personally, in your role as the sole member

24  of Venetian Hills, whether you made any mistakes in how you

25  went about providing fire protection to the residents in unit

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 85 of 125
Valentravan 41s9 Apartments LLC 30(b)(6), John Vaughan
July 30, 2020

83

```
 1   I-5?
 2        A.    I don't believe so.
 3        Q.    You don't believe you made any mistakes at all in
 4   the decisions you made as the owner?
 5        A.    I refuse to answer that question.
 6        Q.    Well, sir, why do you refuse to answer?
 7        A.    Because it's an unreasonable question.
 8        Q.    Well --
 9        A.    It's open-ended, unreasonable question.
10        Q.    Let me ask that again.  Because what I'm trying to
11   communicate to you, sir, is the family of George Hughes has
12   questions about whether this was a preventable incident,
13   whether Mr. Hughes did not have to die in a fire.  Are you
14   saying that's --
15        A.    I refuse to pursue that.
16        Q.    Are you saying it's unreasonable for the family to
17   want to have answers to these types of questions?
18        A.    I refuse to answer the question.
19        Q.    So you're saying that an unnecessary loss of life is
20   unreasonable?
21        A.    I refuse to answer that question.
22        Q.    Sir, have you taken any steps at all to examine what
23   type of fire protection should have been provided to George
24   Hughes and the other residents of unit I-5?
25        A.    I refuse to answer that question.
```



AccuTran, Inc.
770-426-9705

84

| 1 | **Q.** Why do you refuse? |
| 2 | A. I refuse to answer that question. |
| 3 | MR. HINSON: Ms. Court Reporter, could you read that |
| 4 | question back, please. |
| 5 | (Whereupon the court reporter read the referred-to |
| 6 | question.) |
| 7 | THE WITNESS: I refuse to answer that question. |
| 8 | BY MR. HINSON: |
| 9 | **Q.** Sir, this case has been in litigation for over a |
| 10 | year now; do you understand that? |
| 11 | A. I understand that. |
| 12 | **Q.** Do you understand that my client, the family of |
| 13 | Mr. Hughes, has been asking for documentation and |
| 14 | verification -- |
| 15 | A. Say that again. I did not hear that. |
| 16 | **Q.** I don't want to speak over you, sir. What did you |
| 17 | say? |
| 18 | A. I didn't understand what you said. |
| 19 | **Q.** Yes, sir. I'm saying, through this whole |
| 20 | litigation, since this lawsuit started, the family has been |
| 21 | asking for documentation to be provided by you concerning |
| 22 | what fire protection was provided to the tenants in unit I-5; |
| 23 | do you understand that? |
| 24 | A. I understand that. |
| 25 | **Q.** And you understand that the only thing after all |



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 87 of 125
Venetian Hills Apartments, LLC 30(b)(6), John Maughan
July 30, 2020

85

1    this time that you have been able to produce is one page of

2    records of an inspection report?

3         A.    I guess so.

4         Q.    Was there any effort on the part of Venetian Hills

5    to provide any fire safety inspections of these apartments

6    that have been rented out as one bedroom with common areas?

7         A.    What was the question?

8         Q.    Yes, sir.  Have there been any attempts before --

9    let me ask this a different way, sir.  Before the first

10   bedroom in unit I-5 was rented out, did Venetian Hills take

11   any effort to add any fire protection other than what was

12   already there?

13        A.    Did we do any other fire protection other than what

14   was there?

15        Q.    Yes, sir.

16        A.    Not to the best of my knowledge.

17        Q.    So what Venetian Hills did, what you decided to do,

18   was simply to rent out the bedroom and build an extra bedroom

19   on the first floor?  That's what was done in unit I-5,

20   correct?

21        A.    Yes.

22        Q.    Did you make any attempt whatsoever to investigate

23   whether that would be appropriate in a situation where you

24   were renting out bedrooms to individuals?

25        A.    Did I make any, yes.  I had an attorney check it

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 88 of 125
Venetian 441 Apartments LLC 30(b)(6), John Faughnan
July 30, 2020

86

```
 1   out.
 2        Q.    Sir, you don't see any issue with this at all?  You
 3   don't see any mistake at all in renting out bedrooms
 4   individually?
 5        A.    I refuse to answer that.
 6        Q.    I couldn't hear you at all, sir.  What did you say?
 7        A.    I refuse to answer that.
 8        Q.    Sir, would you agree that you're taking money from
 9   people who are in extreme financial straights and providing
10   them with a place to live that doesn't meet the basic fire
11   safety codes?
12        A.    What was the end of that about the safety code?
13        Q.    You're providing them with a place to live that does
14   not comply with the bare minimum fire safety code?
15        A.    I was -- I checked it out before I did it with an
16   attorney.
17        Q.    I couldn't understand you, sir.
18        A.    I checked it out with an attorney before I did it.
19        Q.    Sir, you have been in this business a long time.
20   Are you familiar with building codes?
21        A.    I believe so.
22        Q.    You're familiar with fire codes?
23        A.    Am I familiar with what?
24        Q.    Fire codes?
25        A.    I believe so.
```



AccuTran, Inc.
770-426-9705

1       **Q.**     Sir, how much is a smoke detector?

2       **A.**     How much is it?

3       **Q.**     Yes, sir.

4       **A.**     Not a large amount.

5       **Q.**     How much?

6       **A.**     I don't know.  I don't have the number right in

7    front of me.  It's not a lot.

8       **Q.**     What would be your guess?

9       **A.**     What would be my guess?

10      **Q.**     Yes, sir.

11      **A.**     $20.  We bought a number of them at the time of the

12   inspections.  You've got that information.

13      **Q.**     Sir, since you have not answered my questions about

14   whether Venetian Hills made any mistakes in providing fire

15   safety measures for its tenants, does that mean that you

16   believe that Venetian Hills did not make any mistakes?

17      **A.**     I refuse to answer that question.

18      **Q.**     Do you believe that Venetian Hills and yourself did

19   nothing wrong in the events leading up to this fire?

