IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| MARIE HUGHES, as Administrator for the Estate of GEORGE HUGHES, deceased, )<br><br>Plaintiff, )<br><br>v. )<br><br>VENETIAN HILLS APARTMENTS, LLC, ) and JOHN MAUGHAN, )<br><br>Defendants. ) | CIVIL ACTION FILE<br><br>NO.  19A73694 |

VIDEOTAPED DEPOSITION OF
KAMARA WHEELER

July 18, 2021



APG USA, INC.
www.APGreporting.com
(770) 827-1223

```
          IN THE STATE COURT OF DEKALB COUNTY
                  STATE OF GEORGIA


MARIE HUGHES, as Administrator  )
for the Estate of GEORGE HUGHES,)
deceased,                       )
                                )
            Plaintiff,          )
                                ) CIVIL FILE ACTION
vs.                             )
                                ) NO. 19A73694
VENETIAN HILLS APARTMENTS, LLC, )
and JOHN MAUGHAN,               )
                                )
            Defendants.         )
_____)
```

              VIDEOTAPED DEPOSITION OF

                  KAMARA WHEELER

                  July 18, 2021

                   10:10 a.m.


              Pulaski State Prison

              373 Upper River Road

              Hawkinsville, Georgia


        Reported by:  Marsi Koehl, CCR-B-2424



APG USA, INC.
www.APGreporting.com
(770) 827-1223

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER              7/18/2021

```
 1                    C O N T E N T S
 2                  E X A M I N A T I O N
 3
 4                                            Page
```

```
 5   Examination by Mr. Grantham......................4
 6   Examination by Mr. Jackson.....................21
 7   Further examination by Mr. Grantham............32
 8   Further examination by Mr. Jackson.............33
```

```
 9
10
11
12                    E X H I B I T S
13
     Exhibit No.        Description           Page
14
15                   (None marked.)
16
17
18
19
20
21
22
23
24
25
```

***** C E R T I F I E D *****
APG USA INC.                          (888) 542-5598

Hughes v.                    Deposition of
Venetian Hills           KAMARA WHEELER              7/18/2021

```
 1   APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiff:

 3        KYLE R. JACKSON, SR.
          Attorney at Law
 4        SHIVER HAMILTON, LLC
          3490 Piedmont Road
 5        Suite 640
          Atlanta, Georgia  30305
 6        (404) 593-0020
          kjackson@shiverhamilton.com
 7

 8   On behalf of the Defendants:

 9        BRYAN M. GRANTHAM
          Attorney at Law
10        HAWKINS PARNELL & YOUNG, LLP
          303 Peachtree Street, NE
11        Suite 4000
          Atlanta, Georgia  30308
12        (404) 614-7400
          bgrantham@hpylaw.com
13
     -- and --
14
          M. RYAN DEL CAMPO
15        Attorney at Law
          GRAY RUST ST. AMAND MOFFETT & BRIESKE, LLP
16        Salesforce Tower Atlanta
          950 East Paces Ferry Road, NE
17        Suite 1700
          Atlanta, Georgia  30326
18        (404) 870-7373
          rdelcampo@grsmb.com
19

20

21

22        (Pursuant to OGCA 15-14-37 (a) and (b) a

23   written disclosure statement was submitted

24   by the court reporter and is attached

25   hereto.)
```

***** C E R T I F I E D *****

Hughes v.                        Deposition of
Venetian Hills              KAMARA WHEELER                 7/18/2021

```
 1                   P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  This will be the
 3         deposition of the Kamara Wheeler.  Today's
 4         date is August 18th, 2021, and the time is
 5         10:10 a.m. and we are on the record.
 6              Would the attorneys present please state
 7         their names and who they represent.
 8              MR. GRANTHAM:  Brian Grantham on behalf
 9         of Venetian Hills Apartments, LLC.
10              MR. DEL CAMPO:  Ryan Del Campo also on
11         behalf of Venetian Hills.
12              MR. JACKSON:  Kyle Jackson on behalf of
13         Marie Hughes who is the personal
14         administrator for the estate of George
15         Hughes.
16              THE VIDEOGRAPHER:  Would the court
17         reporter please swear in the witness.
18                        KAMARA WHEELER,
19    having been first duly sworn, was examined and
20    testified as follows:
21                        EXAMINATION
22    BY MR. GRANTHAM:
23         Q.  Ms. Wheeler, good morning.
24         A.  Good morning.
25         Q.  My name is Brian Grantham and I represent
```

1   Venetian Hills Apartments, LLC.

2          We just met this morning; is that correct?

3      A.  Yes.

4      Q.  Okay.  And can you just give us your full

5   legal name, please.

6      A.  Kamara Wheeler.

7      Q.  And, Ms. Wheeler, where do you currently

8   reside?

