# EXHIBIT

# "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| KINSALE INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION FILE NO: |
| ) | 1:21-cv-03214-LMM |
| v. ) | |
| ) | **DISPOSITIVE MOTION** |
| VENETIAN HILLS APARTMENTS, ) | |
| LLC, JOHN MAUGHAN, and MARIE ) | |
| HUGHES, as Authorized Administrator ) | |
| for the Estate of GEORGE HUGHES, ) | |
| ) | |
| Defendants. | |

## KINSALE INSURANCE COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT

KINSALE INSURANCE COMPANY ("Kinsale"), pursuant to Fed. R. Civ.

P. 56 and LR 56, NDGa., files this brief in support of its motion for final summary

judgment against VENETIAN HILLS APARTMENTS, LLC ("Venetian") and

MARIE HUGHES, as Authorized Administrator for the Estate of GEORGE

HUGHES ("Estate"),[1] and in support states:

---

[1] Kinsale also filed suit against John Maughan in this action. Maughan is not addressed in this brief because he was dropped from the underlying lawsuit. The parties have also stipulated that Kinsale's claims against Maughan are now moot. [Dkt. No. 82.]

## INTRODUCTION

This coverage dispute arises from the underlying lawsuit by the Estate ("Underlying Lawsuit") against Venetian over an arson fire at the Venetian Hills Apartments complex ("Premises") that killed George Hughes. It is undisputed the fire was an act of criminal arson by Kamara Wheeler, who is presently sitting in prison. The Estate sued Venetian in an operative, amended complaint ("Underlying Complaint") for failing to maintain the Premises in a safe condition. The Underlying Complaint is silent regarding the cause of the fire.

Kinsale does not have a duty to defend for two reasons.

I.   The Policy has a **Failure to Maintain Exclusion** that expressly excludes coverage for any alleged failure to maintain the Premises in a safe or habitable condition, which is the entire basis for the Underlying Complaint. Defendants have never articulated a coherent argument on why the exclusion does not apply.

II.  The Policy has an **Assault and Battery Exclusion** and it is undisputed that the fire was caused by arson. The Underlying Complaint does not allege anything to the contrary and the facts surrounding the crimes by Kamara Wheeler are undisputed.

## ARGUMENT AND CITATION OF AUTHORITY

**Summary Judgment Standard:** Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the Court must examine "materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only); admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The interpretation of an insurance policy is a matter of law and can be decided on summary judgment. *Maxum Indem. Co. v. Jimenez*, 734 S.E.2d 499, 501 (Ga. Ct. App. 2012).

**Duty to Defend:** An insurer's duty to defend is generally determined by comparing the allegations of the complaint against the insured with the provisions of the policy. *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Ass'n, Inc.*, 654 S.E.2d 207, 209 (Ga. Ct. App. 2007). If a lawsuit against an insured falls within the scope of an exclusion, there is no duty to defend. *See Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997).

**Enforcing Policy Language:** Under Georgia law, construction of an insurance contract is a matter of law for the court. *Jimenez*, 734 S.E.2d at 501. Courts look to the text of the insurance policy for the outcome. *Georgia Farm Bureau Mut. Ins. v. Smith*, 784 S.E.2d 422, 424 (Ga. 2016). If a provision is unambiguous, it must be enforced as written. *See Zurich Am. Ins. Co. v. Omni Health Sols., LLC,* 774 S.E.2d 782, 784 (Ga. Ct. App. 2015) ("Unambiguous terms of an insurance policy require no construction, and the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the

insured."); *Scottsdale Ins. Co. v. Great Am. Assur. Co.*, 610 S.E.2d 558, 560 (Ga. Ct. App. 2005) ("Construction of an insurance policy is governed by the ordinary rules of contract construction, and when the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent."). The same logic applies to exclusions. *See Nationwide Mut. Fire v. Somers*, 591 S.E.2d 430, 434 (Ga. Ct. App. 2003). That is because insurers are "free to fix the terms of its policies as it sees fit, so long as they are not contrary to law, and it may insure against certain risks while excluding others." *Owners Ins. v. Smith Mech. Contractors, Inc.*, 670 S.E.2d 213, 215 (Ga. Ct. App. 2008), *aff'd*, 683 S.E.2d 599 (Ga. 2009).

## I. THERE IS NO DUTY TO DEFEND UNDER THE FAILURE TO MAINTAIN EXCLUSION.

As a matter of law, the Failure to Maintain Exclusion applies because the Estate sued Venetian for failing to maintain the Premises in a safe condition. By its plain language, the exclusion bars coverage for "any claim or 'suit' for 'bodily injury' … arising directly or indirectly out of, related to, or, in any way involving:" (1) "[a]ny failure to maintain any premises in, or restore any premises to a safe, sanitary, healthy, habitable and tenantable condition;" or (2) "[a]ny actual or alleged violation, whether or not intended to cause injury or damage, of: …[a]ny Housing and Urban Development laws, ordinances or statutes; … or

administrative rules or regulations pertaining to [the preceding], including but not limited to those promulgated by local authorities." [Policy, Dkt. No. 1-6, at 51.]

### A. The Failure to Maintain Exclusion Bars Coverage For Claims Involving Georgia's Statutory Warranty Of Habitability.