20      **A.**     I'm sorry?

21      **Q.**     Do you believe that Venetian Hills did nothing wrong

22   in the events leading up to this fire?

23      **A.**     I believe that, yes.

24      **Q.**     You do?

25      **A.**     Yes.

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 90 of 125
Venetian Hills Apartments, LLC 30(b)(6)/John Vaughan
July 30, 2020

88

1     Q.     Do you believe that Venetian Hills and you did

2     everything you had to do?

3     A.     That's a pretty open-ended question.

4     Q.     Yeah, you're right.  That's fair.  You believe that

5     Venetian Hills and you in renting out one bedroom to George

6     Hughes provided -- you did everything that you needed to do

7     reasonably to provide him with a safe place to live; would

8     you agree with that?

9     A.     Yes.

10    Q.     Sir, would you agree that a single smoke detector in

11    a multi-bedroom unit is unreasonable?

12    A.     To have what?

13    Q.     Would you agree that a single smoke detector in an

14    apartment unit with multiple bedrooms and multiple floors is

15    unreasonable?

16    A.     That it's unreasonable to have what?

17    Q.     One single smoke detector in a two-story apartment

18    unit.

19    A.     No, I don't believe it's unreasonable.

20    Q.     I'm sorry, I couldn't hear you.

21    A.     No.

22    Q.     You don't believe that it's unreasonable?

23    A.     No.

24    Q.     Why?

25    A.     Because I checked out with an attorney before I did

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 91 of 125
Venetran Hills Apartments LLC 30(b)(6), John Vaughan
July 30, 2020

89

```
 1   it.
 2       Q.    Do you believe a single fire extinguisher in a
 3   two-story unit that's been leased out one bedroom at a time
 4   is unreasonable?
 5       A.    No, I don't believe it was unreasonable.
 6       Q.    Do you agree that Venetian Hills should have done
 7   more to provide smoke detectors?
 8       A.    That's an open-ended question.  I don't know what --
 9       Q.    Still a question.  Do you agree Venetian Hills
10   should have done more to provide smoke detectors to the
11   people that lived in unit I-5?
12       A.    No.
13       Q.    Would you agree that Venetian Hills should have had
14   smoke detectors upstairs and downstairs in unit I-5?
15       A.    No.
16       Q.    Would you agree that Venetian Hills should have
17   spent the extra $7 and put a smoke detector downstairs in a
18   two-story unit like unit I-5?
19       A.    If I thought it would have done something, I would
20   have done it.  I don't believe it would have helped.
21       Q.    You didn't believe that would have any effect
22   whatsoever?
23       A.    Well, I don't know.  You know, if I put ten smoke
24   detectors in there, maybe yes, maybe no.  I don't know.  I
25   didn't -- at the time, I checked it out, okay.  I laid out my
```

1   plan and it was satisfactory.

2       Q.    Do you agree that there should have been smoke

3   detectors placed by Venetian Hills in each bedroom in unit

4   I-5?

5       A.    I don't know.  I don't know the answer to that

6   question.

7       Q.    Sir, were the residents allowed to open their

8   windows in unit I-5?

9       A.    I believe so.

10      Q.    Sir, were the windows even capable of being opened

11  in unit I-5 at the time of this fire?

12      A.    I have no information to the contrary.

13      Q.    Sir, if the windows in unit I-5 did not open at the

14  time of this fire, would you agree that that would be

15  unreasonable and a fire safety hazard to the people that live

16  there?

17      A.    I don't know.

18      Q.    You don't know if that would be unreasonable and a

19  fire safety hazard?

20      A.    I don't know.

21      Q.    Sir, you don't know that if a person that's involved

22  in a fire and imminent danger of dying and burning to death

23  or dying from smoke inhalation, that being able to open up a

24  window, you don't know whether that would be an important

25  safety feature of an apartment?

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 93 of 125
Venetian Hills Apartments, LLC 30(b)(6) - Jonathan Halperin
July 30, 2020

91

1    A.    To the best of my knowledge, the windows worked.

2    Q.    Well, if they did not work, sir, would that be a

3  problem?

4    A.    I believe they're supposed to work.  And if they had

5  been reported not working, we would have fixed it.

6    Q.    But my question, sir, if they were not working, if

7  those windows were not capable of being open, wouldn't you

8  agree that that would be a fire safety problem?

9    A.    I don't know the answer to that question.

10   Q.    Sir, on your inspection list that we have been

11  talking about, Exhibit 7, is there a box on there for

12  checking whether the windows opened?

13   A.    No, I don't believe so.

14   Q.    Do you have a separate window check inspection list?

15   A.    I don't believe so.

16   Q.    Do you agree that Venetian Hills should not have

17  operated a boarding or rooming house?

18   A.    I'm sorry?

19   Q.    Do you agree that Venetian Hills should not have

20  operated a rooming house?

21   A.    I got it approved before I did it.

22   Q.    How?

23   A.    The attorney -- I had my attorney draw up the lease

24  and he checked it out.

25   Q.    How did he check it out?

92

1    A.    He -- I believe he checked the City of Atlanta code

2    department at the time.

3    Q.    Well, you have already told me you never applied for

4    a license to run a rooming house, right?

5    A.    No, I didn't consider it a rooming house.

6    Q.    You have never asked for any government permit to

7    allow you to run a rooming house, have you?

8    A.    No.

9    Q.    So wouldn't you agree that Venetian Hills should not

10   have been operating a rooming house?

11   A.    I didn't consider it a rooming house, and I was told

12   it wasn't at the time that I did it.

13   Q.    Sir, it didn't cross your mind when you decided to

14   rent out each bedroom separately to different people that

15   there might be different requirements that would be required

16   of the fire safety code?

17   A.    I went to my attorney and asked him about that.

18   Q.    Who is this attorney you went to to discuss with?

19   A.    I would have to look it up.  I can't remember his

20   name now.  He was my attorney at the time for Venetian Hills.