9      A.  I don't reside --

10     Q.  Where do you currently live?

11     A.  Here.

12     Q.  Okay.  And we're at Pulaski State Prison; is

13  that right?

14     A.  Yes.

15     Q.  Okay.  And how long have you been at Pulaski

16  State Prison?

17     A.  Like a month now.

18     Q.  And prior to Pulaski, where were you?

19     A.  Fulton -- Arrendale.

20     Q.  At Arrendale Prison?

21     A.  Mm-hmm.

22     Q.  And then prior to that where?

23     A.  Fulton County.

24     Q.  And have you essentially been in custody

25  since sometime in 2017?

Hughes v.                        Deposition of
Venetian Hills                   KAMARA WHEELER                    7/18/2021

```
 1      A.  Yes.

 2      Q.  I'm going to ask you some questions about an

 3 incident that happened in March of 2017 today.  Okay?

 4      A.  Mm-hmm.

 5      Q.  Do you recall at some point in March of 2017

 6 going to an apartment complex called Venetian Hills?

 7      A.  Yes.

 8      Q.  Where had you been right before you got to

 9 Venetian Hills?

10      A.  At the gas station.

11      Q.  A gas station near Venetian Hills?

12      A.  I can't -- it's like around the corner from

13 there.

14      Q.  Okay.  And when you were at the gas station,

15 did you meet someone there?

16      A.  Yes.

17      Q.  Do you remember that person's name?

18      A.  Not -- no.  I don't remember his name.

19      Q.  Do you think it was like maybe "Roger"?

20      A.  Yes.

21      Q.  Did you call him "Roger"?  Did he have a

22 nickname or something?

23      A.  No.

24      Q.  You just don't remember his name?

25      A.  I...
```

Hughes v.                    Deposition of
Venetian Hills           KAMARA WHEELER                7/18/2021

```
 1        Q.  Tell me sort of like the conversation you

 2   and Roger had and what you guys decided to do?

 3        MR. JACKSON:  Objection.  Hearsay.

 4   BY MR. GRANTHAM:

 5        Q.  Did Roger invite you to Venetian Hills?

 6        A.  Yes.

 7        Q.  What did you and Roger decide to do that

 8   night?

 9        A.  He's supposed to let me got some rest.  And

10   then when I got up, he's supposed to took me back to

11   where I was going.

12        Q.  Were you -- you said to get some rest?

13        A.  Mm-hmm.

14        Q.  Were you -- were you homeless at the time?

15        A.  Yes.

16        Q.  Okay.  And so Roger -- did Roger invite you

17   to his apartment to sleep or get some rest?

18        A.  Yeah.  He's supposed to have been taking me

19   on Cascade until he made another turn and took me

20   over there.

21        Q.  So you got in the car with Roger?

22        A.  Yes.

23        Q.  And he took you to the apartments at

24   Venetian Hills?

25        A.  Yes.
```

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER              7/18/2021

1       Q.  Do you remember what time of night that was?

2       A.  It was kind of early when he picked me up.

3       Q.  Was it dark out?

4       A.  It was almost dark.

5       Q.  So this is March of 2017.  So I'm guessing

6   almost dark, we're talking about like 6:00 or

7   7:00 p.m.

8           Does that sound about right?

9       A.  Yeah.

10      Q.  And so do you remember how long it took to

11  get from the gas station to the apartment?

12      A.  No.  It wasn't long.  It wasn't long.

13      Q.  It was kind of in the area?

14      A.  Yeah.

15      Q.  And then when you got to the apartment, what

16  did you guys do?

17      A.  I went up to his apartment and we went to

18  his room.  I fell asleep for a minute.

19      Q.  Can I stop you there for a second?

20      A.  Mm-hmm.

21      Q.  Do you remember where his room was in the

22  apartment?

23      A.  Upstairs.

24      Q.  So this is an apartment.  Did it have like a

25  downstairs and an upstairs?

Hughes v.                    Deposition of
Venetian Hills           KAMARA WHEELER              7/18/2021

```
 1        A.  Yeah.
 2        Q.  Do you remember, was there like a bedroom
 3   downstairs?
 4        A.  Not that I know of.  He just took me
 5   straight upstairs.
 6        Q.  And when you got to the apartment, did you
 7   see anybody else in the apartment?
 8        A.  No, sir.
 9        Q.  So you went upstairs to, presumably, his
10   bedroom?
11        A.  Yeah.
12        Q.  Okay.  And then while you were there, did
13   you lie down?  What did you do?
14        A.  Yeah.  I went -- I changed clothes because
15   it was raining outside.  And I dozed off for a
16   minute.  And my knowledge that with -- the police ran
17   the camera and said he left and came back.  I didn't
18   know that he left and came back.
19        Q.  You don't know whether he left or came back
20   or not?
21        A.  No.
22        Q.  Do you -- when -- do you know what time it
23   was when you next saw that gentleman?
24        A.  No.
25        Q.  Do you know if it was minutes or hours later
```