The Failure to Maintain Exclusion is designed to bar coverage for not only claims involving failure to maintain a premises in a safe condition, but also claims of habitability. Indeed, it applies to "[a]ny failure to maintain any premises in, or restore any premises to a safe, sanitary, healthy, habitable and tenantable condition," which mirrors the general definition for the warranty of habitability. Notably, a majority of states have adopted the implied warranty of habitability for residential leases, either by statute or case law. Georgia is the same.

Georgia codified the warranty of habitability in O.C.G.A. § 44-7-13, which requires a landlord to "keep the premises in repair." The Supreme Court of Georgia addressed that statute in *Thompson v. Crownover*, 381 S.E.2d 283 (Ga. 1989). That case involved burns sustained by a tenant from flames emanating from a deteriorating gas heater. *Id.* at 283-84. In *Thompson*, the Supreme Court of Georgia recognized that the legislature's finding that "people with low incomes are forced to live in unsafe housing and that such living conditions constitute a menace to the health and safety of all the residents of Georgia." *Id.* at 284. The Court also recognized that the statutory warranty of habitability was enacted to advance several public policies, including imposing liability on landlords for "defective

construction and failure to keep … premises in repair;" and "an equally strong and important public policy in favor of preventing unsafe residential housing." *Id.* at 285. Georgia's public policy also mirrors the following rule from The *Restatement of Law (Second), Property*, § 17.6, which provides:

> A landlord [should be] subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenants by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:
>
> (1)     an implied warranty of habitability; or
>
> (2)     a duty created by statute or administrative regulation.

*Thompson*, 381 S.E.2d at 285. The guidance from *Thompson* is clear—landlords in Georgia owe their tenants duties of repair and habitability under O.C.G.A. § 44-7-13.

### B.     The Failure To Maintain Exclusion Applies.

The Failure to Maintain Exclusion applies to any lawsuit with any connection whatsoever to failure to maintain a premises in a safe and habitable condition. The exclusion includes the broadest possible lead-in language available in any insurance policy—"*arising out of, related to, or, in any way involving*."

The "*in any way involving*" lead-in phrase is so broad it is commonly referred to as a "mop up" clause because it comes in and excludes everything that was not

already excluded by the other phrases. *See RLI Ins. Co. v. Coastline Title of Pinellas, LLC*, 591 F. Supp. 3d 1182, 1189--90 (M.D. Fla. 2022) (holding "*in any way involving*" is a mop-up clause intended to exclude anything not already excluded by the other clauses) (quoting *Clark Sch. For Creative Learning, Inc. v. Phila. Indem. Ins. Co.*, 734 F.3d 51, 56 (1st Cir. 2013)). That "language is extremely broad in scope, and it indicates that the provision applies to any claim even remotely involving" an excluded cause of loss. *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1303 (11th Cir. 2022). *See also Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018) (the phrase only requires a "tenuous connection" to some excluded cause of loss) (quoting *Vozzcom, Inc. v. Great Am. Ins. Co.*, 666 F. Supp. 2d 1332, 1340 (S.D. Fla. 2009)); *W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 437 (8th Cir. 2011) (the phrase "incorporates all reasonable definitions of the word 'involving,' including those not requiring a causal connection, such as 'to have within or as part of itself.'"); *Colorado Boxed Beef Co. v. Evanston Ins. Co.*, No. 8:18-cv-01237, 2018 WL 5312026, at *2 (M.D. Fla. Oct. 26, 2018) ("the phrase … is broad as a term of regular English usage, and courts have so noted."); *Nat'l Bank of California v. Progressive Cas. Ins. Co.*, 938 F. Supp. 2d 919, 931 (C.D. Cal. 2013) (observing that the phrase is intended "to maximally expand the enumerated categories of acts" when used in an exclusion).

The other phrase, "*arising directly or indirectly out of*," is also quite broad and "encompasses almost any causal connection or relationship." *Citizens Ins. Co. of Am. v. Banyan Tree Mgmt., LLC*, 631 F. Supp. 3d 1256, 1272–73 (N.D. Ga. 2022), *aff'd*, No. 22-13581, 2023 WL 6319224 (11th Cir. Sept. 28, 2023) (quoting *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 696 S.E.2d 326, 331 (Ga. Ct. App. 2010)).

Similarly, the last lead-in phrase, "*related to*," means "[c]onnected in some way; having relationship to or with something else." *Prelutsky v. Greater Georgia Life Ins. Co.*, 692 F. App'x 969, 973 n. 6 (11th Cir. 2017).

Here, the Underlying Complaint alleges Venetian breached its statutory duty of habitability under O.C.G.A. § 44-7-13, and that it failed to keep the Premises in a safe condition under O.C.G.A. § 51-3-1. Venetian allegedly violated both statutes by "not hav[ing] proper fire detection and fire suppression equipment, required by applicable codes and regulations." [Underlying Complaint, Dkt. No. 1-5, at 1.] *See Carey v. Bradford*, 461 S.E.2d 290, 291 (Ga. Ct. App. 1995) (observing that the two statutes are not mutually exclusive where a party was sued as a landlord for breaching the "statutory duty to keep premises in repair [under OCGA § 44–7–13]" and for failing "to exercise ordinary care in keeping the premises and approaches safe" under OCGA § 51–3–1).