21   Q.    Did you do anything other than talk to your

22   attorney?

23   A.    I'm sorry?

24   Q.    Did you do anything else to investigate what was

25   required of Venetian Hills?

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 95 of 125
Venetian Hills Apartments LLC 30(b)(6), John Vaughan
July 30, 2020

93

```
 1        A.    He did.

 2        Q.    I'm asking about you, sir.

 3        A.    No, I took my -- I assumed my attorney was smarter

 4   in that regard than me.

 5        Q.    Uh-huh.  Have you contacted your attorney that gave

 6   you this advice since the fire?

 7        A.    That attorney?

 8        Q.    Have you contacted this attorney that gave you all

 9   this advice since the fire?

10        A.    I believe that attorney is retired.

11        Q.    I'm sorry, I couldn't hear you.

12        A.    I believe he is retired.

13        Q.    Aha.

14        A.    I have not used him for a number of years.  And it

15   was not that he wasn't good.

16        Q.    Do you agree that Venetian Hills did not take the

17   safety of its tenants seriously?

18        A.    It did not what?

19        Q.    I'm sorry, I didn't ask that well.  Do you agree

20   that Venetian Hills did not take the safety of its tenants

21   seriously?

22        A.    No, I don't agree with that.

23        Q.    You do not agree with that?

24        A.    Was what?  Say it again, so I make sure that -- I

25   think you're asking a negative question.  I want to make sure
```

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 96 of 125
Venetian Hills Apartments LLC 30(b)(6), John Maughan
July 30, 2020

94

```
 1   I get --
 2        Q.    Okay.  I want to know if you agree that Venetian
 3   Hills did not take the safety of its tenants seriously?
 4        A.    No.
 5        Q.    Why?
 6        A.    The answer is no.
 7        Q.    And my next question is why?
 8        A.    We did take it seriously.
 9        Q.    How -- demonstrate to me or point me to how you took
10   safety -- fire safety seriously before you rented out a one
11   bedroom to George Hughes in unit I-5?
12        A.    I checked it out with my attorney.
13        Q.    Did you do anything else?
14        A.    Huh?
15        Q.    Did you do anything else?
16        A.    My attorney specializes in multi-family to a
17   considerable extent, so I relied on -- I presented the
18   situation to him and I relied on what he told me.
19        Q.    Sir, would you agree that Venetian Hills did not
20   take fire detection seriously before renting out to George
21   Hughes in unit I-5?
22        A.    I resent that.
23        Q.    Why, sir?  Sir, do you agree that Venetian Hills did
24   not take fire detection seriously?
25        A.    You have answered that question before and I
```

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 97 of 125
Valectran #1 LMM Apartments LLC 30(b)(6) John Maughan
July 30, 2020

95

```
 1    answered it.

 2        Q.    I think you answered it by telling me you resent it.

 3    That's not an answer.

 4        A.    It's my answer.

 5        Q.    Would you agree that failure to update fire

 6    prevention equipment over the course of 40 years is

 7    unreasonable?

 8        A.    I resent that question.

 9        Q.    I'm sorry, I did not hear you, sir.

10        A.    I resent that.

11        Q.    Would you agree that failure to update fire

12    prevention equipment over the course of 40 years is

13    unreasonable?

14        A.    I resent that question.

15        Q.    Sir, you have to answer my question.

16        A.    I refuse to answer the question at this time.

17        Q.    Sir, it's required under the rules that you answer

18    my question.  Do you agree that the failure to update fire

19    prevention equipment over the course of 40 years is

20    unreasonable?

21        A.    That's an open-ended question.  I refuse to go

22    there.

23        Q.    Sorry?  Go ahead.  What did you say?  I didn't mean

24    to cut you off, sir.

25        A.    You know, that's way out.
```

Case 1:21-cv-03214-LMM  Document 81-2  Filed 10/11/23  Page 98 of 125
Venetian Hills Apartments, LLC 30(b)(6) - John Vaughan
July 30, 2020

96

1          MR. GRANTHAM:  You need to answer his question,

2     John.

3          THE WITNESS:  Huh?

4          MR. GRANTHAM:  You need to answer the question.

5          THE WITNESS:  I should answer the question?

6          MR. GRANTHAM:  Yes, sir.

7          THE WITNESS:  What's the question again?

8     BY MR. HINSON:

9     Q.    Yes, sir.  Do you agree that the failure to update

10    fire prevention equipment over the course of 40 years was

11    unreasonable?

12    A.    No.

13    Q.    Did you or Venetian Hills check with any fire safety

14    expert before you leased out one bedrooms with common areas

15    to George Hughes?

16         MR. GRANTHAM:  Object to the form.  He's answered

17    that a few times already.

18    BY MR. HINSON:

19    Q.    Sir, I didn't hear your answer.

20         MR. GRANTHAM:  You can answer.

21         THE WITNESS:  Huh?

22         MR. GRANTHAM:  You can answer.

23         THE WITNESS:  What was the question again?

24         MR. GRANTHAM:  Did you check with any fire experts

25    before leasing the unit to George Hughes?

```
 1              THE WITNESS:  I checked with my attorney.
 2    BY MR. HINSON:
 3         Q.    Did you check with a fire safety expert?
 4         A.    I checked with my attorney, told him what I was
 5    doing, and I accepted his advice.
 6         Q.    So does that mean you did not check with a fire
 7    safety expert --
 8         A.    I checked with my attorney.
 9         Q.    You told me you checked with your attorney, sir.  My
10    question is, did you check with a fire safety expert before
11    renting out one bedrooms in unit I-5?
12         A.    I checked with my attorney and I relied on him to
13    give me advice on this matter.
14         Q.    Does that mean no?
15         A.    I checked with my attorney regarding the
16    ramifications of what I was doing and I relied on his
17    direction.
18         Q.    For the record, I'll move to strike your answer as
19    nonresponsive.
20              Sir, my question is, did you check with a fire
21    safety expert before renting out one bedrooms in unit I-5?
22         A.    I checked with my attorney regarding all of the
23    ramifications, and I relied on what he told me.
24         Q.    Sir, are you not going to answer my question?
25         A.    That is my answer.
```