***** C E R T I F I E D *****
APG USA INC.                              (888) 542-5598

Hughes v.                     Deposition of
Venetian Hills              KAMARA WHEELER              7/18/2021

```
 1   or do you know one way or the other?

 2        A.   It was -- I probably sleep for a good

 3   minute.

 4        Q.   So you got some sleep?

 5        A.   Yeah.

 6        Q.   And then at some point he comes back to the

 7   apartment?

 8        A.   He was there when I woke up.

 9        Q.   So he's there when you woke up?

10        A.   Mm-hmm.

11        Q.   Is he like sitting on the bed?  Is he

12   sitting next to you?

13        A.   Yeah.  He was sitting on the bed.

14        Q.   Did you-all have a conversation at that

15   point?

16        A.   Yeah.

17        Q.   What was the conversation?

18             MR. JACKSON:  Objection.  Hearsay.

19   BY MR. GRANTHAM:

20        Q.   At some point Mr. Liddell spoke to you and

21   then what did you guys do next?

22        A.   He wanted me to get high with him.

23        Q.   Did you?

24        A.   Eventually, yeah.

25        Q.   What drug were you-all using?
```

***** C E R T I F I E D *****

Hughes v.                          Deposition of
Venetian Hills            KAMARA WHEELER                7/18/2021

```
 1        A.  Crack.

 2        Q.  Did you smoke it or what did you do?

 3        A.  Yeah.  He -- yeah.

 4        Q.  Did he have like a pipe or what did you-all

 5   use?

 6        A.  Yeah.  He had a pipe.

 7        Q.  Okay.  And had you used crack before?

 8        A.  Yeah.

 9        Q.  And so how did it sort of affect you?  I

10   mean, do you kind of get high?  Can you try to

11   describe how it feels to you?

12        A.  It wasn't -- to be honest with you, I don't

13   think it was what he said he gave me.

14        Q.  You're skeptical as to whether it was

15   actually crack?

16        A.  Yeah.

17        Q.  Because it didn't affect you the way crack

18   had affected you in the past?

19        A.  Huh-uh.

20        Q.  Is that a no?

21        A.  No.

22        Q.  What kind of happened next after you smoked

23   what he told you was crack?

24        A.  I started feeling -- like my heart started

25   beating real fast.  And I got real scared, so I told
```

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills              KAMARA WHEELER                7/18/2021

1   him -- I asked him to take me to Cascade.

2        Q.  Were you feeling bad?

3        A.  Yes.  And he was like he was going to take

4   me, but I kept rushing him to take me.  And by that

5   time, he started asking me to give him some head and

6   stuff.

7        Q.  He wanted you to perform sex on him?

8        A.  Yes.

9        Q.  And I take it you did not want to?

10       A.  No.

11       Q.  You wanted to leave?

12       A.  I wanted to leave.

13       Q.  And so I assume -- did you tell him no?

14       A.  Yeah.

15       Q.  And how did he take that?

16       A.  He got upset.

17       Q.  What did you do when he got upset?

18       A.  I called -- excuse me -- I called my friend.

19   And then my friend told me he can't come pick me up,

20   so then I called the police.  And by the time I

21   called the police -- I didn't want him to know that I

22   was calling the police.  So I put the phone down and

23   the phone hung up and I guess they called back.

24       Q.  So let's go through that.

25            After you told him no, you called someone

Hughes v.                     Deposition of
Venetian Hills                KAMARA WHEELER                7/18/2021

```
 1  and asked them to come pick you up?

 2       A.   Mm-hmm.

 3       Q.   And then you also called -- did you also

 4  call the police?

 5       A.   Yes.

 6       Q.   And so after you called the police, it

 7  sounds -- did you hang up on the police and then they

 8  called back?

 9       A.   Mm-hmm.

10       Q.   What happened exactly?

11       A.   I think the phone -- I think the phone hung

12  up.  I didn't hang up the phone.

13       Q.   And then did 911 call you back?

14       A.   They called back and he -- I think he

15  answered the phone.  And that's when he really,

16  really got mad.

17       Q.   So did he seem angry after he answered the

18  phone?

19       A.   Yes.

20       Q.   And after he got angry talking on the phone,

21  like did he -- did he hang it up or what did he do

22  with the phone?

23       A.   No.  He put it -- I think he put it back in

24  his pocket or something.

25       Q.   Was it his phone or was it your phone?
```

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills              KAMARA WHEELER              7/18/2021

1      A.  It was his phone.

2      Q.  And so after that gentleman put the phone

3  back in his pocket, what did you do next?

4      A.  I wanted to leave out of the house and he

5  just stood in front of the door blocking me, wouldn't

6  let me out.