Similar exclusions have been routinely enforced in other jurisdictions. *See, e.g., 24th & Hoffman Invs., LLC v. Northfield Ins. Co.*, 82 Cal. App. 5th 825, 839 (2022),

*review denied* (Dec. 14, 2022) (habitability exclusion applied not only to the habitability claims, but also claims unrelated to habitability because of the exclusion's broad language); *Northfield Ins. Co. v. Hudani*, No. 220CV01695SBEX, 2021 WL 3556672, at *7 (C.D. Cal. Mar. 16, 2021) ("The habitability exclusion in the policy in this case plainly excludes claims against the insured for failing to maintain a premise in a habitable condition and to other claims asserted in a lawsuit alleging inhabitability."); *Riverport Ins. Co. v. Oakland Cmty. Hous.*, C 08-3883 VRW, 2009 WL 2058239, at *1 (N.D. Cal. July 13, 2009) (habitability exclusion barred coverage for alleged breach of warranty of habitability, negligent maintenance, intentional infliction of emotional distress, intentional nuisance, violation of statutory duty, and conversion); *Burlington Ins. Co. v. Affordable Hous. Alternatives, Inc.*, 2:14-CV-00733-ABC, 2014 WL 3611644, at *2 (CD. Cal. July 11, 2014) (habitability exclusion applied to "claims concerning the actual or alleged failure … to keep any portion of the insured premises in a habitable or tenantable condition.").

Because of the broad lead-in language, the Failure to Maintain Exclusion applies so long as there is any allegation Venetian failed to maintain the Premises in a safe and habitable condition. Kinsale does not have a duty to defend because that is the entire basis for the Underlying Lawsuit by the Estate against Venetian.

*See Penn-Am. Ins. Co.*, 490 S.E.2d at 565. Kinsale is entitled to final summary judgment.[2]

## II.  THERE IS NO DUTY TO DEFEND UNDER THE ASSAULT AND BATTERY EXCLUSION.

The Assault and Battery Exclusion broadly excludes coverage for "'bodily injury[]' … arising out of, related to, or, in any way involving any actual or alleged assault, battery, harmful or offensive contact, or threat, whether provoked or unprovoked … regardless of fault or intent and regardless of the particular cause of action." [Policy, Dkt. No. 1-6, at 40.] Like the Failure to Maintain Exclusion, the Assault and battery Exclusion includes the same lead-in language: "*arising out of, related to, or, in any way involving*." The exclusion applies so long as there is the slightest or more remote connection to excluded conduct.

Wheeler has pled guilty to arson and voluntary manslaughter for killing Hughes. The Venetian and Hughes do not (and cannot) argue against this undisputed fact.

### A.    Similar Assault And Battery Exclusions Are Routinely Enforced.

Under Georgia law, courts routinely enforce assault and battery exclusions. *See, e.g., First Specialty Ins. Corp., Inc. v. Flowers*, 644 S.E.2d 453, 455 (Ga. Ct. App.

---

[2] The defenses raised by Kinsale are independently dispositive. If the Court agrees with Kinsale on any one defense, it need not address the others. Conversely, for Venetian and the Estate to prevail, they must defeat all of Kinsale's defenses.

2007) (applying an assault and battery exclusion to a lawsuit alleging the insured apartment complex "failed to take reasonable steps to keep the … premises safe" from a shooting); *Eady v. Capitol Indem. Corp.*, 502 S.E.2d 514, 516 (Ga. Ct. App. 1998) (applying exclusion to a lawsuit alleging the insured bar was liable for injuries from a shooting because the insured allegedly failed to keep the premises safe); *Boomer's, Inc. v. Whitney*, 486 S.E.2d 59, 60-61 (Ga. Ct. App. 1997) (similar); *Dynamic Cleaning Serv., Inc. v. First Fin. Ins. Co.*, 430 S.E.2d 33, 34-35 (1993) (Ga. Ct. App. 1993) (similar); *Capitol Indem., Inc. v. Brown*, 581 S.E.2d 339, 342-43 (Ga. Ct. App. 2003) (similar); *Nautilus Ins. Co. v. EJIII Dev. Co.*, No. 1:17-CV-2048-TCB, 2018 WL 3524639, at *3 (N.D. Ga. July 19, 2018) (similar).

Whether an assault and battery exclusion applies to arson is a matter of first impression in Georgia, but other jurisdictions have clearly held it applies. *See Mount Vernon Fire Ins. v. Oxnard Hosp. Enter., Inc.*, 219 Cal. App. 4th 876 (2013).

In *Mount Vernon Fire Ins. Corp.*, the insurer argued an assault and battery exclusion barred coverage for the claimant's allegations that she was injured when "a third party threw a glass full of a flammable liquid on her and set her on fire[.]" *Id*. at 878. In pertinent part, the exclusion defined a "battery" as "physical contact with another without consent." *Id*. Based on this definition, the insured argued that "direct 'body-to-body' contact" was required to trigger the exclusion. The

court disagreed because setting someone on fire necessarily included unwanted "striking or touching." *Id.*

**B. Wheeler's Guilty Plea And Venetian's Admissions Establish The Fire Was Caused By Criminal Arson.**

Hughes and Venetian attempt to avoid the Assault and Battery Exclusion by arguing the Underlying Complaint is silent; that is, despite the fact that she is sitting in prison for her crimes, that the pleading does not allege how the fire started, much less mention anything about Wheeler. Despite their attempts to obfuscate, the following facts are undisputed:

- On March 18, 2017, Wheeler was arrested for murder and arson in connection with the fire. [Kinsale Complaint, Dkt. No. 1, at 4; Venetian Answer to Kinsale's Complaint, Dkt. No. 12, at 8; Hughes Answer to Kinsale Complaint, Dkt. No. 24, at 7.]