Case 1:21-cv-03214-LMM  Document 81-2  Filed 10/11/23  Page 100 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

98

```
 1      Q.    Are you not going to answer my question about
 2   whether you consulted with a fire safety expert before
 3   leasing out the bedrooms in unit I-5?
 4      A.    I consulted with my attorney to give me advice in
 5   that regard.
 6      Q.    Did you consult with a fire safety expert before
 7   leasing out the bedrooms in unit I-5?
 8      A.    I relied on my attorney for all matters in that
 9   regard.
10      Q.    So the answer is no?
11      A.    I have given you my answer a number of times.
12      Q.    Sir, if you had consulted with a fire safety expert,
13   would Mr. Hughes still be here?
14      A.    I'm sorry?
15      Q.    If you had consulted with a fire safety expert,
16   would Mr. Hughes still be here?
17           MR. GRANTHAM:  Object to the form.
18           You can answer if --
19           THE WITNESS:  I'm not going to answer that.  I'm not
20       going to go there.
21   BY MR. HINSON:
22      Q.    Sir, if Venetian Hills had complied with the fire
23   safety codes, would Mr. Hughes still be here?
24      A.    It is my understanding that we complied with all of
25   the requirements when we did what we did.
```



AccuTran, Inc.
770-426-9705

1      **Q.**    And it's your position, sir, that there was nothing

2   that Venetian Hills could have done that would have kept

3   George Hughes alive today?

4           MR. GRANTHAM:  Object to the form.  He can answer.

5           THE WITNESS:  I did what I thought was right and

6      what I was informed was right.

7           MR. HINSON:  All right.  We're going to take a quick

8      break, Mr. Hughes -- excuse me, Mr. Maughan, we're going

9      to take a quick break.

10          THE VIDEOGRAPHER:  We are off the record.

11          (A break was taken at 3:59 p.m., and the deposition

12     resumed at 4:12 p.m.)

13          THE VIDEOGRAPHER:  We are now back on the record.

14          MR. GRANTHAM:  Darrell, ready when you are.

15          MR. HINSON:  Thank you.

16   BY MR. HINSON:

17     **Q.**    Mr. Maughan, you repeatedly told me that --

18     **A.**    I'm sorry.  Face the camera, please.

19     **Q.**    Yes, sir.  Mr. Maughan, you repeatedly told me that

20   you checked with your attorney when I was asking you about

21   whether you had checked with a fire safety expert before

22   renting out unit I-5.  Walk me through why you would rely on

23   a lawyer for that as opposed to a safety expert.

24     **A.**    Why was I relying on him?

25     **Q.**    No, why would you be checking with a lawyer instead



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 102 of 125
Venetian Hills Apartments LLC 30(b)(6) (John Maughan)
July 30, 2020

100

```
 1   of a safety expert?
 2       A.    Well, I checked on him with everything with regard
 3   to doing the studios, the legality of them and what needed to
 4   be done, and he drew up the lease and gave me advice as to
 5   what I needed to do.
 6       Q.    And I didn't hear your whole answer, sir.  He told
 7   you about what?  Could you repeat -- I'm sorry, could you
 8   repeat your answer.
 9           MR. GRANTHAM:  I'm going to have the court reporter
10       read it back.
11           MR. HINSON:  That would be fine.  I was about to ask
12       that.
13           (Whereupon, the court reporter read the referred-to
14       answer.)
15   BY MR. HINSON:
16       Q.    Okay.  Mr. Maughan, I understand that the lawyer --
17   you asked the lawyer about the legality of your studios and
18   you say he advised you what you needed to do.  But I'm trying
19   to understand why you would go to the lawyer on the fire
20   safety equipment issues concerning unit I-5.
21       A.    I went to him on all of the matters.  I couldn't go
22   to ten different people to get ten different answers on every
23   aspect, so I -- he was very knowledgeable and I relied on him
24   to tell me what to do.  And he drew up the lease and I did
25   what he told me to do.
```

AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 103 of 125
Venetian Hills Apartments LLC 30(b)(6) - Jonah Maughan
July 30, 2020

101

1     **Q.**    Well -- and specifically we have been talking

2   about -- of course, Mr. Maughan, we have been talking about

3   smoke detectors and fire extinguishers and fire safety

4   equipment.

5          So my question is, why would you be talking with a

6   lawyer about what you would need for fire safety equipment

7   instead of a fire safety expert?

8     **A.**    Well, I didn't go to ten experts.  My attorney had,

9   in my opinion, considerable expertise in all of these

10  matters, so I relied on him to advise me on everything in

11  this regard in regard to studios.  He's more knowledgeable

12  than me, okay, in all of these areas, obviously.

13    **Q.**    But, sir, I'm trying to understand why you would be

14  talking with a lawyer about fire safety equipment instead of

15  a fire safety expert.  And I'm not talking about multiple

16  experts, just one.

17    **A.**    I didn't go to numerous experts.  My attorney, who

18  was pretty knowledgeable, I relied on to give me advice on

19  that, as well as any other matter associated with doing the

20  studios.

21    **Q.**    Well, you're talking with a lawyer, I understand,

22  who represents your interest, the interests of Venetian Hills

23  and protect you.  But my question deals with fire safety and

24  protecting the tenants, the people that are paying you

25  money --

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 104 of 125
Venetian Hills Apartments LLC 30(b)(6) (John Vaughan)
July 30, 2020

102

1    A.    I did not go to a fire expert, okay?  I relied on my

2    attorney to give me advice in all matters --

3    Q.    Could you --

4    A.    -- concerning the studios.

5         MR. HINSON:  Could you repeat the answer please,

6    Ms. Court Reporter.

7         (Whereupon, the court reporter read the referred-to

8    answer.)