7      Q.  Was this in front of the bedroom door?

8      A.  Yes.

9      Q.  And when you go upstairs, am I right that

10 you kind of turn left and go towards the bedrooms?

11     A.  I think so.

12     Q.  Do you remember if his bedroom was like on

13 the left, on the right, just walk straight to get to

14 it?

15     A.  I think when -- when you go up the steps,

16 it's -- yeah, you have to go around a little bit...

17     Q.  And so what did you sort of do next?

18     A.  We tussled a little bit.  And by that time I

19 really got tired of like fighting with him and I kind

20 of gave in to giving him head, but once I tried to

21 start, I didn't do it.

22          And we were arguing and then the door -- I

23 kind of pulled the door open and ran downstairs.  I

24 tried to unlock the door, but he had locks on the

25 door, so --

***** C E R T I F I E D *****
APG USA INC.                                    (888) 542-5598

Hughes v.                     Deposition of
Venetian Hills          KAMARA WHEELER                7/18/2021

```
 1        Q.  Is this the exterior door that goes out into

 2   the parking lot that was locked?

 3        A.  The door that you come in and out of.

 4        Q.  That's the door that if you would have

 5   gotten out of that door, it would have taken you out

 6   to like the parking lot?

 7        A.  Yeah.

 8        Q.  And so when you tried to open that door, is

 9   it your testimony you just weren't able to?

10        A.  I unlocked the lock, but it was some things

11   on there kind of...

12        Q.  Like a chain?

13        A.  Yeah.

14        Q.  And is it your testimony that you couldn't

15   get the chain --

16        A.  I couldn't get it off of there.

17        Q.  And so at that point, what did you decide to

18   do?

19        A.  I hid in the closet.

20        Q.  Where was the closet in relation to that

21   entry and exit door?

22        A.  Like -- like from the door to probably like

23   right there in front of -- not too far from the door.

24        Q.  Does it sound like maybe it was like five or

25   six feet away?
```

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills               KAMARA WHEELER              7/18/2021

1        A.  Yeah, probably so.

2        Q.  And so when you got in the closet, what did

3   you decide to do?

4        A.  He came downstairs.  And I just took my

5   lighter and I took a sock and I started a fire.

6        Q.  So was there a sock kind of in that closet?

7        A.  No.  I already had it myself.

8        Q.  So this -- was this your sock?

9        A.  Mm-hmm.

10       Q.  Is that a yes?

11       A.  Yes.

12       Q.  And so you took your lighter and you lit

13   your sock.  Is that how the fire started?

14       A.  Yes.

15       Q.  Did -- tell me what you kind of did with the

16   sock after you lit it?

17       A.  I dropped it.  It was -- it was a lot of

18   sheets in the closet and I dropped the sock on it.

19       Q.  After you lit the sock and dropped it on the

20   sheets, what did you do next?

21       A.  By that time, he was like standing there.  I

22   guess he was unlocking the door, but I don't know if

23   he left the door and went past the closet I was in

24   and went around another way.  So I went out the door.

25       Q.  So when -- after you lit the sock, dropped

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills              KAMARA WHEELER              7/18/2021

```
 1  it, you opened the closet door; is that right?

 2       A.   I didn't open it right then and there.

 3       Q.   The closet door?

 4       A.   I waited until he walked past, then I came

 5  out.

 6       Q.   How could you tell from the closet that he

 7  walked past or not?

 8       A.   Because it was halfway cracked.

 9       Q.   Okay.  You didn't -- the closet door was not

10  fully shut?

11       A.   It wasn't fully shut.

12       Q.   And so you -- were you able to look through

13  the crack in the door and --

14       A.   I seen when he walked past.

15       Q.   Could you tell whether he knew whether you

16  were in the closet?

17       A.   I don't think he knew I was in there.

18       Q.   And so do you think he knew that you had lit

19  a sock?

20       A.   No.

21       Q.   So where did you see him go, looking through

22  the crack in the closet?

23       A.   He went around -- it was another little wall

24  right here and he went around it.

25       Q.   So -- but he -- did you see him go outside
```

***** C E R T I F I E D *****

Hughes v.                        Deposition of
Venetian Hills            KAMARA WHEELER            7/18/2021

```
 1  the front door?
 2       A.  No.  He didn't go outside the front door.
 3       Q.  So after you see him go around, what did you
 4  do next?
 5       A.  I went out.  I went out the door.
 6       Q.  Was it your testimony earlier that you had
 7  seen him unlatch that front door?
 8       A.  Yeah, he did.
 9       Q.  And so how long do you think it was from the
10  time you lit the sock, dropped it on the sheets until
11  you left out that door?
12       A.  It wasn't -- it wasn't long.
13       Q.  Seconds?
14       A.  It was -- yeah, it was some seconds.
15       Q.  What did you do after you ran out the front
16  door?
17       A.  I walked through the parking lot and I left.
18       Q.  Did you ever get an indication that this was
19  going to be a big fire?
20       A.  No.
21       Q.  Did you ever see sort of like the whole
22  apartment engulfed in flames or anything like that?
23       A.  No.
24       Q.  Did you know that there were other people in
25  the unit other than the gentleman you were with?
```