- On July 14, 2017, the State of Georgia filed a criminal indictment against Wheeler for murder, felony murder, and four counts of arson. [Indictment, Dkt. No. 1-2; Kinsale Complaint, Dkt. No. 1, at 4; Venetian Answer to Kinsale Complaint, Dkt. No. 12, at 8; Hughes Answer to Kinsale Complaint, Dkt. No. 24, at 7.]

- On March 31, 2021, Wheeler pled guilty to voluntary manslaughter under O.C.G.A. § 16-5-2, as a lesser included offense of the murder charge against her, and four counts of arson under O.C.G.A. § 16-7-60. [Guilty Plea Final Disposition Form in Criminal Action, Dkt. No. 81-6; Kinsale Complaint, Dkt. No. 1, at 4-5; Venetian Answer to Kinsale Complaint, Dkt. No. 12, at 8; Hughes Answer to Kinsale Complaint, Dkt. No. 24, at 8.]

- As part of her guilty plea, Wheeler is required to serve a total of 25 Years in prison, with the first 20 Years in confinement and the remainder to be served on probation. [Guilty Plea Final Disposition Form in Criminal Action, Dkt. No. 81-6.]

- As a special condition of probation, Wheeler was also ordered to successfully complete an arson program. [Guilty Plea Final Disposition Form in Criminal Action, Dkt. No. 81-6.]

- During the guilty plea proceeding, the court specifically found "there to be a factual basis for the plea in each of these indictments[.]" [Transcript of Wheeler Guilty Plea Proceeding, Dkt. No. 81-6, at 23:19-23.][3]

- On March 12, 2019, the Estate filed the Underlying Lawsuit against Venetian and John Maughan over the same fire that Wheeler confessed to starting intentionally.

- After her guilty plea, Wheeler testified in the Underlying Lawsuit that she intentionally started the fire. [Transcript of Wheeler Guilty Plea Proceeding, Dkt. No. 81-7, at 23:19-23.]

- In the Underlying Lawsuit, Venetian's principal defense has always been that Venetian is not responsible for the fire because it was intentionally started by Wheeler. [Transcript of Maughan Deposition in Underlying Lawsuit on December 18, 2019, Dkt. No. 81-1, at 20:15-17;[4] Venetian Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-9, at 5, 8, 10, 11; Venetian Supplemental Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-10; at 6; Maughan Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-11; at 5, 8, 10, 11; Maughan Supplemental Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-12; at 6; Venetian Response to First Request for Admissions in Underlying Lawsuit, Dkt. No. 81-13, at 5.]

- One of Venetian's principal defenses in the Underlying Lawsuit is that the jury should be permitted to apportion fault to Wheeler as a non-party because she intentionally started the fire. [Venetian Notice of Intent to Apportion Damages to Wheeler in the Underlying Lawsuit, Dkt. No. 81-14,

---

[3] Pursuant to the Court's Standing Order Regarding Civil Litigation, any pages of the "Transcript of Wheeler Guilty Plea Proceeding" cited in this brief are attached as Exhibit "1."

[4] Pursuant to the Court's Standing Order Regarding Civil Litigation, any pages of the "Transcript of Maughan Deposition in Underlying Lawsuit on December 18, 2019" cited in this brief are attached as Exhibit "2."

at 1-2; Venetian Motion for Apportionment Ruling in the Underlying Lawsuit, Dkt. No. 81-15; Venetian Renewed Motion to Allow Apportionment Against Wheeler in the Underlying Lawsuit, Dkt. No. 81-16.]

- In the instant action, Venetian similarly testified that Wheeler intentionally started the fire. [Transcript of Venetian Deposition in the Instant Action on September 18, 2023, Dkt. No. 81-3, at 13:4-13, 13:21-14:3.][5]

Wheeler pled guilty to voluntary manslaughter under O.C.G.A. § 16-5-2, which provides: "A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]"

In turn, the four arson convictions are governed by O.C.G.A. § 16-7-60, which provides:

A person commits the offense of arson in the first degree when, by means of fire or explosive, he or she knowingly damages or knowingly causes, aids, abets, advises, encourages, hires, counsels, or procures another to damage:

(1)     Any dwelling house of another without his or her consent or in which another has a security interest, including but not limited to a mortgage, a lien, or a conveyance to secure debt, without the consent of both, whether it is occupied, unoccupied, or vacant;

---

[5] Pursuant to the Court's Standing Order Regarding Civil Litigation, any pages of the "Transcript of Venetian Deposition in the Instant Action" cited in this brief are attached as Exhibit "3."

(2)     Any building, vehicle, railroad car, watercraft, or other structure of another without his or her consent or in which another has a security interest, including but not limited to a mortgage, a lien, or a conveyance to secure debt, without the consent of both, if such structure is designed for use as a dwelling, whether it is occupied, unoccupied, or vacant; …

(5)     Any building, vehicle, railroad car, watercraft, aircraft, or other structure under such circumstances that it is reasonably foreseeable that human life might be endangered.