9    BY MR. HINSON:

10    Q.    Sir, how does a lawyer with a law degree tell you

11    what fire safety equipment should be put into an apartment?

12    A.    I relied on him to give me direction and I did not

13    go to experts in each of the areas.

14    Q.    Did you have anybody come in and actually look at

15    unit I-5 and advise you with respect to what fire safety

16    equipment should be put in there before you started renting

17    out one bedroom at a time?

18    A.    No.

19    Q.    And why did you not do that, sir?

20    A.    I repeat, my attorney was, in my opinion, an expert

21    in these matters and he checked out certain things and he

22    told me what to do and so I relied on him.

23    Q.    Did you call the fire department and ask them to

24    come out and look at unit I-5 before you started renting out

25    bedrooms?



AccuTran, Inc.
770-426-9705

1    A.    No, I did not.

2    Q.    Did you call the fire marshal's office and ask if

3    they could come out and take a look at unit I-5 before you

4    started renting out one bedroom at a time?

5    A.    No, I did not.  I relied on my attorney to tell me

6    what was required.

7    Q.    Not even a fire safety expert, sir.  Did you consult

8    with anybody, even someone that you would not have to pay who

9    had some fire safety expertise, to come in and look at unit

10   I-5 before you rented it out?

11   A.    No, I did not.  I relied on my attorney.

12   Q.    I'm sorry, sir, I can't hear you.  If you can speak

13   up.  Could you speak up, Mr. Maughan?

14   A.    Same answers I have been giving you all along.  No,

15   did I not consult the fire department.  I relied on my

16   attorney to tell me what was required, which I believe --

17   which he did, and I followed his advice.  And he did not have

18   any specific advice in that regard.

19   Q.    Mr. Maughan, when you rented out the one bedroom to

20   George Hughes in February of 2012, were there already any

21   other people renting the other bedrooms?

22   A.    I believe, but I'm not positive, okay?  I believe he

23   was the first, but I'm not positive.  Certainly, if he wasn't

24   the first, he was in -- if I recall correctly.  You know,

25   you're going back a long time now.  But I recall him being

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 106 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

104

```
1   either the first or one of the very first.  I could check my

2   records on that.

3       Q.    If he was -- let me ask this way.  When someone came

4   in to unit I-5 to rent one bedroom from you in the common

5   areas, what procedures did you do to inspect the unit before

6   you rented the bedroom to them?

7       A.    Well, we made the adjustments to the unit that I was

8   informed or required and rented them.

9       Q.    What did you do before someone came in who you had

10  rented out the one bedroom to, before you turned over the key

11  to them, what did you do?

12      A.    Well, we did all four units at the same time, okay?

13  We prepared them and then we rented them.

14      Q.    Were all four units occupied at the same time?

15      A.    Very shortly thereafter there was a big demand for

16  them.

17      Q.    Well, was there any process in place before you gave

18  a key to someone to a bedroom in unit I-5 about checking the

19  unit?

20      A.    Yes, we prepared the units.  They were rented for

21  the first time, so.

22      Q.    Well, what I'm trying to find out, sir, is when did

23  you prepare the unit for a new tenant to come in, someone who

24  is renting one of these bedrooms?

25      A.    In the case of unit I-5, it was the first one, so we
```

1  did them all at the same time before any of them were rented,

2  if I recall correctly.

3      Q.   So -- but when people came in after George Hughes,

4  before you gave him keys, did you do an inspection of the

5  safety features in unit I-5 before renting out the next

6  bedroom?

7      A.   We prepared them all for that purpose.

8      Q.   What do you mean prepared?  You prepared them at one

9  time or --

10     A.   We prepared them all at the same time, if I recall

11 correctly, all four units.  And then we rented them as people

12 came in.  And I believe George Hughes was the first or one of

13 the very first.

14          And, you know, they certainly had the right to see

15 the unit, and I believe all these people did see the unit

16 before they moved in because it was a new thing for us.

17     Q.   So George Hughes lived in the apartment from 2012

18 through the fire in 2017.  Wasn't there turnover in the other

19 bedrooms during that five-year period?

20     A.   Yes, but very little.  I would have to check.  I've

21 got the rent roll.  I can check.

22     Q.   So when there was turnover in the other bedrooms,

23 what was the process that was done at that time before a new

24 tenant came in to one of the bedrooms to verify the apartment

25 was safe?

1      A.      I'm sorry, say that again.

2      **Q.**      Yes, sir.

3      A.      Since I'm not hearing you as well when you're

4   looking in the other direction.

5      **Q.**      When a new tenant came in to rent a bedroom in unit

6   I-5 during that period of time between 2012 and 2017, what

7   was the process before you turned over the bedroom to them to

8   check the apartment was safe?

9      A.      Well, just like any other apartment, we went in and

10   did what was required that was wrong with the apartment.

11   Generally, because they were mostly there for quite a while,

12   generally paint.  But whatever else was wrong with the

13   apartment, just like we turn any apartment.

14      **Q.**      And specifically with respect to the fire safety

15   equipment in the unit, was that checked each time a new

16   resident was rented a bedroom in unit I-5?

17      A.      There was no fire safety equipment in the bedroom

18   except the one downstairs.  No, correction, not downstairs.

19   No, there was none in the bedroom, as you pointed out

20   previously.

21      **Q.**      Well, what about the fire safety equipment in the

22   common areas?  What about the smoke detector that you say was

23   at the top of the stairs, was that checked every time a new

24   resident came in to one of the bedrooms in unit I-5?

25      A.      I don't know about that.  We inspected them on a

1   regular basis, all units in the complex.

2       Q.    So before a new tenant came in to be rented one of

3   the bedrooms in unit I-5, would you check that smoke detector

4   that you say was at the top of the stairs?

5       A.    Now, that, I do not know.  That, I don't know.  We

6   checked -- we checked it at the same time as we checked the

7   them in every unit, whether they were studios, one bedroom,

8   two bedroom, three bedroom, whatever.  We inspected all units

9   on a regular basis.