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER                    7/18/2021

```
 1        A.  No.

 2        Q.  And so when do you -- when did you learn

 3   that this was a serious fire?

 4        A.  Probably like days later when I was at this

 5   store that I used to be sleeping at.  And this man

 6   told me -- he was like -- I would ask him for some

 7   change and he was like, You're famous.  I thought he

 8   was talking about this show that I was in in Fulton

 9   County.

10             And then I didn't pay no mind until I kept

11   walking like days later.  And I think the police -- I

12   was coming from a friend's house and the police

13   stopped me and told me they was looking for me for a

14   fire.  And they didn't tell me what happened until I

15   got all the way to jail.

16        Q.  Do you remember how many days it was after

17   the fire before you got arrested?

18        A.  No.

19        Q.  I think I read you might have been arrested

20   like on a probation violation or some other kind of

21   warrant?

22        A.  Yeah.

23        Q.  Do you remember?

24        A.  They stopped me and said I had a warrant and

25   she was telling me that -- a man told me that I was
```

***** C E R T I F I E D *****

```
 1  being questioned for a fire in some apartments.

 2      Q.  And so after you were arrested for an

 3  unrelated warrant, they questioned you -- did they

 4  question you about the fire?

 5      A.  Yeah.  He was standing outside the car and

 6  he told me somebody's going to come and see me.

 7      Q.  And when the police asked you about the

 8  fire, did you basically tell them the same story you

 9  told us today?

10      A.  Yes.

11      Q.  When did you learn that someone passed away

12  in the fire?

13      A.  When I was arrested in Fulton County and

14  investigators came and got me.

15      Q.  So sometime that day when you were

16  questioned, that was the first time you learned that

17  someone passed away?

18      A.  I was -- when they arrested me, I was in

19  Fulton County for like probably about two days and

20  then somebody came and took me down to the place to

21  be questioned.

22          MR. GRANTHAM:  One second, Ms. Wheeler.

23          (Brief pause.)

24  BY MR. GRANTHAM:

25      Q.  Ms. Wheeler, did you get an understanding of
```

 1 | how you were identified as the person who set the

 2 | fire?

 3 |      A.  Yeah.  They told me that this person -- this

 4 | lady seen me walking out the apartment.

 5 |      Q.  So you were told a witness identified you?

 6 | A.  Yes.

 7 |      MR. GRANTHAM:  Thank you, Ms. Wheeler.

 8 |      Those are my questions.  Mr. Jackson will

 9 |      have some questions for you.

10 |      MR. JACKSON:  Can we go off the record?

11 |      I just want to collect my thoughts real

12 |      quick.

13 |      THE VIDEOGRAPHER:  Off the record at

14 |      10:28.

15 |      (Brief pause from 10:28 a.m. to

16 |      10:30 a.m.)

17 |      THE VIDEOGRAPHER:  Back on the record at

18 |      10:30.

19 |                    EXAMINATION

20 | BY MR. JACKSON:

21 |      Q.  Okay.  Ms. Wheeler, you mentioned that you

22 | were in the room with the gentleman you believed was

23 | named "Roger;" correct?

24 |      A.  Yes.

25 |      Q.  And you don't know whether he left or came

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER                    7/18/2021

```
 1  back or whatever the case, but when you woke up, he
 2  was sitting on the bed?
 3      A.  Yes.
 4      Q.  You mentioned that you-all did the
 5  activities you did that night and then he began to
 6  request that you perform sexual acts on him; right?
 7      A.  Right.
 8      Q.  Okay.  Was that a request or was it more of
 9  like him telling you --
10      A.  Demanding.
11      Q.  He was demanding it?
12      A.  Yeah.
13      Q.  So he was trying to force sex on you?
14      A.  Yes.
15      Q.  You didn't want to have sex --
16      A.  I didn't want to.
17      Q.  When -- you mentioned that you had his phone
18  and you tried to call a friend first.
19          How did you get his phone?
20      A.  He let me use it.
21      Q.  Okay.  So he let you use it for the purposes
22  of calling a friend?
23      A.  Mm-hmm.
24      Q.  And you said that that friend couldn't come
25  to get you?
```