Wheeler's guilty plea constitutes an admission that she committed the underlying crimes of voluntary manslaughter and arson, which can be considered by the Court. *See Harden v. State Farm Fire & Cas. Co.*, 605 S.E.2d 37, 38-39 (Ga. Ct. App. 2004) (finding State Farm had no duty to defend or to indemnify under an intentional acts exclusion based on evidence of an insured's entry of an *Alford* plea[6] to a charge of child molestation); *Fuller v. Mercury Ins. Co. of Georgia*, No. 1:13-CV-1914-TWT, 2017 WL 395693, at *2 (N.D. Ga. Jan. 30, 2017), *aff'd*, 708 F. App'x 637 (11th Cir. 2018) (holding an insured's guilty plea in a separate criminal action was prima facie evidence of excluded conduct in coverage litigation because: "Georgia courts and the Eleventh Circuit have been abundantly clear.").

---

[6] An *Alford* plea "is one of guilt [under a claim of innocence] and may be accepted only if the court determines there is a factual basis for a determination of guilt." *Argot v. State*, 583 S.E.2d 246, 248-49 (Ga. Ct. App. 2003). "[T]he collateral consequences flowing from an Alford plea are the same as those flowing from an ordinary plea of guilt." *Id.* at 248.

An *Alford* plea is the same as a guilty plea, and can be used as evidence in subsequent civil proceedings. … As long as the plea was voluntary and had a sufficient factual basis, "the collateral consequences flowing from an Alford plea are the same as those flowing from an ordinary plea of guilt."); *Centennial Ins. Co. v. Johnson*, No. 1:07-CV-1885-MHS, 2008 WL 11336791, at *5 (N.D. Ga. Oct. 28, 2008) ("[T]he Court agrees with plaintiff that evidence of Johnny Johnson's guilty plea for battery in the State Court of Cobb County is admissible for the purpose of adjudicating a motion for summary judgment[.]"); *Merritt v. State Farm Fire & Cas. Co.*, 463 S.E.2d 42, 44-46 (Ga. Ct. App. 1995) (considering evidence of an insured's plea of guilty but mentally ill to one count of murder as *prima facie* evidence that the insured's actions fell within an exclusion to coverage for willful and malicious acts); *Trustgard Ins. Co. v. Herndon*, 790 S.E.2d 115, 119 (Ga. Ct. App. 2016) (considering an insured's guilty plea to a shooting in concluding that an insurer did not owe coverage under an intentional acts exclusion); *State Farm Fire & Cas. Co. v. Moss*, 441 S.E.2d 809, 810-11 (Ga. Ct. App. 1994) (same for guilty plea to aggravated assault charge); *Woods v. Allied Van Lines, Inc.*, 730 S.E.2d 35, 37 (Ga. Ct. App. 2012) (admitting the guilty plea of a non-party as an admission against interest). *See also Scottsdale Ins. Co. v. GWF Phillips Lodge No. 691*, No. 1:08-CV-94 (WLS), 2009 WL 10673435, at *4 (M.D. Ga. Sept. 30, 2009) (entering summary judgment for insurer on the duty to defend because an uninsured assailant "was

found guilty by a Georgia court of assault and battery"); *Blohm v. Comm'r*, 994 F.2d 1542, 1554 (11th Cir.1993) (concluding the defendant's conviction for tax evasion based on an *Alford* plea collaterally estopped the defendant from denying tax liability). Accordingly, in the instant case, Wheeler's guilty plea is admissible evidence establishing that the fire was an excluded act of arson.

The decision in *Harden* dealt with an *Alford* plea. 605 S.E.2d at 38. State Farm argued it did not have a duty to defend a claim involving sexual molestation against a husband or a claim for negligent supervision against the husband's wife. *Id*. at 37-38. State Farm relied on an exclusion for injuries that were expected or intended. *Id*. at 38. State Farm argued the exclusion applied to the wife because the negligent supervision claims against her were derivative of the claim against the husband. *Id*. at 39.

The court entered summary judgment for State Farm by finding it did not have a duty to defend the husband or the wife. In the process, the court relied heavily on the *Alford* plea. *Id*. at 38-39. The court observed:

> it is undisputed that the alleged facts provided the basis for a guilty plea entered by Ronald Harden to the criminal charge of child molestation. … Harden's guilty plea under *Alford* placed him in the same position as if he had been convicted of child molestation, and "the collateral consequences flowing from an *Alford* plea are the same as those flowing from an ordinary plea of guilt." Accordingly, evidence that Ronald Harden entered an *Alford* plea of guilt to child molestation was sufficient to establish a prima facie case that State Farm had no duty under the terms of the policy to provide coverage or a defense to Mr. Harden.

*Id.* at 38.

The court also held that State Farm did not have a duty to defend the wife because the negligent supervision claim against her "was necessarily 'the result of' Ronald Harden's alleged acts of sexual abuse, because there would be no claim against Beverly Harden but for Ronald Harden's alleged acts." *Id.* at 39.

Even beyond Wheeler's criminal conviction, Venetian is bound by its admissions that the fire was an act of arson by Wheeler. "Judicial admissions are 'formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'" *Langdale Co. v. Nat'l Union Fire Ins. Co.*, 110 F. Supp. 3d 1285, 1293–94 (N.D. Ga. 2014), *aff'd*, 609 F. App'x 578 (11th Cir. 2015) (quoting *In re Malia*, No. 09–42273, 2012 WL 909738, *2 (Bankr. N.D. Ga. Feb. 8, 2012). Judicial admissions are "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller v. U.S.*, 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995). Judicial admissions must be clear, deliberate, and unequivocal factual assertions—whether made in pleadings, stipulations, responses to discovery, or orally in trial or court proceedings. *In re Jones*, 197 B.R. 949, 956 (Bankr. M.D. Ga. 1996). *See also James River Ins. Co. v. Fortress Sys.*, 899 F. Supp. 2d 1331, 1334 (S.D. Fla. 2012) (applying judicial estoppel against a purported insured for taking one position in the underlying action and another position in the ensuing coverage action).