10      Q.    And that is the only time -- so you're saying that

11  the only time the smoke detectors would have been inspected

12  in the units was when they were inspected at the whole

13  complex all at one time?

14      A.    Yeah.  But of course in the other units, they did

15  not have -- in the full size -- in the -- other than these

16  studios, I call them, there was a fire extinguisher and a

17  smoke detector, and of course we checked that.  Whether we

18  checked each -- the whole thing on each studio, that, I

19  cannot answer.

20            I know that we inspected them at the time in

21  question, in spite of the fact that it doesn't have the full

22  date on it, on the copy you've got.

23      Q.    Were all other residents in unit I-5 rented bedrooms

24  by the week?

25      A.    Yes.

1    **Q.**    And is that how you were handling renting out these
2    studios or efficiencies, whatever you call them, in buildings
3    I, building C, and building H, were those all by the week?
4    **A.**    All apartments, no matter what size.  We went to a
5    weekly rental.  We went from a monthly rental to a weekly
6    rental.
7    **Q.**    And why are you renting -- I'm more interested in
8    the unit that George was in.  Whey were you renting by the
9    week?
10   **A.**    Why did we rent by the week?
11   **Q.**    Yes, sir.
12   **A.**    Because when it comes the first of the month and the
13   rent is due, they often do not have the money if they don't
14   pay by the week.  We found it very effective.  We tried it
15   and we found it very effective, so we did it long before the
16   studios on all apartments.  All apartments were rented by the
17   week.
18   **Q.**    And all the unit I-5 --
19   **A.**    It was no different than the others in that regard.
20   **Q.**    Now, the common areas in unit I-5, were they cleaned
21   by Venetian Hills?
22   **A.**    Yes.
23   **Q.**    And the kitchen was cleaned by Venetian Hills, and
24   the bathrooms?
25   **A.**    Yes.

Venetian Hills Apartments LLC 30(b)(6), John Vaughan
July 30, 2020

109

```
 1        Q.    Would the other tenants that you had in unit I-5,
 2   would they be coming and going regularly as far as moving out
 3   and moving back in?
 4        A.    No, we had very little turnover.
 5        Q.    Was there a bed provided in these bedrooms?
 6        A.    I'm sorry?
 7        Q.    Were there beds provided in these bedrooms in unit
 8   I-5?
 9        A.    Yes.
10        Q.    Sir, I had a note that you told me before in an
11   answer to a question that you said you did not know whether
12   Venetian Hills should have had more than one smoke detector
13   in unit I-5; is that right?
14        A.    I don't know that there was more than one smoke
15   detector, no.  I don't believe there was.
16        Q.    But do you know whether more than one smoke detector
17   was required in unit I-5?
18        A.    I don't believe so.
19        Q.    You don't know that?
20        A.    I believe that they were not required, more than one
21   smoke detector.
22        Q.    And why do you believe they were not required to
23   have more than one smoke detector in unit I-5?
24        A.    I was told it was fine.  And there have been a
25   number of inspection people that have been in various units,
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 112 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

110

1  studio units, and -- not frequently, but from time to time --

2  and it was never a problem.  I'm talking about code

3  inspection.

4      **Q.**  Can you read back that --

5      A.   I'm sorry?

6          MR. HINSON:  I'm sorry, I was asking Ms. Court

7      Reporter to read back the answer.  I didn't hear you.

8          (Whereupon, the court reporter read the referred-to

9      answer.)

10 BY MR. HINSON:

11     **Q.**  Sir, I need you to explain that, because you told me

12 earlier that you hadn't had any fire code inspections, unless

13 I misunderstood.

14     A.   No, no, no, this was people that came out for

15 whatever problems in units, you know, code enforcement

16 people, that said something was wrong and they get a call

17 directly.  They come out and, you know, inspect it and we've

18 got to correct the situation.

19          And they have been -- the only one I can think of

20 offhand is H building, where I know they were in.  And there

21 was no mention of there being any problem with regard to

22 smoke detectors or fire extinguishers.

23     **Q.**  Are you saying that somebody went into units in H

24 building to inspect smoke detectors and fire extinguisher?

25     A.   No, no, no, they did not go in for that purpose.

1    They were in there and they were in all the units and they

2    didn't find anything offensive -- anything incorrect.

3            In fact, one of them came out in regard to -- I

4    think was inspecting the units.  And then that particular one

5    we advanced, as I told you previously, to putting a small

6    refrigerator and -- not microwave -- toaster oven in there.

7            And their suggestion -- well, not their suggestion.

8    Their requirement was that it not be between -- that it not

9    be near the door for fire purposes.  So we moved them all.

10   She told us where to move them to and we did it.

11       **Q.**    So you're telling me that somebody came in and was

12   telling you where to put a --

13       **A.**    A code person came in for another reason, okay, and

14   saw that there was a refrigerator and a toaster oven that was

15   placed in such a position that she said it was a problem if

16   there was a fire in that toaster oven for getting out, so

17   move it over here.

18           So we immediately went to the -- I don't know,

19   three, four, five units that we had those in and we placed

20   them where they told us to.  Am I making myself clear?

21       **Q.**    So you told me that somebody came in and told you

22   about toaster ovens, but did this person say anything -- was

23   this person there to inspect smoke detectors and fire

24   extinguishers?

25       **A.**    I'm sorry, no.  They were code enforcement.  They

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 114 of 125
Venetian Hills Apartments LLC 30(b)(6) John Maughan
July 30, 2020

112

1    were there for another purpose.

2        Q.    Okay.

3        A.    If I recall correctly, it's a long time ago, I think

4    it was an HVAC situation.  And they came and they checked the

5    units, and they were studios.  And like George Hughes, we had

6    at that point put in a refrigerator, small refrigerator, and

7    a toaster oven.

8            And they said that the placement of it was not

9    satisfactory, in her opinion, that it was preferable to get

10   it over there so that it would not be a problem if there was

11   a fire in the toaster oven, okay?

12           So all I'm saying is that the code enforcement

13   people were in the studios from time to time, not very often

14   because we didn't have very many.  But if somebody would call

15   code enforcement, they would come out.

16           And that one I recall particularly because it was

17   the one objection that they had ever made to studio

18   situations.  And that was an advanced once, as I just told

19   you.

20       Q.    So if I understand what you're telling me, sir, the

21   question was about whether unit I-5 should have smoke

22   detectors, more than one smoke detector.  And it sounds like

23   your answer was, well, there was code people that came in to

24   look at HVAC for toaster ovens and --

25       A.    I was just adding that as a reinforcement, in

Case 1:21-cv-03214-LMM   Document 81-2   Filed 10/11/23   Page 115 of 125
Venetian Hills Apartments LLC 30(b)(6) (John Vaughan)
July 30, 2020

113