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER              7/18/2021

```
 1        A.  No.

 2        Q.  Okay.  And so if I'm understanding

 3   correctly, when you couldn't get a friend to come get

 4   you, you then placed a call to 911?

 5        A.  Yes.

 6        Q.  Did you call that friend because you were

 7   hoping that friend could rescue you from the

 8   situation?

 9        A.  Yeah.

10        Q.  And so because your friend couldn't rescue

11   you, then you called 911 to rescue you?

12        A.  Yes.

13        Q.  And you mentioned that you kind of put the

14   phone down, the phone hung up.  Were you sneaking at

15   that point --

16        A.  Yeah.

17        Q.  -- because you were just trying to get ahold

18   of 911 without him finding out?

19        A.  Right.

20        Q.  Is that because you feared what he might do

21   if he found out you were calling 911?

22        A.  Yeah.

23        Q.  And so then you said Roger got angry; right?

24        A.  He did.

25        Q.  So he then actually started to act what you
```

***** C E R T I F I E D *****

1   were afraid he would do?

2        A.  Yeah.

3        Q.  And then at that point Roger blocked you

4   from leaving; right?

5        A.  Yes.

6        Q.  So at that moment, even if you wanted to

7   leave, you had to essentially encounter this grown

8   man to be able to escape?

9        A.  Yes.

10       Q.  Had Roger not blocked you that night, would

11  you have just left?

12       A.  Left out the door.

13       Q.  Okay.  And you would have never had to start

14  a fire?

15       A.  Right.

16       Q.  But Roger, as we know, did block you that

17  night?

18       A.  Yes.

19       Q.  And, eventually, you were able to get free?

20       A.  Yes.

21       Q.  And when you were free, you actually tried

22  to leave the apartment, right --

23       A.  Yeah.

24       Q.  -- without ever starting a fire?

25       A.  Yes.

Hughes v.                    Deposition of
Venetian Hills           KAMARA WHEELER                  7/18/2021

```
 1        Q.  Okay.  But because of way that the door was

 2   constructed, you weren't able to leave quickly?

 3        A.  Right.

 4        Q.  So instead of leaving quickly, you found

 5   yourself retreating to a closet, right --

 6        A.  Yes.

 7        Q.  -- because you were hiding --

 8        A.  Yes.

 9        Q.  -- because you were scared --

10        A.  Yes.

11        Q.  -- of Roger?

12        A.  Yes.

13        Q.  -- and what Roger might do to you

14   physically?

15        A.  Yes.

16        Q.  So in that fear, if I understand you

17   correctly, you grabbed the only thing that you had

18   that could help you get away; right?  That was your

19   lighter --

20        A.  My lighter.

21        Q.  -- and your sock?

22        A.  Mm-hmm.

23        Q.  Okay.  And you lit the sock?

24        A.  Mm-hmm.

25        Q.  Okay.  And you lit that sock as kind of a
```

Hughes v.                  Deposition of
Venetian Hills        KAMARA WHEELER              7/18/2021

```
 1  diversion; right?
 2       A.   (No audible response.)
 3       Q.   Okay.  So you were never intending to harm
 4  anyone?
 5       A.   Nobody.
 6       Q.   Not even Roger?
 7       A.   Not even him.
 8       Q.   Right.  You just wanted a way to get out --
 9       A.   Right.
10       Q.   -- an escape plan so to speak?
11            Okay.  And so you saw the sheets, you had
12  your lighter, you had your sock and you essentially
13  formed your escape plan; right?
14       A.   Yes.
15       Q.   Okay.  And as you said, that fire was a
16  small fire; right?
17       A.   Small.
18       Q.   Was it small enough that you think
19  sprinklers like the ones we have in here, if they
20  existed in that apartment, could have suppressed it?
21       A.   It was small.
22       Q.   Right.  So those sprinklers could have made
23  a difference?
24       A.   Yes.
25            MR. GRANTHAM:  Objection.  Foundation.
```

Hughes v.                    Deposition of
Venetian Hills              KAMARA WHEELER              7/18/2021

```
 1  BY MR. JACKSON:

 2      Q.  Have you lived in apartment complexes before

 3  or in buildings that have sprinkler systems before?

 4      A.  Yes.

 5      Q.  Okay.  Have you seen videos, whether on the

 6  news or TV, of how sprinkler systems work?

 7      A.  Yes.

 8      Q.  And have you seen how sprinkler systems like

 9  the ones that we have in this room --

10      A.  Mm-hmm.

11          (Reporter requests counsel slow down.)

12          THE WITNESS:  Yes.

13  BY MR. JACKSON:

14      Q.  And you've seen how sprinkler systems like

15  the ones in this room, when there's a fire, can help

16  condense the size of that fire; right?

17      A.  Yes.

18      Q.  You've seen that?

19      A.  Yes.

20      Q.  So you have knowledge about how these

21  sprinkler systems work?

22      A.  Yes.

23      Q.  And with that knowledge had a sprinkler

24  system like these been in place on that night with

25  the size fire that you saw, you know, do you believe
```