Venetian has always maintained that it is not responsible because the fire was intentionally started by Wheeler. [Transcript of Maughan Deposition in Underlying Lawsuit on December 18, 2019, Dkt. No. 81-1, at 20:5-17;[7] Venetian Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-9, at 5, 8, 10, 11; Venetian Supplemental Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-10; at 6; Maughan Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-11; at 5, 8, 10, 11; Maughan Supplemental Response to First Set of Interrogatories in Underlying Lawsuit, Dkt. No. 81-12; at 6; Venetian Response to First Request for Admissions in Underlying Lawsuit, Dkt. No. 81-13, at 5.]

Indeed, one of Venetian's principal defenses is that the jury should be permitted to apportion fault to Wheeler as a non-party because she intentionally started the fire. [Venetian Notice of Intent to Apportion Damages to Wheeler in the Underlying Lawsuit, Dkt. No. 81-14, at 1-2; Venetian Motion for Apportionment Ruling in the Underlying Lawsuit, Dkt. No. 81-15; Venetian Renewed Motion to Allow Apportionment Against Wheeler in the Underlying Lawsuit, Dkt. No. 81-16.] Venetian has similarly testified that Wheeler intentionally started the fire in the instant action. [Transcript of Venetian

---

[7] Pursuant to the Court's Standing Order Regarding Civil Litigation, any pages of the "Transcript of Maughan Deposition in Underlying Lawsuit on December 18, 2019" cited in this brief are attached as Exhibit "2."

Deposition in the Instant Action on September 18, 2023, Dkt. No. 81-3, at 13:4-13, 13:21-14:3; *see also* Exhibit 3.]

During its deposition in this action, Venetian conceded it should have admitted Wheeler intentionally started the fire in its answer to Kinsale's complaint. [Transcript of Venetian Deposition in the Instant Action on September 18, 2023, Dkt. No. 81-3, at 13:4-13, 13:21-14:3; 17:9-18:25; *see also* Exhibit 3.] This case could have been resolved years ago if Venetian simply responded truthfully to Kinsale's Complaint.

Venetian should not be rewarded for violating its pleading obligations. *See* Fed. R. Civ. P. 11(b)(4) (requiring litigations and their attorneys to ensure "denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.").

Venetian's judicial admissions are binding and establish the Assault and Battery Exclusion applies.

### C. Hughes and Venetian's Defenses Lack Merit.

#### i. The Assault and Battery Exclusion does not require that Venetian itself committed the excluded act.

The Assault and Battery Exclusion applies if there is even the slightest connection to excluded conduct, and "regardless of fault or intent and regardless of the particular cause of action" or " whether caused by, or at the instigation, instruction, direction or due to the negligence of the insured, the insured's

employees, agents, patrons, customers or any other person arising from any causes whatsoever[.]" Venetian and Hughes argue the policy language should be ignored and instead construed as requiring an insured to commit an excluded act. But, courts routinely reject similar arguments under Georgia law. *See, e.g., Brown*, 581 S.E.2d at 342-43 (Ga. Ct. App. 2003); *Dynamic Cleaning Serv., Inc.*, 430 S.E.2d at 34-35; *Flowers*, 644 S.E.2d at 455; *Boomer's, Inc. v. Whitney*, 486 S.E.2d 59, 60-61 (Ga. Ct. App. 1997); *Capitol Indem. Corp. v. L. Carter Post 4472 Veterans of Foreign Wars, Inc.*, 484 S.E.2d 52, 54 (Ga. Ct. App. 1997).

*Flowers,* 644 S.E.2d, dealt with a similar exclusion. The court reviewed the language of the exclusion and observed that "[i]nclusion of the phrase 'whether or not' is significant and makes clear that the exclusion is intended to apply to all instances of assault and battery occurring on the Lakewood premises." *Id.* at 456. The court held that, "[b]y its clear terms, the assault and battery exclusion at issue here applies to any claim or suit for bodily injury or death arising out of an assault and battery committed on the Lakewood premises, *regardless of who committed the assault and battery.*" *Id.* at 455.

Stated simply, the Assault and Battery Exclusion applies regardless of who committed the excluded act.

ii. <u>The Assault and Battery Exclusion unambiguously applies to arson</u>.

Hughes and Venetian have argued the Assault and Battery Exclusion is ambiguous because the average person would not read the exclusion as encompassing arson and voluntary manslaughter. That argument is belied by the plain language of the exclusion, which applies to any "harmful or offensive contact, or threat." [Policy, Dkt. No. 1-6, at 40.] Moreover, the exclusion applies whenever "'bodily injury' … arises out of a chain of events that includes assault, battery, harmful or offensive conduct, or threat regardless of whether the assault, battery, harmful or offensive contact, or threat is the initial precipitating event or is in any way a cause of the 'bodily injury'[.]" [Policy, Dkt. No. 1-6, at 40.] In other words, the Assault and Battery Exclusion applies so long as there is "harmful or offensive contact."