```
 1    addition to relying on the attorney and he checked it out.
 2    The attorney checked things it out, okay?
 3              And -- but I'm just telling you that from time to
 4    time code enforcement people were there and there was never
 5    any question about smoke detectors in any room or anywhere
 6    else in the studio unit.
 7        Q.    Did your attorney come out and look at unit I-5
 8    before you started renting it out?
 9        A.    Did who?
10        Q.    Did your attorney come out and look at unit I-5
11    before you started renting it out?
12        A.    Did who come out and look at it?
13        Q.    Your attorney.
14              MR. GRANTHAM:  Your attorney, John.
15              THE WITNESS:  Yes, I believe so.
16    BY MR. HINSON:
17        Q.    Did he look at smoke detectors and fire
18    extinguishers?
19        A.    Yes, he saw the units, I believe.  And we told him
20    -- I think he -- I believe it was after he did it.  I don't
21    know.
22        Q.    To you, that is reasonable and good enough for you?
23    That is good enough to ensure the safety of the tenants?
24        A.    I said it was satisfactory, he said it was.  He
25    checked it out.  So I relied on his opinion, yes.  Not his
```

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 116 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

114

```
 1   opinion, his expertise.
 2       Q.    And how does that, you relying on your lawyer,
 3   protect the tenants in the units from fire?
 4       A.    From all things.
 5             COURT REPORTER:  I'm sorry?
 6             THE WITNESS:  From all things.  From everything.
 7   BY MR. HINSON:
 8       Q.    My question is, how did that protect your tenants
 9   from fire, you relying on what your lawyer's telling you?
10       A.    I relied on what he told me.  I relied on what he
11   told me.  I had great respect for his judgment.  I worked
12   with him for a number of years.  He was a good attorney, in
13   my judgment.
14       Q.    Do you have any paper documents of all this great
15   advice you got from your lawyer?
16       A.    I'm sorry?
17       Q.    Do you have any paper documents concerning this
18   advice that your lawyer gave you?
19       A.    Yes, I believe I do.
20       Q.    Do you have documentation of when somebody came out
21   and looked at the building I, unit 5, before you started
22   renting out bedrooms?
23       A.    That he came out?
24       Q.    Anyone -- anyone that would have looked at the fire
25   safety before you rented out to George Hughes?
```

 1    A.    No.

 2    Q.    You don't have any documents about that?

 3    A.    No.

 4    Q.    Would you consider the setup you had with unit I-5

 5  and these other studios and efficiencies, do you consider

 6  them to be like a hotel?

 7    A.    I'm sorry, a hotel?

 8    Q.    Did you consider them to be a hotel?

 9    A.    I'm not hearing you properly.

10        (Whereupon, the court reporter read the referred-to

11    question.)

12        THE WITNESS:  No, I don't consider it to be a hotel.

13  BY MR. HINSON:

14    Q.    Do you have people at Venetian Hills that come and

15  stay just for a week and leave?

16    A.    I'm not hearing him as well.

17    Q.    I can't hear you.  Did we lose our connection?

18    A.    I'm sorry, I'm not hearing you as well as I was.

19    Q.    Okay.

20    A.    I hear okay.

21    Q.    Did you have people that come to Venetian Hills and

22  only stay for a week and then leave?

23    A.    No, not generally.  They put down a month's deposit.

24  It was not -- they were treated like any other resident in

25  that regard.  They put down a month's deposit.

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 118 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

116

1     **Q.**    Are these weekly rentals, though, are they

2     like an extended stay, in your mind, in any way?

3     **A.**    I'm sorry?

4     **Q.**    Are they like an extended stay hotel in any

5     way?

6     **A.**    No.  The only difference was that one day I

7     decided to rent by the week instead of the months

8     because the residents, many residents do not control

9     their finances very well, and they had difficulty

10    paying a full month's rent at the first of the month.

11    And all leases say, if you don't pay on the first,

12    you're late on the 5th and a warrant is filed.

13          And I wanted to try and avoid that and help

14    the people out by doing it by the week.  And I did it

15    and I found that extremely successful in helping the

16    residents, so all residents were on the same basis.

17    **Q.**    Before you started renting out unit I-5 by

18    the bedroom, was it a three-bedroom apartment?

19    **A.**    Yeah, they were rented by the week.

20    **Q.**    And how much would you rent out the three-bedroom

21    apartment of I-5 for before you converted it?

22    **A.**    I can't remember.

23          (Plaintiff's Exhibit No. 9 marked.)

24          MR. HINSON:  Ms. Court Reporter, could you

25          show him Exhibit 9, please.

AccuTran, Inc.
770-426-9705