***** C E R T I F I E D *****

Hughes v.                      Deposition of
Venetian Hills            KAMARA WHEELER                  7/18/2021

```
 1   that they would have been able to help suppress a

 2   fire of that size?

 3        A.  Yes.

 4             MR. GRANTHAM:  Objection.  Foundation.

 5        Calls for expert testimony.

 6   BY MR. JACKSON:

 7        Q.  And your opinion regarding what those

 8   sprinkler systems could have done with a fire that

 9   size that you saw on that night is based on your

10   perception of how you know sprinkler systems work and

11   the size fire that was present; right?

12        A.  Yes.

13             MR. GRANTHAM:  Same objection.

14   BY MR. JACKSON:

15        Q.  And you said, as you were sitting in that

16   closet, you heard Roger walk by --

17        A.  Yes.

18        Q.  -- right?

19             And you heard Roger and you could see him

20   through the crack of the door --

21        A.  Yes.

22        Q.  -- unlock that door; right?

23        A.  Yes.

24        Q.  Okay.  So now you have an opportunity to

25   escape out of the front door; right?
```

***** C E R T I F I E D *****

Hughes v.                  Deposition of
Venetian Hills             KAMARA WHEELER              7/18/2021

```
 1        A.   Yes.

 2        Q.   And then Roger went around the corner;

 3   right?

 4        A.   Yes.

 5        Q.   And then that's when you took your shot to

 6   get out without him finding out and got out of that

 7   door --

 8        A.   Yes.

 9        Q.   -- right?

10             It was never your intention that night --

11        A.   No.

12        Q.   -- to light a fire?

13        A.   No.

14        Q.   It was never your intention that night to

15   harm anyone --

16        A.   No.

17        Q.   -- not even Roger?

18        A.   Not even him, no.

19        Q.   And that was the first time you had ever

20   been to Venetian Hills Apartments in Unit I-5; right?

21        A.   With him, yes.

22        Q.   And you had no idea that any other person

23   was living in that unit; right?

24        A.   No.

25        Q.   It just -- you thought it was simply
```

***** C E R T I F I E D *****

```
 1  entirely Roger's townhome unit; right?

 2      A.  That's what he told me.  He -- he told me

 3  that he owned the place, like it was his.

 4      Q.  Okay.  So there was no way whether you did

 5  or even could have known that there was another

 6  person in there?

 7      A.  No.

 8      Q.  And, regardless, you weren't trying to hurt

 9  anybody?

10      A.  Nobody.

11      Q.  Not even Roger?

12      A.  Not even him.

13      Q.  At any point in time while you were in that

14  closet after that lighter -- after -- excuse me,

15  after that fire had been lit, did you hear any smoke

16  detectors go off?

17      A.  No.

18      Q.  Did you ever see any smoke detectors

19  while --

20      A.  No.

21      Q.  -- you were in there?

22          Did you ever see any fire alarms like the

23  ones you pull on the wall?

24      A.  No.

25      Q.  Did you ever see any fire alarms like, you
```

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER              7/18/2021

```
 1   know, perhaps, the ones that are in a hotel that have

 2   the white lights that flash?

 3        A.  No.

 4        Q.  And you never saw any sprinkler systems?

 5        A.  No.

 6        Q.  And even after you lit that fire and you

 7   escaped from Roger's attempts to harm you, it wasn't

 8   until days later that you learned that Mr. Hughes had

 9   been killed in this fire?

10        A.  Yes.

11        Q.  And if it's my understanding, the night all

12   began simply because you trusted Roger enough to take

13   you to another location near Cascade that you were

14   used to sleeping on?

15        A.  Yes.

16        Q.  And he never took you there?

17        A.  He never took me there.

18        Q.  Right.  He took you back to his place?

19        A.  Yes.

20        Q.  And this apartment unit, as you've now

21   learned, you know, was subdivided.  It was chopped up

22   and allowed for other people to live there --

23        A.  Yes.

24        Q.  -- right?

25            And wouldn't you agree that if Roger truly
```

Hughes v.                    Deposition of
Venetian Hills        KAMARA WHEELER              7/18/2021

1  had this unit by himself, right, and all things

2  stayed the same, you still lit that fire, if it's not

3  subdivided and chopped up in the way that it was,

4  George wouldn't have even been in that unit to have

5  been injured in the fire; right?

6      A.  Yes.  He told me that he was staying there

7  by himself.

8      Q.  Right.  And that's the point I'm making.

9          Had the unit itself not been chopped up and

10 subdivided and allowed other people from different

11 families to live in the same townhome, even if it had

12 only been Roger and you lit that fire, George

13 wouldn't have been present to be hurt; right?

14     A.  No.

15         MR. JACKSON:  Okay.  That's all that I

16     have.