Being burned to death in an attack of arson clearly constitutes a harmful or offensive contact. Under the defendants' logic, an assault or battery exclusion would not apply to shooting claims because both arson and a shooting involve an act (pulling a trigger or starting a fire) done at a distance that travels and ultimately makes harmful or offensive contact (bullet or fire) with a victim. The defendants' interpretation of the Assault and Battery Exclusion ignores the policy language and an overwhelming number of decisions applying similar exclusions to shootings under Georgia law. *See, e.g., Flowers*, 644 S.E.2d at 455 (applying an

assault and battery exclusion to a shooting); *Eady*, 502 S.E.2d at 516 (same); *Boomer's, Inc.*, 486 S.E.2d at 60-61 (same); *Brown*, 581 S.E.2d at 342-43 (same); *EJIII Dev. Co.*, No. 2018 WL 3524639, at *3 (same).

Venetian voluntarily purchased consecutive insurance policies with assault and battery exclusions. [*See* Renewal Policy, Dkt. No. 81-19, at 41, 52.] Venetian cannot credibly argue that arson and voluntary arson are covered in spite of a sweeping Assault and Battery Exclusion.

## CONCLUSION

The Failure to Maintain Exclusion applies because the Underlying Complaint contains allegations Venetian failed to maintain the Premises in a safe and habitable condition, and the Assault and Battery Exclusion applies because it is undisputed Wheeler started the fire through arson that resulted in the death of Hughes. Kinsale is entitled to enforce the terms of the policy that Venetian voluntarily purchased and paid for. Kinsale requests an order that Kinsale does not have a duty defend.

Respectfully submitted,

/s/ ANDRES CORDOVA
Andres Cordova
Florida Bar No. 0118147
andres.cordova@clydeco.us
*Admitted Pro Hac Vice*

CLYDE & CO US LLP
1221 Brickell Avenue, Suite 1600

Miami, Florida 33131
Telephone: (305) 446-2646
Fax: (305) 441-2374
*Counsel for Plaintiff*

/s/ ERIC P. BENEDICT
Eric P. Benedict
Georgia Bar No. 890708
Eric.Benedict@clydeco.us
*Local Counsel*

CLYDE & CO US LLP
271 17th Street NW
Suite 1720
Atlanta, GA 30363
Telephone: (404) 410-3178
*Counsel for Plaintiff*

## LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE

I hereby certify that the foregoing complies with the font and point selections approved by the Court in Local Rule 5.1(B). It is prepared in Book Antiqua, 13-point font.

/s/ANDRES CORDOVA
ANDRES CORDOVA

## CERTIFICATE OF SERVICE

I CERTIFY that on October 11, 2023, this document was filed via the CM/ECF system. I further certify I am unaware of any non-CM/ECF participants.

/s/ANDRES CORDOVA
ANDRES CORDOVA

# EXHIBIT
# 1

1           MR. SCHARDT:  MS. WHEELER -- AND WE DISCUSSED
2       THIS -- I THINK THE HUGHES FAMILY WOULD LIKE TO KNOW
3       IF GEORGE HUGHES WAS THE INTENDED VICTIM OR INTENDED
4       TARGET OF WHAT OCCURRED THAT DAY AND OF YOU LIGHTING
5       A FIRE?
6           THE DEFENDANT:  NO.
7           MR. SCHARDT:  OKAY.  DID YOU KNOW THAT
8       MR. HUGHES WAS EVEN IN THE UNIT THAT DAY?
9           THE DEFENDANT:  NO.
10          MR. SCHARDT:  OKAY.  DID YOU INTEND TO HARM
11      ANYONE?
12          THE DEFENDANT:  NO, SIR.
13          THE COURT:  ALL RIGHT.  THANK YOU.  MS. WHEELER,
14      IS THERE ANYTHING ELSE YOU WANT TO SAY TO THE COURT
15      OR TO THE VICTIM'S FAMILY?
16          THE DEFENDANT:  I WOULD LIKE TO APOLOGIZE TO
17      THEM, TO THE CHILDREN.  I DIDN'T MEAN TO HURT
18      ANYBODY.  I'M SORRY.
19          THE COURT:  THANK YOU.  I FIND THERE TO BE A
20      FACTUAL BASIS FOR THE PLEA IN EACH OF THESE
21      INDICTMENTS, AND I WILL ACCEPT THE PLEA IN EACH CASE
22      AS KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY
23      ENTERED.
24          I DON'T HAVE A BREAKDOWN, MR. DAILEY, OF WHAT
25      THE SENTENCE IS FOR EACH COUNT THAT'S BEEN

# EXHIBIT

# 2

1    don't know the circumstances, all the

2    circumstances, but to the best of my knowledge.

3        **Q**    Did Venetian Hills do any investigation

4    with respect to the source of the fire?

5        **A**    Subsequent to the fire?

6        **Q**    Yes, sir.

7        **A**    We provided the police with the video of

8    the arsonist leaving the property and gave them

9    whatever information they requested.

10       **Q**    Do you know what information you gave the

11   police?

12       **A**    I have no idea.

13       **Q**    Did Venetian Hills try to figure out what

14   went wrong?

15       **A**    Did Venetian Hills try to figure out what

16   went wrong?  Seemed to be pretty obvious that an

17   arsonist set the fire in the apartment.