```
 1              COURT REPORTER:  Just a second.  He has it.
 2    BY MR. HINSON:
 3         Q.    Mr. Maughan, please take a look at Exhibit 9.  And
 4    tell me what it is first.
 5         A.    I'm sorry?  This is a brochure that we handed out to
 6    people about the apartments if they came in looking for an
 7    apartment.
 8         Q.    And this was produced to us by you, by your lawyer.
 9    The brochure contains three bedroom, two bedroom and one
10    bedroom homes --
11         A.    I did not discuss a brochure with my attorney, if
12    that's what you're asking.
13         Q.    No, sir, I'm just I'm wanting to know, this shows --
14    this document, Plaintiff's Exhibit 9, shows rents of 165 a
15    week for a three-bedroom townhome.  My question is, is that
16    what you were renting out unit I-5 before you switched it
17    over to George Hughes by the bedroom?
18         A.    I don't know what date this brochure was.  It looks
19    extremely old because those prices are very low.
20         Q.    Well, and that's why I'm asking you.  I can't tell
21    from the document itself.
22         A.    I don't know what time frame this is, but it's a
23    long -- I believe it's long before George Hughes because
24    those prices are way low.
25         Q.    Okay.  Well, there again, how would we tell what you
```

```
 1    were renting out unit I-5 when it was a three-bedroom

 2    apartment?  How would we tell --

 3         A.    What we were renting that before George Hughes?

 4         Q.    Yes, sir, 2011 --

 5         A.    I'll look it up for you.  Immediately before it

 6    became studios?

 7         Q.    Yes, sir.

 8         A.    I'll look it up for you.

 9         Q.    Where would you go to find that information?

10         A.    From my rent roll.

11         Q.    Okay.  Sir, if you could add to your list there the

12    rent roll.

13         A.    I'm sorry?

14         Q.    If you could add to your list --

15         A.    That's a document that I have in my office that is

16    separate from Venetian Hills.

17         Q.    Okay.

18         A.    Okay.  Do you want that information?

19         Q.    Yes, sir.  We'll send a request to your lawyer, but

20    I think --

21         A.    You want to know the price of a three bedroom, rent

22    of a three bedroom immediately prior to when we did I-5?

23         Q.    Yes, sir.

24         A.    Okay.  Let me make a note.  Let me make a note.

25    Okay.
```



AccuTran, Inc.
770-426-9705

1    **Q.**    Okay.  Mr. Hughes -- Mr. Hughes.  Mr. Maughan, we

2    covered that there were some additional documents we asked

3    from your deposition.  We also sent you a request for some

4    other documents.  So we're going to look for those documents

5    from you and that information we discussed today and

6    elsewhere in your deposition, okay?

7    **A.**    Okay.  I've got two things that we discussed today.

8    **Q.**    Okay.  And your lawyer has some other things.  So

9    those are the questions I have for you today.  But again, we

10    do have some other documents we're waiting on, so we'll

11    just -- I'm going to suspend the deposition now.

12    **A.**    Okay.

13    MR. GRANTHAM:  Well, just so we're clear, we can

14    suspend it now and if you want to ask him questions about

15    any new documents that we produce later, that's fine.

16    But I don't want to go through everything again.

17    MR. HINSON:  No, that's agreeable, Counsel.  That's

18    fine.  I'm talking about if we have questions about

19    documentation we haven't seen yet, I'm just reserving the

20    right to come back and ask questions about it if

21    necessary.  That's all I'm saying.

22    MR. GRANTHAM:  All right.  Sounds good.

23    MR. HINSON:  Mr. Maughan, I'm done talking to you

24    today.  You're done talking to me today.  Thank you for

25    your time.

120

1          THE VIDEOGRAPHER:  We are now off the record.

2          (Deposition adjourned at 4:53 p.m.)

3                         *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 123 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

121

```
 1              E R R A T A   P A G E

 2       I, JOHN MAUGHAN, the witness herein, have read the
    transcript of my testimony and the same is true and correct
 3  to the best of my knowledge.

 4  _____ There are no corrections.

 5  _____ Any corrections/additions are listed below.

 6

 7  PAGE/LINE          SHOULD READ          REASON

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20

21

22  _____
                   JOHN MAUGHAN

23  Sworn to and subscribed before me
    this _____ day of _____ 2020
24  _____
    Notary Public
25  My commission expires_____
```



AccuTran, Inc.
770-426-9705

Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 124 of 125
Venetian Hills Apartments LLC 30(b)(6) - John Maughan
July 30, 2020

122

```
 1                             DISCLOSURE

 2    STATE OF GEORGIA:

 3    COBB COUNTY:
                       DEPOSITION OF:  JOHN MAUGHAN
 4
              Pursuant to Article 10.B. of the Rules and
 5
      Regulations of the Board of Court Reporting of Judicial
 6
      Council of Georgia, I make the following disclosure:
 7
              I am a Georgia Certified Court Reporter acting as an
 8
      agent of AccuTran, Inc., who was contacted by the offices of
 9
      Shiver Hamilton, to provide court reporting services for this
10
      deposition.  I will not be taking this deposition under any
11
      contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).
12
              AccuTran, Inc., has no contract to provide reporting
13
      services with any party to the case, and counsel in the case,
14
      or any reporter or reporting agency from whom a referral
15
      might have been made to cover this deposition.  AccuTran,
16
      Inc. will charge its usual and customary rates to all parties
17
      in the case, and a financial discount will not be given to
18
      any party to this litigation.
19

20

21

22


23   _____, CCR# B-2007 DATE:_____
24   Debbie C. Hennings

25
```



Case 1:21-cv-03214-LMM Document 81-2 Filed 10/11/23 Page 125 of 125
Venetian Hills Apartments, LLC 30(b)(6) - John Marghen
July 30, 2020

123

```
 1                        CERTIFICATE

 2

 3   STATE OF GEORGIA:

 4   COBB COUNTY:

 5

 6        I hereby certify that the foregoing transcript was

 7   taken down, as stated in the caption, and the questions and

     answers thereto were reduced to typewriting under my
 8
     direction; that the foregoing pages 1 through 122 represent a
 9
     true and correct transcript of the evidence given upon said
10
     hearing.
11
          The witness did reserve the right to read and sign
12
     the transcript.
13
          This, the 30th day of July 2020.
14

15

16

17

18

19

20

21

22

                         _____
23
                         DEBBIE C. HENNINGS, CCR-B-2007
24                       My commission expires the
                         1st day of April 2021
25
```