17         MR. GRANTHAM:  Ms. Wheeler, just a

18     couple of questions.

19                 FURTHER EXAMINATION

20 BY MR. GRANTHAM:

21     Q.  You were -- am I right that you were

22 eventually charged with murder and arson?

23     A.  Yes, sir.

24     Q.  And did you eventually enter a guilty plea?

25     A.  Yes, sir.

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER                7/18/2021

```
 1        Q.  And did you plea guilty to voluntary
 2   manslaughter?
 3        A.  Yes.
 4        Q.  And also to -- did you also plead guilty to
 5   arson?
 6        A.  Yes.
 7        Q.  And is the sentence you received 20 years to
 8   serve on the voluntary manslaughter?
 9        A.  Yes, sir.
10        Q.  And did you receive five years probation on
11   the arson?
12        A.  Yes.
13            MR. GRANTHAM:  Thank you, Ms. Wheeler.
14            THE WITNESS:  You're welcome.
15            MR. JACKSON:  Just a brief recross.
16                    FURTHER EXAMINATION
17   BY MR. JACKSON:
18        Q.  I understood -- understand that you entered
19   a plea agreement on those charges, but was that for
20   the benefit of being able to reduce your time in
21   prison?
22        A.  I did it because he was innocent and I
23   didn't mean to hurt him.  That's why I took the time.
24        Q.  So you took it for your own -- for your
25   moral -- for morality's sake?
```

***** C E R T I F I E D *****

Hughes v.                    Deposition of
Venetian Hills          KAMARA WHEELER              7/18/2021

```
 1       A.  Yes, for him.  Because I didn't -- I didn't
 2  want -- I really didn't want nobody to get hurt in
 3  that.  So to find out that he had died, it really
 4  hurt me.  Sorry.  (Witness crying.)
 5          MR. JACKSON:  I understand.
 6          (Brief pause.)
 7  BY MR. JACKSON:
 8       Q.  Ms. Wheeler, can we agree that the only
 9  reason you did the things that you did that night was
10  because a man was trying to force sexual behavior
11  that you did not want --
12       A.  Yes.
13       Q.  -- onto you?
14          Was that a yes?
15       A.  Yes.
16          MR. JACKSON:  That's all that I have,
17      Ms. Wheeler.
18          MR. GRANTHAM:  That's all.
19          THE VIDEOGRAPHER:  Going off the record
20      at 10:41.
21          (Deposition concluded at 10:41 a.m.)
22          (Signature waived.)
23
24
25
```

***** C E R T I F I E D *****

Hughes v.                   Deposition of
Venetian Hills              KAMARA WHEELER              7/18/2021

```
 1                       CERTIFICATE

 2

 3    STATE OF GEORGIA:

 4    COUNTY OF FULTON:

 5

 6         I hereby certify that the foregoing

 7    transcript was taken down, as stated in the caption,

 8    and the colloquies, questions, and answers were

 9    reduced to typewriting under my direction; that the

10    transcript is a true and correct record of the

11    evidence given upon said proceeding.

12         I further certify that I am not a relative

13    or employee or attorney of any party, nor am I

14    financially interested in the outcome of this action.

15         This the 8th day of September, 2021.

16

17

18

19    _____

20         Marsi Koehl, CCR-B-2424

21

22

23

24

25
```

***** C E R T I F I E D *****

APG USA INC.                              (888) 542-5598

Hughes v.                    Deposition of
Venetian Hills            KAMARA WHEELER              7/18/2021

```
 1 |                    DISCLOSURE

 2 |

 3 | STATE OF GEORGIA:

 4 | COUNTY OF DEKALB:

 5 |          Deposition of KAMARA WHEELER.

 6 |          Pursuant to Article 8.B. of the Rules and
   | Regulations of the Board of Court Reporting of the
 7 | Judicial Counsel of Georgia, I make the following
   | disclosure:
 8 |
   |          I am a Georgia Certified Court Reporter
 9 | acting as an agent of APG USA, Inc., who was contacted
   | by the offices of Hawkins Parnell & Young, to provide
10 | court reporting services for this deposition.  I will
   | not be taking this deposition under any contract that
11 | is prohibited by O.C.G.A. 15-14-37 (a) and (b).

12 |          APG USA, Inc., has no contract to provide
   | reporting services with any party to the case, any
13 | counsel in the case, or any reporter or reporting
   | agency from whom a referral might have been made to
14 | report this deposition.  APG USA, Inc., will charge
   | its usual and customary rate to all parties in the
15 | case, and a financial discount will not be given to
   | any party to this litigation.
16 |

17 |

18 |

19 |

20 |  Marsi Koehl, CCR-B-2424              Date: 9/8/21

21 |

22 |

23 |

24 |

25 |
```

***** C E R T I F I E D *****

APG USA INC.                                    (888) 542-5598