18       **Q**    So that's not responsive to my question.

19   I'm going to move to strike it.  My question is:

20   Did Venetian Hills do anything to investigate what

21   went wrong in this case?

22       **A**    Only in relation to our communicating with

23   the authorities.  Certainly I'm not going to

24   duplicate their efforts.  And I don't believe --

25   you know, I'm not the manager of the place -- that

# EXHIBIT

# 3

1          privilege, Venetian Hills had smoke detectors in the

2          stairwell.  We believe that that was sufficient.

3   BY MR. CORDOVA

4          Q    Okay.  Now, in the underlying lawsuit, there's been a

5   lot of discussion and we have a motions practice regarding a

6   nonparty Kamara Wheeler, do -- do you know or are you aware of

7   that individual?

8          A    I'm aware that she was charged with starting the

9   fire, yes.

10         Q    Okay.  And is Venetian Hills' position in the

11  underlying lawsuit that she did start the fire?

12         A    That's my understanding is that she did start the

13  fire, yes.

14         Q    Okay.  Do you know if Venetian is arguing in the

15  underlying lawsuit that she started the fire, perhaps to say

16  that Venetian actually wasn't negligent and she was the

17  proximate cause of the damage or what's your understanding?

18              MR. MOFFET:  Objection to the form of the question,

19         foundation, attorney-client privilege.

20  BY MR. CORDOVA

21         Q    So do you know if Venetian Hills is arguing, in the

22  underlying action, that Kamara Wheeler started the fire?

23         A    Mr. Grantham is defending us in that action.  We're

24  just relying on him to make the arguments that he's going to

25  make.  We do know that she did start the fire.  We think she

1  caused Mr. Hughes' death.  I cannot speak to Mr. Grantham on

2  what he's going to argue.  We haven't done the trial prep yet,

3  but those are my -- that's my understanding of the facts.

4      Q    Okay.  To your knowledge -- well, let me ask you

5  this:  Were you involved with the drafting of Venetian's

6  discovery responses in the underlying lawsuit?

7      A    Mr. Grantham drafted those.  I assisted in gathering

8  the documents that were responsive to the request assisting Mr.

9  Maughan in doing that.  I didn't pull documents myself out of

10 files.  I assisted Mr. Maughan and complied with discovery

11 requests.

12     Q    Okay.  Now, do you recall if you specifically

13 assisted with Venetian's responses to Hughes' requests for

14 admission in the underlying case?

15     A    I do not.  My recollection is that Mr. Grantham

16 communicated directly with Mr. Maughan on that.

17     Q    Okay.  But did you review -- did you review those

18 responses and prepare to testify about those responses today?

19     A    I have reviewed them, yes.  I'll need to look at them

20 before I testify about them, but yeah, I reviewed them.

21     Q    Okay.  Give me one moment here.  Okay.  So would you

22 happen to have a copy of those responses or do you need me to

23 share my screen?

24     A    I do not think I brought those.  Yeah, share your

25 screen if you can on that.

1    allegation and the response there?

2        A    I see the response.

3        Q    Okay.  If you could also pull up the complaint, I

4    suppose, to cross-reference.  And I'll go ahead and have

5    Venetian's answer in this case marked as Exhibit 4 for the

6    record.

7        (Plaintiff's Exhibit No. 4 marked for identification.)

8        A    All right.  I've reviewed it.

9        Q    Okay.  So the response -- well, first of all, the

10   allegation in Paragraph 9 was -- that allegation is, quote, on

11   March 15th, 2017, Wheeler committed arson by setting the fire

12   at the Venetian Hills Apartments.  Could you please -- could

13   you please read the response to that allegation and the answer?

14       A    Paragraph 9 of plaintiff's complaint asserts a legal

15   conclusion to which no response is required.  To the extent

16   that the paragraph -- should say nine -- is construed to a

17   certain factual or legal allegation, these defendants are

18   without sufficient knowledge or information to either admit or

19   deny the allegations contained in Paragraph 9 of plaintiff's

20   complaint.

21       Q    So regarding the factual allegations made in

22   Paragraph 9, the response was essentially that Venetian has

23   insufficient knowledge to admit or deny?

24       A    Yeah.

25       Q    Is that fair to say?

1        A    Yes.

2        Q    Okay.  Isn't that inconsistent with Venetian's

3    position in the underlying lawsuit that Wheeler started the

4    fire?

5              MR. MOFFET:  Objection to the form of the question,

6         foundation.

7              THE WITNESS:  It says what it says, but yeah, I read

8         it as legal speak.  I do the same thing when I file

9         answers where factual allegations that we think might be

10        true but haven't been fully proven or made, you know,

11        everything is fleshed out in the actual underlying

12        lawsuit.

13   BY MR. CORDOVA

14        Q    Correct.  But when you're answering a complaint,

15   don't you have -- well, let me rephrase.

16             So you're saying that Venetian was responding

17   tactically or strategically, but not actually based on fact in

18   that paragraph?  I'm trying to understand your response.

19             MR. MOFFET:  Objection to the form of the question.

20             THE WITNESS:  We relied on our attorney to draft the

21        answer.  We understand that Kamara Wheeler was arrested

22        and charged with arson.  I think at the time -- I don't

23        remember if she has entered her plea yet or not, she may

24        have, but respectively we just relied on our attorneys to

25        answer Number 9.